William CAPACCHIONE, Individually and on Behalf of Cristina Capacchione, a Minor, Plaintiff,

and

Michael P. Grant et al., Plaintiff–Intervenors,

v.

CHARLOTTE–MECKLENBURG SCHOOLS et al., Defendants.

James E. Swann et al., Plaintiffs,

v.

Charlotte–Mecklenburg Board of Education et al., Defendants.

Nos. 3:97–CV–482–P, 3:65–CV–1974–P.

United States District Court, W.D. North Carolina, Charlotte Division.

Sept. 9, 1999.

John O. Pollard, Kevin V. Parsons,
McGuire, Woods, Battle & Boothe, L.L.P.,

Charlotte, NC, William S. Helfand, Stephen A. Katsurinis, Magenheim, Bateman, Robinson, Wrotenbery & Helfan, P.L.L.C., Houston, TX, Lee Myers, Meyers & Hulse, Charlotte, NC, for William Capacchione.

Anita S. Hodgkiss, James E. Ferguson, Luke Largess, Ferguson, Stein, Wallas, Gresham & Sumter, P.A., Charlotte, NC, Adam Stein, Ferguson, Stein, Wallas, Adkins, Gresham & Sumter, Chapel Hill, NC, Elaine Jones, Norman J. Chachkin, Gloria J. Browne, NAACP Legal Defense & Educational Fund, Inc., New York City, for Swann Plaintiffs, intervenor–plaintiff.

James G. Middlebrooks, Irving M. Brenner, Smith, Helms, Mulliss & Moore, LLP, Charlotte, NC, Allen R. Snyder, Kevin J. Lanigan, Maree Sneed, Rose Marie L. Audette, Hogan & Hartson, L.L.P., Washington, DC, Leslie J. Winner, Charlotte–Mecklenburg Board of Education, Charlotte, NC, for Charlotte–Mecklenburg Schools, defendant.

A.Lee Parks, K.Lee Adams, Kirwan, Parks, Chesin & Miller, P.C., Atlanta, GA, Thomas J. Ashcraft, Charlotte, NC, for Michael P. Grant, intervenor–plaintiff.

## MEMORANDUM OF DECISION AND ORDER

ROBERT D. POTTER, Senior District Judge

## TABLE OF CONTENTS

INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 232

I. FACTUAL BACKGROUND AND PROCEDURAL HISTORY . . . . . . . . . . . . . . . . . . 232
 A. *Swann v. Charlotte–Mecklenburg Board of Education* . . . . . . . . . . . . . . . . . . . . . . . 232
 B. 1975–1998: *Swan* Inactive . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 236
 C. *Cavacchione v. Charlotte–Mecklenburg Schools / Swann* Reactivated . . . . . . . . . . 239

II. DISCUSSION AND ANALYSIS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 240
 A. The Constitutional Basis for Race Conscious Desegregation Orders . . . . . . . . . . . . 240
 B. Unitary Status . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 242
 1. Student Assignment . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 244
 a. The Standard for Compliance . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 244
 b. The Level of CMS's Compliance . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 246
 c. Desegregation and Demographic Trends . . . . . . . . . . . . . . . . . . . . . . . . . 249
 d. The Concerns of *Martin*: School Siting and Transportation Burdens . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 250
 e. The Historical Status of Imbalanced Schools . . . . . . . . . . . . . . . . . . . . . . 253
 f. Possibilities of Further Racial Balance . . . . . . . . . . . . . . . . . . . . . . . . . . 255
 2. Faculty Assignment . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 257
 3. Facilities and Resources . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 261
 4. Transportation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 267
 5. Staff Assignment . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 268
 6. Extracurricular Activities . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 268
 7. Ancillary Considerations . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 269
 a. Teacher Quality . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 270
 b. Student Achievement . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 272
 i. The Requirements of *Swann* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 272
 ii. CMS's Efforts to Close the Gap . . . . . . . . . . . . . . . . . . . . . . . . . . . . 273
 iii. Experts' Explanations of the Gap . . . . . . . . . . . . . . . . . . . . . . . . . . . 275
 c. Student Discipline . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 281
 8. Good Faith . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 282
 C. Constitutional Injuries . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 284
 1. Immunity under the *Swann* Orders . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 285
 2. The Magnet School Admissions Policy . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 287
 3. Nominal Damages . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 290
 D. Injunctive Relief . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 290
 E. Attorneys Fees . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 292

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 293

## INTRODUCTION

Three decades ago, this Court-and ultimately the United States Supreme Court-provided the constitutional imprimatur for ordering local school systems to bus children away from their neighborhood schools in order to remedy the past vestiges of unlawful segregation. See *Swann v. Charlotte–Mecklenburg Bd. of Educ.*, 402 U.S. 1, 91 S.Ct. 1267, 28 L.Ed.2d 554 (1971). The usurpation of a local school system's student assignment policies by a federal court was an extraordinary event. As the Supreme Court has observed: "No single tradition in public education is more deeply rooted than local control over the operation of schools." *Milliken v. Bradley*, 418 U.S. 717, 741, 94 S.Ct. 3112, 3125, 41 L.Ed.2d 1069 (1974) *("Milliken I")*. Nevertheless, this Court's exercise of its equity power was deemed necessary to eliminate the conditions and redress the injuries caused by the "dual school system." The injunction entered by this Court, like any temporary equitable remedy, eventually must reach an end. Today, this Court decides whether the Defendant Charlotte–Mecklenburg Schools ("CMS"[1]) has reached that end by creating a "unitary school system."

CMS takes a bizarre posture in this late phase of the case, arguing that it has not complied with the Court's orders. In 1965, when the *Swann* litigation began, CMS strongly resisted federal supervision, but, today, the school system is equally fervent in resisting the removal of. the desegregation order because it now wishes to use that order as a pretext to pursue race-conscious, diversity-enhancing policies in perpetuity. Consequently, CMS, the defendants, are now allied with the original class action plaintiffs who represent parents of black children in the district (the "Swarm Plaintiffs"[2]). A separate group of parents of children in the school system (collectively referred to as the "Plaintiff–Intervenors") seek an end to CMS's use of race-based policies.

After an extensive, two-month evidentiary trial, the Court is convinced that CMS, to the extent reasonably practicable, has complied with the thirty-year-old desegregation order in good faith; that racial imbalances existing in schools today are no longer vestiges of the dual system; and that it is unlikely that the school board will return to an intentionally-segregative system. For the reasons set forth below, the Court finds that CMS has achieved unitary status in all respects and therefore dissolves the desegregation order. The Court also finds that certain CMS student assignment practices went beyond constitutionally permissible bounds. Finally, to the extent that the continued use of certain race-based policies would violate the commands of the Equal Protection Clause absent a remedial purpose, such practices by CMS are hereinafter prohibited.

## I. FACTUAL BACKGROUND AND PROCEDURAL HISTORY

### A. *Swann v. Charlotte–Mecklenburg Board of Education*

In 1954, the Supreme Court announced that the doctrine of "separate but equal" was unconstitutional, thereby prohibiting state-sponsored racial separation in public schools. *Brown v. Board of Educ.*, 347

---

**1.** Although originally sued in the *Swann* case as "the Charlotte–Mecklenburg Board of Education," the school system is now commonly referred to as "Charlotte–Mecklenburg Schools" or "CMS." For simplicity, the Court will refer to the school system as "CMS" throughout the opinion.

**2.** Not surprisingly, the original plaintiffs in *Swann* no longer have children attending schools in the district. Therefore, after the Court reactivated *Swann*, counsel for the original Swann Plaintiffs substituted as class representatives Terry Belk and Dwayne Collins, both of whom have children in the CMS system. (Order of 9/16/98 at 2.) Walter Gregory also was named as a substituted party but lost standing after he moved his family out of the state. (Order of 2/22/99 at 2.)

U.S. 483, 74 S. Ct. 686, 98 L.Ed. 873 (1954) ("*Brown I*"). In a subsequent decision, the Supreme Court further mandated desegregation "with all deliberate speed." *Brown v. Board of Educ.*, 349 U.S. 294, 75 S.Ct. 753, 99 L.Ed. 1083 (1955) ("*Brown II*"). Despite the holdings of *Brown I* and *Brown II* many public school systems, particularly in the South, resisted taking any positive steps toward desegregation. *See generally* Geoffrey R. Stone et al., *Constitutional Law* 533 (3d ed. 1996); James R. Dunn, *Title VI. The Guidelines and School Desegregation in the South*, 53 Va. L. Rev. 42, 42 (1967). The Charlotte–Mecklenburg school district in North Carolina-where, prior to *Brown*, public schools had been segregated on the basis of race as a matter of state law and school board policy-was likewise slow to dismantle its dual school system. *See generally Swann v. Charlotte–Mecklenburg Bd. of Educ.*, 300 F.Supp. 1358 (W.D.N.C.1969) (detailing the history of segregation in Charlotte, North Carolina).

In 1965, the Swann Plaintiffs filed their complaint for injunctive relief in this Court, claiming that the policies and practices of the Charlotte–Mecklenburg Board of Education were perpetuating a segregated school system. On July 14, 1965, United States District Judge Braxton Craven, Jr., presiding over the case, approved a school board-proposed desegregation plan that closed certain all-black schools, built some new schools, established school zones based on neighborhoods, and allowed for students of any race to freely transfer to a school of his or her choice. *Swann v. Charlotte–Mecklenburg Bd. of Educ.*, 243 F.Supp. 667 (W.D.N.C.1965), *aff'd*, 369 F.2d 29 (1966).

"Freedom of choice" transfer plans were a common response to the mandate of *Brown*,[3] but such policies had little effect on dismantling the dual systems. Dunn, *supra*, at 44. Only a small number of black children transferred to predominately white schools, and predominately black schools remained all or predominately black. *Id.* The Supreme Court addressed this concern in *Green v. County School Bd.*, 391 U.S. 430, 88 S.Ct. 1689, 20 L.Ed.2d 716 (1968), holding that " 'freedom of choice' is not an end in itself;" rather, "it is only a means to a constitutionally required end." *Id.* at 440, 88 S. Ct. at 1695 (citation omitted). "If the means prove effective, it is acceptable, but if it fails to undo segregation, other means must be used to achieve this end." *Id.* Thus, *Green* established that a school system which had been enforcing *de jure* segregation at the time of *Brown* had an "affirmative duty" to desegregate, not merely an obligation to implement race-neutral policies. *Id.* at 437–38, 88 S. Ct. at 1694. *Green* also identified six areas of school operations that must be free from racial discrimination before the mandate of *Brown* is met: student assignment, faculty, staff, transportation, extracurricular activities, and facilities. *Id.*, at 435, 88 S. Ct. at 1693. These are commonly referred to as the "*Green* factors."

In 1968, the Swann Plaintiffs filed a motion for further relief, seeking greater speed in desegregation efforts in the spirit of *Green*. On April 23, 1969, following a six-day hearing, United States District Judge James B. McMillan, newly assigned to the case,[4] ruled that the plan based upon geographic zoning with a free-trans-

---

**3.** In fact, the use of freedom of choice was explicitly endorsed by the United States Department of Health, Education, and Welfare (HEW). U.S. Office of Education, HEW, General Statement of Policies Under Title VI of the Civil Rights Act of 1964 Respecting Desegregation of Elementary and Secondary Schools (April 1965); *see United States v. Jefferson County Bd. of Educ.*, 372 F.2d 836, 889 (5th Cir.1966).

**4.** Judge Craven was subsequently appointed to the United States Court of Appeals for the Fourth Circuit. *Swann v. Charlotte–Mecklenburg Bd. of Educ.*, 431 F.2d 135 (4th Cir.1970) (recusing himself in subsequent appellate review of Swann litigation).

fer provision had left the dual school system virtually intact. *Swann*, 300 F.Supp. at 1372. The Court also concluded, however, that no racial discrimination or inequality was found in the following areas:

> the use of federal finds; the use of mobile classrooms; quality of school buildings and facilities; athletics; PTA activities; school fees; free lunches; books; elective courses; [and] in individual evaluation of students.

*Id.* As to those areas where vestiges of discrimination were found to still exist-primarily, student and faculty assignment-the Court directed the school board to submit a more aggressive desegregation plan and outlined the preferred changes, including busing, re-zoning, and other methods. *Id.* at 1373. The Court was hesitant to mandate precise racial quotas, stating: "This court does not feel that it has the power to make such a specific order." *Id.* at 1371.

At first, the school board was slow to act on the Court's recommendations. *See Swann v. Charlotte–Mecklenburg Bd. of Educ.*, 300 F.Supp. 1381, 1382 (W.D.N.C. 1969) (noting the "foot-dragging" by the board). On August 15, 1969, the Court approved an interim plan that included programs for faculty desegregation and for closing seven all-black schools and assigning their pupils to outlying predominately white schools. *Swann v. Charlotte–Mecklenburg Bd. of Educ.*, 306 F.Supp. 1291, 1298–99 (W.D.N.C.1969). The Court noted that the plan represented substantial progress but expressed reservations that a disproportionate burden of desegregation was being placed on black children. *Id.* at 1298.

By November 1969, the Court reviewed the plan and determined that it had "not been carried out as advertised." *Swann v.*

*Charlotte–Mecklenburg Bd. of Educ.*, 306 F.Supp. 1299, 1302 (W.D.N.C.1969). The Court also disapproved of an amended plan because it suffered from the same defects in the previously-approved plan, i.e., it stated no definable desegregation goals and did not safeguard against resegregation. *Id.* at 1313. Concluding that the board had "shown no intention to comply by any particular time with the constitutional mandate to desegregate the schools," *id.* at 1306, the Court announced that it would designate a consultant to immediately prepare a desegregation plan. *Id.* at 1313–14.

On December 2, 1969, the Court appointed Dr. John A. Finger, Jr.,[5] to study the system and to recommend a desegregation plan. The school board also prepared a plan. On February 5, 1970, after two days of hearings, the Court adopted Dr. Finger's plan for elementary schools and the board's plan, as modified by Dr. Finger, for secondary schools (the "Finger Plan"). *Swann v. Charlotte–Mecklenburg Bd. of Educ.*, 311 F.Supp. 265, 268–70 (W.D.N.C.1970). The Court ordered immediate compliance with the Finger Plan, which was the only plan ever mandated by the Court. The plan required the following:

- Similar to the 1969 board-proposed plan, the assignment of faculty at each school had to approximate the same ratio of black and white faculty members throughout the system. *Id.* at 268.
- The overall competence of teachers at formerly black schools could not be inferior to those at formerly white schools. *Id.*
- Students had to be assigned "in such a way that as nearly as practicable the various schools at various grade levels have about the same proportion of black and white students." *Id.*

5. Dr. Finger, an expert in education administration from Providence, Rhode Island, had served as a witness for the Swarm Plaintiffs and thus had a familiarity with the case, The Fourth Circuit later cautioned that courts should avoid appointing a person who has appeared as a witness for one of the parties but determined that the error, if any, was harmless. *Swann v. Charlotte–Mecklenburg Bd. of Educ.*, 431 F.2d 138, 147–48 (4th Cir. 1970).

- "[N]o school [could] be operated with an all-black or predominately black student body." *Id.*
- In redrawing the school system's attendance zones, the Court authorized the use of bus transportation and noncontiguous "satellite zones" to accomplish its goals. *Id.*
- The student transfer policy was restricted in order to safeguard against any resegregation. *Id.* at 268–69.
- Finally, the board was required to monitor and report on its progress in implementing the plan. *Id.*

The school board appealed the ruling, and the Fourth Circuit affirmed the District Court as to faculty desegregation and the secondary school plans but vacated the order as to elementary schools, determining that the provisions for pairing and grouping[6] elementary schools imposed an undue burden on the board. *Swann v. Charlotte–Mecklenburg Bd. of Educ.*, 431 F.2d 138 (4th Cir.1970). The Fourth Circuit remanded the case for reconsideration and submission of additional plans. *Id.* The Supreme Court granted certiorari and reinstated the District Court's judgment pending further proceedings. *Swann v. Charlotte–Mecklenburg Bd. of Educ.*, 399 U.S. 926, 90 S.Ct. 2247, 26 L. Ed.2d 791 (1970). On remand, Judge McMillan conducted eight more days of hearings, and, after reviewing the various options, he concluded that the Finger Plan was not unreasonable. *Swann v. Charlotte–Mecklenburg Bd. of Educ.*, 318 F.Supp. 786, 788 (W.D.N.C.1970). Thus, the District Court again directed the board to implement the Finger Plan and also provided suggestions for successful implementation. *Id.* at 802–03.

In 1971, the Supreme Court reviewed the case to address the scope of authority of federal courts to enforce the mandates of *Brown* and *Green*, *Swann*, 402 U.S. 1, 91 S.Ct. 1267, 28 L.Ed.2d 554. Holding that district courts have broad equitable powers to fashion remedies to eliminate segregated public schools that were established and maintained by state action, the Supreme Court affirmed Judge McMillan's order. *Id.* at 15, 91 S.Ct. at 1276; *see id.*, at 15–16, 91 S. Ct. at 1276 ("[A] school desegregation case does not differ fundamentally from other cases involving the framing of equitable remedies to repair the denial of a constitutional right.").

Chief Justice Burger, writing for the unanimous court, stated that student assignment was the central issue involved in crafting desegregation orders, and he enunciated guidelines for four identified problems areas. *Id.* at 22, 91 S.Ct. at 1279.

1. With regard to racial balances or quotas, the limited use of mathematical ratios of white to black students is permissible "as a starting point" but not as "an inflexible requirement." *Id.* at 22–25, 91 S.Ct. at 1279–80.

2. The existence of "one-race, or virtually one-race, schools" does not necessarily mean that desegregation has not been accomplished, but such schools "in a district of mixed population" should receive close scrutiny to determine that assignments are not part of state-enforced segregation. *Id.* at 25–27, 91 S.Ct. at 1280–81.

3. The remedial altering of attendance zones, including the pairing and grouping of noncontiguous zones, is not, as "an interim corrective measure," beyond the remedial powers of a district court. *Id.* at 27–29, 91 S.Ct. at 1281–82.

4. The use of bus transportation to implement a remedial decree is permissible so long as "the time or distance of travel is [not] so great as to either risk the health of the children or significantly

---

**6.** The technique of grouping and pairing involved matching an outlying white school attendance area with an inner-city black school attendance area, transporting black students from grades one through three to the outlying school, and transporting white students from the fourth through sixth grades to the inner-city black school.

impinge on the educational process." *Id.* at 29–31, 91 S.Ct. at 1282–83.

With the affirmation of the Supreme Court, the District Court continued its supervision of the Charlotte–Mecklenburg school system but still encountered some difficulties. In the months following the Supreme Court decision, the Court had to make some adjustments and revisions to the desegregation plan and continued to express its dissatisfaction with the regressive and unstable nature and results of certain aspects of the plan. *See Swann v. Charlotte–Mecklenburg Bd. of Educ.,* 328 F.Supp. 1346 (W.D.N.C.1971); *Swann v. Charlotte–Mecklenburg Bd. of Educ.,* 334 F.Supp. 623 (W.D.N.C.1971). The Court kept a "hands off" approach during the 1971–72 and 1972–73 school years, in the hope that the board and its staff would undertake constructive remedial action. *Swann v. Charlotte–Mecklenburg Bd. of Educ.,* 362 F.Supp. 1223, 1230 (W.D.N.C. 1973). By June 19, 1973, the Court observed that "schools in most areas reached a condition of relative educational and racial stability" but again found signs of continuing discrimination. *Id.,* at 1230–37.

On July 30, 1974, the Court announced that the board was finally on its way to producing a unitary school system. *Swann v. Charlotte–Mecklenburg Bd. of Educ.,* 379 F.Supp. 1102, 1103 (W.D.N.C. 1974). The Court approved a new set of board-adopted guidelines and policies that marked "a clean break with the essentially 'reluctant' attitude which dominated Board actions for many years." *Id.* The Court stated: "If implemented according to their stated principles, they will produce a 'unitary' (whatever that is) school system." *Id.* The proposal—dubbed the "CAG Plan" because it was drafted by the Citizens Advisory Group-was intended to result in no school with a majority of minority students, with the exception of Hidden Valley Elementary School, which was exempted

due to its unique history and its location in a recently integrated neighborhood. *Id.* at 1104. The proposal also allowed for the creation of "optional schools" that would be "open to all county residents and have about or above 20% black students." *Id.* Furthermore, under the CAG Plan, the burdens of busing were more equally distributed between blacks and whites, and safeguards would be implemented to prevent adverse trends in racial make-ups of schools. *Id.*

The board successfully implemented the new guidelines and policies, and, on July 11, 1975, the Court closed Swann as an active matter of litigation and removed the case from the docket. *Swann v. Charlotte–Mecklenburg Bd. of Educ.,* 67 F.R.D. 648, 649 (W.D.N.C.1975). In this final order, which was referred to by Judge McMillan as the "Swann Song," the Court noted:

> The new Board has taken a more positive attitude toward desegregation and has at last openly supported affirmative action to cope with recurrent racial problems in pupil assignment. Though continuing problems remain, as hangovers from previous active discrimination, defendants are actively and intelligently addressing these problems without court intervention.

*Id.* The Court added that the case could be re-opened upon a proper showing that the orders were not being observed, although such action was not anticipated. *Id.*

**B. 1975–1998: *Swann* Inactive**

The *Swann* case remained inactive from 1975 until the present litigation. During this time, Mecklenburg County saw significant population growth and demographic change. The total population of Mecklenburg County has grown from 354,656 in 1970 to 613,310 in 1997. (PX 138 Table I (Clark Rpt.).)[7] According to 1998 census

---

7. Trial exhibits are cited throughout as "PX" for the Plaintiff–Intervenors' exhibits, "DX" for the Swann Plaintiffs' exhibits, and "DX"

for CMS's exhibits. Transcripts of the hearing held from April 19, 1999, through June

figures, Charlotte is the twenty-fifth largest city in America and ranks second in population growth in the 1990s among cities with more than 500,000 people. U.S. Census Bureau, Population Estimates for Cities with Populations of 100,000 and Greater (released June 30,1999) <http://www.census.gov/population/www/estimates/citypop.html>. The racial composition of the county has changed from 76% white and 24% black in 1970 to 68% white, 27% black, and 5% other in 1997. (PX 138 Table I (Clark Rpt.).) This "other" category, which has doubled since 1990, reflects the county's large gains in Asians and Hispanics. (*Id.* at 2.)

Similar to most large metropolitan areas, Charlotte has experienced an outward growth of its population from the inner city into the peripheral areas of the county.[8] (PX 138 Figs. 2–8 (Clark Rpt.).) The highest level of population growth in the county has been in the southern and southeastern regions and, to a lesser extent, in the northern outer region. *Id.*, Figs. 2–8. During this suburbanization trend, the inner city and nearby suburbs lost large numbers of white residents as they spread further out into communities along the major arteries extending from downtown. (*Id.*, at 6.) This growth has caused a great deal of traffic congestion and has required the building and expansion of several roads and highways, including the I–485 beltway.

Today, blacks are still more concentrated near the inner city, and whites have become highly concentrated in the outer peripheries. (PX 138 at 8, Fig. 8 (Clark Rpt.).) Nevertheless, there is a greater degree of residential integration in the county than there was thirty years ago. (*Id.* at 8, Table 3). As compared to the

nation's major metropolitan areas, Charlotte has become one of the most racially integrated cities in America. (*Id.* Table 4). This is generally due to the dispersion of blacks into the suburbs. (*Id.* at 7–8.) In fact, some of the middle suburban communities that were almost all white in 1970 are now predominately black. (*Id.*, at 8.)

The county's school system has experienced substantial growth and change as well. Of course, CMS was a large system at the beginning of the *Swann* litigation, as noted by the Supreme Court in 1971:

> The Charlotte–Mecklenburg school system, the 43d largest in the Nation, encompasses the city of Charlotte and surrounding Mecklenburg County, North Carolina. The area is large–550 square miles—spanning roughly 22 miles east-west and 36 miles north-south. During the 1968–1969 school year the system served more than 84,000 pupils in 107 schools. Approximately 71% of the pupils were found to be white and 29% Negro.

*Swann*, 402 U.S. at 6, 91 S.Ct. at 1271. Today, CMS has become the twenty-third largest school system in the nation. (Tr. % at 6 (Test. of Eric Smith).) In the 1998–99 school year, CMS served 98,542 pupils in 135 schools, including 85 elementary schools, 27 middle schools, 14 high schools, and 9 special schools. (DX 3 (CMS Enrollment Rpts.).) The current racial composition of schoolchildren in CMS is approximately 50% white, 42% black, and 8% other. (DX 215 (1998–99 CMS Facts).)

The growth in the school age population was relatively stable until the 1990s, at which time it experienced rapid yearly increases. (PX 138 4–5, Table I (Clark Rpt.).) Since about 1992, CMS has real-

---

22, 1999, are cited throughout by date, page, and witness.

8. The Court defines the "inner city" as the central area of the county, bounded by I–85 to the north, Billy Graham Parkway to the west, and Route 4 to the south and east. (DX 5 Attach. E (Foster Rpt.).) Surrounding the inner city is a doughnut-like "middle suburban" ring, with an approximately fifteen-mile diameter. (*Id.*). The Court refers to the remaining area of the county as the "outer area." (*Id.*)

ized 3% growth annually, which equates to roughly 3,000 additional students per year. (PX 139 at 3 (CMS Student Assignment Proposal for 1998–99).) While the black student population in CMS has grown steadily since 1970, the white student population declined sharply in the 1970s and continued to decrease in the 1980s before realizing modest increases in the 1990s. (*Id.*, at 4–5, Fig. 1). Between 1970 and 1990, the number of white students in CMS decreased by more than 15,000. (Id., at 2, Fig. 1.) In the 1990s, CMS has attracted a higher number of white students into the system, but there is still a large proportion who do not attend public schools. (*Id.* 5.) In the 1997–98 school year, the county's private and home school enrollment totaled 15,835. (PX 138 at 5 (Clark Rpt.) (citing statistics of the North Carolina Division of non-Public Education).) This represents a 14.2 percent rate of private school enrollment-almost double the national level. (*Id.*), By comparison, private school enrollment in the 1968–69 school year was only 2,150. (PX 26 (CMS Enrollment with Private School Data).)

When these demographic changes began occurring, CMS responded by modifying student assignments under the desegregation plan. In turn, on a couple occasions, the Court was called on to revisit the issues in *Swann.* First, in *Martin v. Charlotte–Mecklenburg Bd. of Educ.*, 475 F.Supp. 1318 (W.D.N.C.1979), a group of parents brought suit against the school board, seeking an order prohibiting the board from reassigning pupils during the 1978–79 school year pursuant to a provision in the 1974 CAG Plan. The parents relied on the Supreme Court's then-recent decisions in *Pasadena City Bd. of Educ. v. Spangler*, 427 U.S. 424, 96 S.Ct. 2697, 49 L.Ed.2d 599 (1976), and *Regents of the Univ. of Cal. v. Bakke*, 438 U.S. 265, 98 S.Ct. 2733, 57 L.Ed.2d 750 (1978), to argue that CMS could not assign students based on race.

The Court determined that *Pasadena* and Bakke were inapposite. *Martin,* 475 F.Supp. at 1321. In *Pasadena,* the Supreme Court prohibited a district court from requiring reassignment of students due to racial imbalance that was caused not by school board action but by demographic changes. 427 U.S. at 424, 96 S.Ct. at 2697. By contrast, in CMS, reassignment was not mandated by the Court but was voluntarily implemented by the board under a board-approved plan. *Martin,* 475 F.Supp. at 1322–23. In *Bakke,* the Supreme Court found unconstitutional a public university's practice of reserving 16 out of 100 admissions slots for racial minorities. 438 U.S. at 319–20, 98 S.Ct. at 2763. By contrast, in the Charlotte–Mecklenburg system, no slots were reserved for students by race; in fact, all students in the system were guaranteed admission into schools of equal quality. *Martin,* 475 F.Supp. at 1321. Hence, the Court found that no students were being denied "opportunities or benefits enjoyed by others solely because of [ ] race." *Id.* (quoting *Bakke,* 438 U.S. at 305, 98 S.Ct. at 2756). The Court further reiterated that although the *Swann* case had been closed, jurisdiction had not yet been relinquished, so remedial race-based measures were still permissible. *Id.* at 1341. The Court observed that the board and its staff were "aggressively attacking the problems" and were committed to integration but jurisdiction was still needed due to lingering effects from past active discrimination. *Id.* at 1341, 1343.

During *Swann's* inactivity, the only other action in this Court affecting the *Swann* case occurred in 1980, when CMS and the *Swann* Plaintiffs notified the Court that the black student population of elementary schools had grown from 29% in 1969 to 40% in 1980, making it increasingly difficult to avoid majority black elementary schools. (PX 113 (Mot. to Modify Orders).) The Court approved a proposed modification that permitted CMS to operate elementary schools with black student populations of "plus 15%" from the dis-

trict-wide average. *Swann v. Charlotte–Mecklenburg Bd. of Educ.*, No. 1974, slip op. at 2 (W.D.N.C. April 17, 1980) (unpublished order). Other than this modification, the *Swann* case lay dormant for almost a quarter of a century without either side petitioning for further relief and without any complaints of noncompliance.

In the meantime, CMS's student assignment process continued to operate under the desegregation plan approved by the Court, which focused primarily on pairing elementary schools, using satellite attendance zones, and operating a feeder plan to assign students from certain neighborhoods to certain secondary schools. (DX 108 at 2 (Stolee Plan).) CMS periodically reassigned students as demographics changed, the population grew, new schools were opened, and old schools were closed. (*Id.* at 3–4.) The greatest change in student assignment policy occurred in 1992, when CMS implemented a modified pupil assignment program that emphasized the use of "magnet" schools.[9] (DX 112 (CMS Student Assignment Plan: A New Generation of Excellence).) This change allowed CMS to phase out pairing, which had become increasingly unstable and unpopular. (DX 108 at 3–6 (Stolee Plan); Tr. 5/3 at 18–20, 22 (Test. of Jeffrey Schiller).) The plan also contemplated the increased use of "stand alone" and "mid-point" schools,[10] so that satellite zones could be phased out. (Tr. 5/3 at 21 (Test. of Jeffrey Schiller).)

Dr. Michael Stolee, the consultant who drafted the new assignment plan, recommended that CMS secure approval from the Court before making any changes. (DX 108 at 9 (Stolee Plan).). CMS never sought Court approval, however, and implemented the plan without any direct judicial supervision. CMS claims that it relied on the provision for "optional schools" in the *Swann* Order of July 30, 1974. 379 F.Supp. at 1104. CMS had operated a few open enrollment "optional" schools since 1973; yet, none of these schools offered the distinct curricula of the magnet programs started in the 1990s. (*See* DX 5 Attach. B, Table 5 (Foster Rpt.).) The race-based admissions policies of these new magnet schools became the impetus for the current litigation.

### C. *Capacchione v. Charlotte–Mecklenburg Schools/Swann* Reactivated

On September 5, 1997, William Capacchione filed a Complaint against CMS, claiming his daughter, Cristina, was unlawfully and unconstitutionally denied admission into a magnet school program due to a rigid racial enrollment quota. Cristina's racial identity is Hispanic and Caucasian, which CMS classifies as "non-black." The Complaint sought declaratory, injunctive, and compensatory relief under 42 U.S.C. §§ 1983 and 2000d.

On October 22, 1997, CMS moved for dismissal, asserting that the magnet school's race-based assignment policies were required under the Court's desegregation order in *Swann*. Almost simultaneously, counsel for the original Swann Plaintiffs moved to reactivate *Swann* and to consolidate it with the *Capacchione* litigation. The Swann Plaintiffs, like CMS, contended that past vestiges of the dual school system remained unremedied.

On March 6, 1998, the Court granted the *Swann* Plaintiffs' motions to restore

---

**9.** A magnet school is "a public elementary or secondary school ... that offers a special curriculum capable of attracting substantial numbers of students of different racial backgrounds." 20 U.S.C. § 7204 (1999). The special curricula offered in CMS's magnet program include communication arts, Montessori, advanced math and science, visual and performing arts, classical studies, international baccalaureate, global studies, work-place training, finance, medical sciences, and foreign languages. (PX 43 (CMS Magnet Options 1998–99).)

**10.** A stand alone school is located in a naturally integrated neighborhood with a contiguous attendance zone. (PX 6 at 5 (Tidwell Rpt.).) A mid-point school draws on students from black and white neighborhoods and is located halfway between such neighborhoods. (*id.*)

*Swann* to the active docket and to consolidate it with *Capacchione,* finding that the cases involved several common issues of law and fact. The Court denied CMS's motion to dismiss, finding that Capacchione had met his pleading burden and noting that the magnet school assignment plan had never been subject to judicial review.

On March 16, 1998, CMS filed an Answer to Capacchione's Complaint, again asserting that the magnet school program was instituted in an attempt to comply with the Court's orders. Capacchione filed an Amended Complaint, stating that the Court-ordered desegregation plan in *Swann* did not justify the discrimination in question because the school system had long-since achieved unitary status.

The Court permitted Capacchione to intervene in the *Swann* action on May 4,1998. On May 20, 1998, the Court granted another motion to intervene in the consolidated action by Michael P. Grant et al., a group of parents of students in the school system. Similar to Capacchione, these parents sought a finding that the school system had achieved unitary status as required by the Court's orders and urged an end to the school system's race-based policies.

In August 1998, Capacchione and his family moved to California. In deposition testimony, Capacchione stated that his family had no intent of moving back to Charlotte. (Capacchione Dep. Tr. at 122–23.) In light of these circumstances, on November 12, 1998, the Court granted in part and denied in part a Motion for Summary Judgment filed by CMS. The Court found that Capacchione no longer had standing to assert injunctive or declaratory relief but found that Capacchione still had standing to pursue compensatory relief.

During the trial, Capaechione and Grant et al. consolidated their cases. They are collectively referred to in court documents and exhibits as the "Plaintiff–Intervenors." Following the presentation of the Plaintiff–Intervenors' evidence, CMS and the *Swann* Plaintiffs both filed motions to dismiss the various claims of the Plaintiff–Intervenors. The Court reserved ruling on most of these arguments because they involved factually justiciable issues or they involved issues where an immediate ruling did not reduce significantly the remaining amount of testimony. (Order of 5/28/99 at 1.) With regard to actual damages, however, the Court found that the Plaintiff–Intervenors did not prove actual injury as required for compensation for a constitutional claim. (*Id.*) citing *Price v. City of Charlotte,* 93 F.3d 1241, 1248–57 (4th Cir. 1996), *cert. denied,* 520 U.S. 1116, 117 S.Ct. 1246, 137 L.Ed.2d 328 (1997).) Specifically, the Court found: "The Plaintiff–Intervenors only presented conclusory statements that their children suffered emotional distress; none of the Plaintiff–Intervenors ever sought medical or psychological treatment for their children. Moreover, the alleged injuries did not flow from the alleged equal protection violation." (*Id.*) The Court now addresses the remaining issues in this case.

## II. DISCUSSION AND ANALYSIS

### A. The Constitutional Basis for Race Conscious Desegregation Orders

The Fourteenth Amendment provides that "[n]o state shall ... deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1. In the school desegregation context, the watershed decision of *Brown v. Board of Education,* 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873, stood for the proposition that separate treatment for people of different races violates the Constitution's equal protection guarantee. Justice Harlan recognized this race neutrality principle in his prophetic dissent from the misguided "separate but equal" doctrine enunciated in *Plessy v. Ferguson,* when he stated: "In respect of civil rights, common to all citizens, the Constitution of the United States does not, I think, permit any public authority to know the race of

those entitled to be protected in the enjoyment of such rights." 163 U.S. 537, 554, 16 S.Ct. 1138, 1145, 41 L.Ed. 256 (1896) (Harlan, J., dissenting).

 Because of the "odious" nature of racial classifications, "all legal restrictions which curtail the civil rights of a single racial group are immediately suspect" and are reviewed under the strictest judicial scrutiny, regardless of whether the classification is intended to burden or benefit a particular race. *Adarand Constructors, Inc. v. Pena,* 515 U.S. 200, 215–16, 115 S.Ct. 2097, 2107, 132 L.Ed.2d 158 (1995) (quoting *Hirabayashi v. United States,* 320 U.S. 81, 100, 63 S.Ct. 1375, 1385, 87 L.Ed. 1774 (1943); *Korematsu v. United States,* 323 U.S. 214, 216, 65 S.Ct. 193, 194, 89 L.Ed. 194 (1944)). Consequently, "[racial] classifications are constitutional only if they are narrowly tailored measures that further compelling governmental interests." *Id.* at 227, 115 S.Ct. at 2113. Modern Supreme Court precedent suggests that there is only one compelling state interest that will justify race-based classifications: remedying the effects of past racial discrimination. *Metro Broadcasting, Inc. v. Federal Communications Comm'n,* 497 U.S. 547, 612, 110 S.Ct. 2997, 3034, 111 L.Ed.2d 445 (1990) (O'Connor, J., dissenting); *City of Richmond v. J.A. Croson Co.,* 488 U.S. 469, 493, 109 S.Ct. 706, 722, 102 L.Ed.2d 854 (1989); *Hopwood v. State of Texas,* 78 F.3d 932, 944 (5th Cir.1996).

It is in this remedial context that the race-conscious desegregation orders of *Swann* were constitutionally permissible; the District Court's injunction was specifically aimed at dismantling an unconstitutional school system. *Swann,* 402 U.S. at 22, 91 S.Ct. at 1279. While *Swann,* acknowledged the broad scope of courts' equitable authority,[11] it also recognized the limitations and potential abuses that can come about from using race as a remedial device. *Id.* at 24–28, 91 S.Ct. at 1280–82;

*see Spangler,* 427 U.S. at 434, 96 S.Ct. at 2704 (" '[1]t must be recognized that there are limits' beyond which a court may not go in seeking to dismantle a dual school system." (citing *Swann* 402 U.S. at 28, 91 S.Ct. at 1282)); *Ho v. San Francisco Unified School Dist.,* 147 F.3d 854, 865 (9th Cir.1998) (holding that race-conscious provisions in a desegregation decree had to be narrowly tailored); *see also Hayes v. North State Law Enforcement Officers Ass'n,* 10 F.3d 207, 212 (4th Cir.1993) ("Of all the criteria by which men and women can be judged, the most pernicious is that of race.... While the inequities and indignities visited by past discrimination are undeniable, the use of race as a reparational device risks perpetuating the very race-consciousness such a remedy purports to overcome." (quoting *Maryland Troopers Ass'n. Inc. v. Evans,* 993 F.2d 1072, 1076 (4th Cir.1993))).

For example, the Supreme Court in *Swann* upheld only "the very limited use made of mathematical ratios" in crafting student assignment plans, 402 U.S. at 25, 91 S.Ct. at 1280, and allowed the gerrymandering of school attendance zones only as "an interim corrective measure." *Id.* at 27, 91 S.Ct. at 1282. Most importantly, any race-based remedies had to be specifically focused on remedying the constitutional violation in question and could not expand beyond that purpose. *Id.* at 22–23, 91 S.Ct. at 1279. Stated the Supreme Court:

> We are concerned in these cases with the elimination of the discrimination inherent in the dual school systems, not with myriad factors of human existence which can cause discrimination in a multitude of ways on racial, religious, or ethnic grounds. The target of the cases from *Brown I* to the present was the dual school system. The elimination of racial discrimination in public schools is a large task and one that should not be

---

11. Of course, even a court's equitable authority is limited in the sense that a court can only order that which is reasonable, feasible, and

workable. *Swann,* 402 U.S. at 31, 91 S.Ct. at 1283.

retarded by efforts to achieve broader purposes lying beyond the jurisdiction of school authorities. One vehicle can carry only a limited amount of baggage. It would not serve the important objective of *Brown I* to seek to use school desegregation cases for purposes beyond their scope, although desegregation of schools ultimately will have impact on other forms of discrimination.

*Id.; see also Milliken v. Bradley,* 433 U.S. 267, 282, 97 S.Ct. 2749, 2758, 53 L.Ed.2d 745 (1977) (*"Milliken II"*) ("[F]ederal-court decrees must directly address and relate to the constitutional violation itself. Because of this inherent limitation upon federal judicial authority, federal-court decrees exceed appropriate limits if they are aimed at eliminating a condition that does not violate the Constitution or does not flow from such a violation.").

▌ The temporal scope of desegregation orders is also limited in that such decrees "are not intended to operate in perpetuity." *Board of Educ. v. Dowell,* 498 U.S. 237, 248, 111 S.Ct. 630, 637, 112 L.Ed.2d 715 (1991). "From the very first, federal supervision of local school systems was intended as a temporary measure to remedy past discrimination." *Id.* at 247, 111 S.Ct. at 637.

> Dissolving a desegregation decree after the local authorities have operated in compliance with it for a reasonable period of time properly recognizes that 'necessary concern for the important values of local control of public school systems dictates that a federal court's regulatory control of such systems not extend beyond the time required to remedy the effects of past intentional discrimination.'

*Id.,* at 248, 111 S.Ct. at 637 (quoting *Spangler v. Pasadena City Bd., of Educ.,* 611 F.2d 1239, 1245 n. 5 (9th Cir.1979) (Kennedy, J., concurring) (citing *Milliken II,* 433 U.S. at 280–82, 97 S.Ct. at 2757–58)); *see also Freeman v. Pitts,* 503 U.S. 467, 505, 112 S.Ct. 1430, 1453, 118 L.Ed.2d 108 (1992) (Scalia, J., concurring) ("But we also

envisioned [federal supervision of local school systems] as temporary, I think, because the rational basis for the extraordinary presumption of causation simply must dissipate as the *de jure* system and the school boards who produced it recede further into the past."). Thus, a desegregation order does not condemn a school board to "judicial tutelage for the indefinite future," as "[n]either the principles governing the entry and dissolution of injunctive decrees, nor the commands of the Equal Protection Clause of the Fourteenth Amendment, require any such Draconian result." *Dowell,* 498 U.S. at 249, 111 S.Ct. at 638.

▌ In addition to remedying a constitutional violation, the end purpose of a desegregation order is "to restore state and local authorities to the control of a school system that is operating in compliance with the Constitution." *Freeman,* 503 U.S. at 489, 112 S.Ct. at 1445. As the law of school desegregation has developed, that withdrawal of jurisdiction occurs when the district court finds that the school system has achieved unitary status. *Id.; Dowell,* 498 U.S. at 248, 111 S.Ct. at 637; *Swann,* 402 U.S. at 32, 91 S.Ct. at 1284.

**B. Unitary Status**

▌ The term "unitary status" has no fixed meaning. *Freeman,* 503 U.S. at 486–87, 112 S.Ct. at 1443–44. In fact, the terms "unitary" and "dual" are nowhere found in the Constitution; they are simply descriptive words that identify school systems that are either in or out of compliance with the commands of the Equal Protection Clause. *Id.* at 486–87, 112 S.Ct. at 1443–44 (citing *Dowell,* 498 U.S. at 245–46, 111 S.Ct. at 636). The concept of achieving unitary status was established in *Green,* where the Supreme Court stated that the goal of equitable relief in a desegregation case was "to convert [a dual system] to a unitary system in which racial discrimination would be eliminated root and branch." 391 U.S. at 437–38, 88 S.Ct. at 1694.

Since *Green*, the use of the term "unitary" has been inconsistent. *Dowell*, 498 U.S. at 245, 111 S.Ct. at 635. Sometimes the term is used to describe a school system that has been released from supervision after fully remedying all vestiges of past discrimination. *Id.* (citing *United States v. Overton*, 834 F.2d 1171, 1175 (5th Cir.1987); *Riddick v. School Bd.*, 784 F.2d 521, 533–34 (4th Cir.1986); *Vaughns v. Board of Educ.*, 758 F.2d 983, 988 (4th Cir.1985)). The term also has been used to describe a school system that has implemented a desegregation plan but has not yet eliminated the vestiges of past discrimination. *Id.* (citing *Georgia State Conference Branches of NAACP v. Georgia*, 775 F.2d 1403, 1413 n. 12 (11th Cir.1985)); *see also United States v. Georgia*, 171 F.3d 1344, 1347 (11th Cir.1999). In the latter circumstance, courts draw a distinction between a school system that is "unitary" and one that has achieved "unitary status." *Dowell*, 498 U.S. at 245, 111 S.Ct. at 635–36. In other words, a school system that has achieved unitary status is one that "has eliminated the vestiges of its prior discrimination and has been adjudicated as such through the proper judicial procedures," i.e., a unitary status hearing or a consent order. *Id.* at 245, 111 S.Ct. at 636 (quoting *Georgia State Conference*, 775 F.2d at 1413 n. 12).

With regard to *Swann*, Judge McMillan closed the case in 1975 after the school system had adopted a desegregation plan that he previously declared would produce a "unitary" school system. *Swann*, 67 F.R.D. at 649; *see Swann*, 379 F.Supp. at 1103. This did not constitute a finding that CMS had achieved unitary status or that the orders had been terminated or dissolved. To the contrary, Judge McMillan stated that the orders in this case remained in continuing effect, *Swann*, 67 F.R.D. at 649; *Martin*, 475 F.Supp. at 1341, and CMS has continued to operate under the assumption that it was still subject to federal court supervision. Thus, it may be said that CMS has been operating a unitary system since at least 1975 but has not yet been granted unitary status. *See Georgia*, 171 F.3d at 1347.

■ The appropriate analysis for determining whether CMS, at long last, has achieved unitary status is (1) whether the school board has eliminated the vestiges of past discrimination to the extent practicable and (2) whether the school board has in good faith fully and satisfactorily complied with, and shown a commitment to, the desegregation plan, such that it is unlikely for the board to return to its former ways. *Freeman*, 503 U.S. at 492, 112 S.Ct. at 1446; *Dowell*, 498 U.S. at 249–50, 111 S. Ct. at 638. In determining whether a school board has eliminated the vestiges of *de jure* segregation as far as practicable, a district court must carefully assess what the school system has accomplished with respect to the six "*Green* factors"—student assignment, faculty, staff, transportation, extra-curricular activities, and facilities. 391 U.S. at 435, 88 S.Ct. at 1693. In its discretion, a court may consider any other ancillary factors. *Freeman*, 503 U.S. at 492, 112 S.Ct. at 1446.

■ A district court may withdraw all judicial supervision over a school system if it finds that the system has achieved unitary status in all respects, or it may withdraw supervision incrementally with respect to discrete categories when the system has achieved only partial compliance with a desegregation plan. *Id.* at 471, 112 S.Ct. at 1436. In the present case, the Plaintiff–Intervenors assert that the system has achieved unitary status in all respects. CMS and the Swann Plaintiffs contend that the school system has not achieved unitary status as to any of the *Green* factors and further assert that CMS has discriminated in areas such as teacher quality, academic achievement, and discipline.

■ The burden of proof for showing whether CMS is free of the vestiges of segregation falls on the parties seeking to end court supervision: the Plaintiff–Inter-

venors. *Id.*, at 494, 112 S.Ct. at 1447. Evidentiary considerations inevitably will impact this burden. Given that school boards are "entitled to a rather precise statement of [their] obligations under a desegregation decree," *Dowell*, 498 U.S. at 246, 111 S.Ct. at 636, the lack of any prior remedial orders or findings of discrimination in certain areas of school operations tends to allay the Plaintiff–Intervenors' burden of proof as to those areas. *Keyes v. School Dist. No. 1*, 902 F.Supp. 1274, 1282 (D.Colo.1995). The passage of time is likewise an evidentiary consideration that affects the burden of proof. *Freeman*, 503 U.S. at 491–92, 496, 112 S.Ct. at 1446, 1448; *id.*, at 503, 112 S.Ct. at 1452 (Scalls, J., concurring); *Jenkins v. Missouri*, 122 F.3d 588, 595 (8th Cir.1997). As to any facets of school operations where the Court expressly found that the school system was free of discrimination, such findings become the law of the case and shift the burden back to the parties trying to prolong judicial oversight: CMS and the Swann Plaintiffs. *Riddick*, 784 F.2d at 531; *Jacksonville Branch, NAACP v. Duval County School Bd.*, No. 85–316–Civ–J–10C, slip op. at 139 (M.D.Fla. May 27, 1999). Underlying this burden-shifting scheme is a district court's ultimate duty to return control of school operations to local authorities when judicial supervision is no longer necessary. *Missouri v. Jenkins*, 515 U.S. 70, 99, 115 S.Ct. 2038, 2054, 132 L.Ed.2d 63 (1995) (*"Jenkins III"*); *Freeman*, 503 U.S. at 489–90, 112 S.Ct. at 1445.

**1. Student Assignment**

Like most desegregation cases, the orders entered during the active phase of *Swann*, from 1969 to 1975, focused primarily on erasing discrimination in student assignment, which was the hallmark of a segregated school system. *See Swann*, 402 U.S. at 18, 91 S. Ct. at 1277 ("[T]he several related cases before us are primarily concerned with problems of student assignment."); *id.* at 22, 91 S. Ct. at 1279 ("The central issue in this case is that of student assignment."). Accordingly, the "critical beginning point" and "fundamental" inquiry of a unitary status determination is the degree of racial imbalance in student assignment. *Freeman*, 503 U.S. at 474, 112 S. Ct. at 1437.

**a. The Standard for Compliance**

During the trial, there was disagreement about what the *Swann* orders required for numerical compliance. Given that Judge McMillan entered roughly fifteen orders addressing student assignment, it is not surprising that the applicable standard is somewhat hazy. Then again, the standard should be somewhat hazy. A court must constantly anchor itself in the constitutional violation and must not get caught up in bean-counting. *Swann*, 402 U.S. at 22–24, 91 S. Ct. at 1279–80. The Court's student assignment guidelines, which do not anticipate a simple quantitative analysis, are as follows: (1) "[t]hat no school be operated with an all-black or predominately black student body"[12] (2) "[t]hat pupils of all grades be assigned in such a way that as nearly as practicable the various schools at various grade levels have about the same proportion of black and white students," and (3) that CMS "prevent any school from becoming racially identifiable." *Swann*, 311 F.Supp. at 268.

The first guideline addressed the concern that CMS's slowest progress in dismantling the dual system was the desegregation of formerly-*de jure* black schools. Fifteen years after *Brown I*, a large num-

---

12. Of course, an all-black or predominately black school is not per se unconstitutional, *Swann*, 402 U.S. at 25–26, 91 S.Ct. at 1280–81, and it would be insidious to assume that a school which is all or predominately black is inherently inferior. To the contrary, "black schools can function as the center and symbol of black communities, and provide examples of independent black leadership, success, and achievement." *Jenkins*, 515 U.S. at 122, 115 S.Ct. at 2065 (Thomas, J., concurring). The purpose of this guideline, rather, was to rid the system of its most conspicuous vestige of segregation.

ber of these schools were still 99% to 100% black. *Swann*, 300 F.Supp. at 1368. While the Court did not define precisely what a "predominately black student body" was, the guideline has been interpreted to mean that no school should be operated with a majority black student body, i.e., one that is over 50% black.[13] (*See, e.g.*, PX 93 at CM095416 (CMS Student Assignment Proposals 1996–97); PX 113 at 2 (Joint Mot. to Modify Orders filed 4/16/80).)

The second guideline requires the racial composition of each school to reflect the district-wide average. In 1970, when this guideline was mandated, the district's racial composition was 29% black and 71% non-black. While the Court acknowledged that "variations from that norm may be unavoidable," *Swann*, 311 F.Supp. at 268, it did not suggest how much variance from the norm-s a plus-or-minus percentage-would be tolerable. The only specific variance ever approved by the Court is found in the one-page unpublished order from 1980, which allowed elementary schools to operate with black student populations of "plus 15%" from the district-wide average. *Swann*, No. 1974, slip op. at 1 (April 17, 1980). This upward variance acknowledged that it was no longer practicable to avoid majority black elementary schools given the increasing black enrollment. (PX 113 at 2 (Joint Mot. to Modify Orders).) At the time, the black student ratio in elementary schools had risen to 40%, which meant that an elementary school could have a 55% black student population. *Id.* The modification applied only to elementary schools because secondary schools had low enough black student populations that they could operate at roughly 15% above the system-wide ratio and still avoid being majority black. (DX 3 (CMS Enrollment Rpts.)) high schools were 35% black in 1980; middle schools were 37% black). Last year, on the other hand, the black student ratio was 42% in middle schools and 40% in high schools, (id., which provided breathing room of only 8% and 10% as an upper limit). Given that +10% was too constricting a ceiling for elementary schools in 1980, it would make little sense to impose an even more constricting ceiling of +8% for middle schools today. It is also worth noting that the Court, in 1970, allowed CMS an upper limit of 21% above the district-wide black average based on the "no majority black schools" interpretation. So, even a +15% upper limit is a relatively strict standard.

The third guideline, prohibiting racially identifiable schools, seems to target the more extreme cases of racial isolation. *Accord Jacksonville Branch. NAACP v. Duval County School Bd.*, No. 85–316–Civ.–J–10C, slip op. at 10–11 (M.D.Fla. May 27, 1999) (defining "identifiably black" as those schools with a black student population in excess of 75% and "identifiably white" as those schools with a black student enrollment of 15% or less). For example, it would be difficult to say that a school with a 51% black student body was racially identifiable, even though, under the no majority black schools interpretation, it might be viewed as such. Determining what is identifiably white is even more difficult. Early on, the Court classified "schools readily identifiable as white" as schools with white percentages above 85%. *See Swann*, 311 F.Supp. at 270; *Swann*, 306 F.Supp. at 1303. Yet, the Court acknowledged that Highland Elementary, which was only 13% black, had achieved adequate desegregation. *Swann*, 300 F.Supp. at 1367–68. Also, the 1970 court-mandated plan-which, the Court said, "achieves full desegregation" allowed black student percentages as low as .3% (Bain Elementary), 9% (Matthews Elementary), 12% (Newell Elementary), and 14% (Clear Creek Elementary). *Swann*, 311 F.Supp. at 270, Ex. J. The Court, therefore, was willing to accept a number

---

13. One finding that seems to contradict this interpretation is Judge McMillan's observation, in 1969, that Elizabeth Elementary, which was 58% black at the time, had "a substantial degree of apparently stabilized desegregation." *Id.*, at 1367–68.

of schools with large white majorities as part of a desegregated system.

In sum, the measuring stick for compliance in student assignment is not a model of clarity. The parties agree that the orders allow elementary schools to operate with black student bodies up to 15% above the district-wide black ratio and allow secondary schools to operate with black student bodies up to 50%. The Plaintiff–Intervenors only challenge the continuing validity of these upper limits. The parties disagree as to whether there is a lower limit for black student populations. CMS and the *Swann* Plaintiffs assert that common practice dictates a minimum black student body in all schools of at least "minus 15%" from the district-wide black ratio. The Plaintiff–Intervenors disagree with this "minus 15%" standard on the grounds that it appears nowhere in the prior orders.[14]

The Plaintiff–Intervenors are technically correct. As to the lower limit, the Court never adopted a "minus 15%" standard or any such downward variance. Nevertheless, Judge McMillan expressed concern about the presence of all-white schools, *Swann*, 311 F.Supp. at 270, so the Court should not ignore completely those schools with small black student populations. *But see Jacksonville NAACP, supra,* slip op. at 11 n. 10 ("The counting of [identifiably white] schools as segregated can tend to distort one's view of the school system as a whole in terms of deciding whether black children continue to be educated in a segregated environment."). As to the upper

limit, the differing standards for elementary and secondary schools have become clumsy and obsolete. Given the rise in the black student population, the requirement that no secondary school operate with a majority black student population allows too little breathing room. The variance should be the same for both elementary and secondary schools to allow uniform flexibility. Indeed, the purpose and result of the 1980 modification, at that time, was to create uniform flexibility.

A singular standard will provide a more accurate evaluation of the system than will the mishmash of standards gleaned from several orders. The only specific variance ever approved by the Court was a "plus 15%" deviation, so the Court will use a $\pm 15\%$ standard. Unless otherwise noted, the Court will refer to racial "balance" and "imbalance" based on this variance. Admittedly, this standard differs somewhat from the explicit standards set by the Court and is more restrictive than necessary[15] The Court emphasizes, however, that there is no level of compliance with the standard that is determinative; the standard is simply a helpful framework for examining the degree of ideal racial balance in the system. Schools that are substantially outside of the variance will need reasonable and supportable explanations for the imbalance. *Manning v. School Bd.,* 28 F.Supp. 2d 1353, 1357–58 (M.D.Fla. 1998) (citing *Swann,* 402 U.S. at 26, 91 S.Ct. at 1281).

### b. The Level of CMS's Compliance

The parties' expert witnesses testified about the degree of compliance with differ-

---

14. CMS recently acknowledged this aspect of the *Swann* orders, stating that "only an upper limit for Black enrollment was set, with no reference to a lower limit." (PX 93 at CM095416 (CMS Student Assignment Proposals 1996–97).) Regardless, "whenever possible the Board also used a lower limit of 15% below the K–6 Black enrollment." (*Id.*) Thus, CMS used a lower limit only as a self-imposed "aspirational" goal.

15. *See, e.g., Reed v. Rhodes,* 1 F.Supp. 2d 705, 716 (N.D.Ohio 1998) (stating that "the common standard used throughout the United States" is "+/−20 percentage points of the

percentage of black students enrolled in the District"); *Stell v. Board of Public Educ.,* 724 F.Supp. 1384, 1401 (S.D.Ga.1988) (applying a $\pm 20\%$ standard and observing that several other courts apply the same standard). Based on several of Judge McMiilan's findings, it could be argued that the acceptable variance from the district-wide average is as high as $\pm 25\%$ to $\pm 30\%$. After all, the Court approved of Bain when it was 26% below the district-wide average and commended Elizabeth when it was 29% above the district-wide average.

ent conclusions based on how they manipulated the data and on what standard they applied. Some experts overstated the level of noncompliance by counting schools that are not within the scope of the Court's orders. Witnesses for CMS and the Swann Plaintiffs sometimes labeled Hidden Valley as out of compliance, even though it is an exempt school. (*See e.g.,* Tr. 6/10 at 113–16 (Test. of Dr. Gordon Foster); DX 6 Attach. C, Exs. 1b, 1d (Peterkin Rpt.).) Dr. Robert Peterkin, a CMS expert, inflated the number of "racially identifiable" schools by including several "special" schools, such as schools for the mentally and physically disabled, management schools for students with disciplinary problems, and schools for pregnant teenagers. (DX 6 Attach. C, Exs. 1a-1f (Peterkin Rpt.); DX 7 at 4, Ex. A–138–52 (Peterkin Rebuttal Rpt.); Tr. 6/18 at 48–52 (Test. of Dr. Robert Peterkin).) These schools are not properly included because students do not attend such schools under normal student assignment policies. In addition, Dr. Peterkin and Dr. Leonard Stevens, an expert for the *Swann* Plaintiffs, improperly characterized certain racially balanced schools as racially identifiable on the grounds that in-school assignment and placement practices segregated black students in classrooms. (DX 7 at 6 (Peterkin Rebuttal Rpt.); SX 2 at 22 (Stevens Rpt.).) Specifically, they attacked the practice of ability tracking, which tends to result in predominately black and predominately white classrooms. As discussed further below, no credible evidence was offered to show that CMS has tacked children in a discriminatory manner. *See infra* part II.B.7.b.ii.

Ultimately, the Court must look to the CMS enrollment data to determine the degree of compliance over time. It would be wrong to focus only on a few select years. Dr. Peterkin, for example, emphasized the two most recent school years, (DX 6 at 3 (Peterkin Rpt.), Dr. Stevens only looked at compliance during the

1990s, (SX 2 at 2 (Stevens Rpt.)), and Dr. Gordon Foster, a CMS expert, only looked at nine out of the last twenty years. (DX 5 at 4 (Foster Rpt.).) This is too narrow a lense to examine CMS's compliance. The potential for misleading interpretations was well-illustrated during the cross-examination of Dr. Foster. When asked what was more important in determining unitary status, the fact that a school had been in compliance for twenty-eight years or has been out of compliance for one year by two-tenths of a percentage point, Dr. Foster refused to say which one. (Tr. 6/10 at 81–82 (Test. of Dr. Gordon Foster).) This is simply unreasonable.

It is expected that some schools will exceed a given variance due to student mobility, inaccurate enrollment projections, and other factors beyond CMS's control. *See Estes v. Metropolitan Branches of the Dallas NAACP,* 444 U.S. 437, 448, 100 S.Ct. 716, 722, 62 L.Ed.2d 626 (Powell, J., dissenting from denial of certiorari) ("[P]erfect solutions may be unattainable in the context of the demographic, geographic, and sociological complexities of modem urban communities."); *Swann,* 402 U.S. at 31, 91 S. Ct. at 1283 ("Communities in our mobile society do not, however, remain demographically stable."). If, over the course of three decades, a school has had a racially balanced student body for 90% of the time or greater, it is certainly reasonable to conclude that CMS has complied fully and satisfactorily with the Court's orders as to that school. On the other hand, the continued existence of schools that are substantially racially imbalanced, especially when those schools are in areas of mixed population, requires close scrutiny. *Swann,* 402 U.S. at 25–26, 91 S. Ct. at 1281. It must be shown that assignments to such schools are genuinely non-discriminatory. *Id.* at 26, 91 S. Ct. at 1281.

The available student enrollment data reveal that CMS has maintained a high

level of desegregation since 1970.[16] Of the 126 elementary, middle, and high schools currently operating, only twenty schools[17] (16%) have had black student bodies higher than 15% above the district-wide ratio for more than three years, and only seventeen schools[18] (13%) have had black student bodies lower than 15% below the district-wide ratio for more than three years[19] In other words, relatively few schools in the system have long histories of racial imbalance.[20] What is more, a great deal of the imbalance has involved borderline discrepancies of a few percentage points. In schools with relatively small student bodies, the displacement of only three or four black students would have put the school back into balance. (*See* Tr. 5/17 at 161–62 (Test, of Dr. Stephen Smith).)

Since 1970, an overwhelming majority of schools—generally, 70% to 100%—have been racially balanced in any given school year. (*See*, PX 137 Figs. 1–2 (Armor Rpt.); DX 6 Ex. 1e (Peterkin Rpt.).) During this time, CMS has operated no all-black or all-white schools. (*See DX* 7 at Ex. A (Peterkin Rebuttal Rpt.).) Aside from Hidden Valley, which is exempted, no school's black population has ever risen above 85%. (*Id.*) Only seven schools have ever had black populations in excess of 75%, and this did not occur until 1994. (*Id.*) In fact, no school ever had a black population exceeding 60% until 1988. (*Id.*)

The remarkable level of desegregation shown by CMS's enrollment data is further confirmed using the two summary indices of desegregation that are used in the field of desegregation research: the index of dissimilarity, which measures the degree of racial imbalance, and the index of interracial exposure, which measures "the average percent white in schools attended by black students, weighted by the proportion of black students in each school." (PX 137 at 6 (Armor Rpt.).) Dr. David Armor, an expert for the Plaintiff–Intervenors, analyzed CMS with these standard measures. The results show that CMS was "severely imbalanced" prior to 1970, then "highly desegregated" for about twenty years, and "well desegregated" for the remaining years. (*Id.* at 6–7, Charts 4–5.) Based on these indices, when CMS is compared to other school districts of similar size and racial composition, CMS has achieved a higher degree of racial balance than several other districts that

16. CMS provided complete student enrollment data by race, by grade, and by school from the 1978–79 school year to the beginning of the 1998–99 school year. (DX 3 (CMS Enrollment Rpts.).) Between 1970 and 1978, student enrollment data is incomplete. CMS provided data only for the 1972–73 and 1974–75 school years. (PX 137 at 2, 4 (Armor Rpt.).) Using these data along with HEW–OCR enrollment data for 1970, Dr. Armor extrapolated the numbers to estimate enrollments for the missing years. (*Id.*, at 2, 4.) The Court accepts this unrebutted method as reasonable and as the best means available for getting the full picture.

17. *Elementary Schools:* Ashley Park, Briarwood, Derira, Devonshire, Druid Hills, Highland, Oaklawn, Sedgefield, Shamrock Gardens, Thomasboro, and Westerly Hills. *Middle Schools*: Cochrane, Eastway, J.T. Williams, Spaugh, and Wilson. *High Schools:* Garinger, Harding, Northwest, and West Charlotte.

18. *Elementary Schools:* Bain, Clear Creek, Cornelius, Davidson Road, Huntersville, Lebanon Road, Long Creek, Mallard Creek, Matthews, McAlpine, and McKee. *Middle Schools*: Alexander, Davidson IB, Randolph, and South Charlotte. *High Schools:* East Mecklenburg and Providence.

19. Moreover, using the common ±20% standard, only nine schools (7%) exceed the standard for more than three years, and only fourteen schools (11%) fall below the standard for more than three years. Using the explicit Court standards—i.e., the upper limits of 50% black for secondary schools and +15% from the district-wide ratio for elementary schools—only twenty-one of the district's current schools (17%) are out of compliance for more than three years since 1970. ·

20. Of course, this cannot be interpreted to mean that all of the remaining schools have been balanced for twenty-six years or more because many schools were built during the last two decades.

have been declared unitary. (*Id.* at 7, Table 1.)

### c. Desegregation and Demographic Trends

Focusing, next, on when, where, and how the racial balance and imbalance has occurred, the Court starts with the fact that, under the dual system, schools were either all black or all white. By 1969, two-thirds of black students in the city of Charlotte—approximately 14,000 of them—still attended schools that were either all black or more than 99% black. *Swann*, 402 U.S. at 6–7, 91 S. Ct. at 1271. This statistic changed dramatically once the Court mandated a desegregation plan. In 1970, only four schools had majority black student populations: Barringer Elementary, Berryhill Elementary, Amay James Elementary, and Wilmore Elementary.[21] (PX 137 at 4 (Armor Rpt.).) Between 1972 and 1978, available data show only two schools besides Hidden Valley with majority black student populations: Wilmore, which was 51% in 1974, and Spaugh Middle, which was 51% in 1978. (*Id.*) In 1979, only three schools were above 50% black: Devonshire Elementary, Smith Elementary, and Cochrane Middle, each of which were 52% black. (*Id.*) After the "plus 15%" rule came into play in 1980, only Briarwood Elementary, which was 56% black, exceeded the new standard. (*Id.*) In sum, during the first decade of the desegregation plan, almost every school complied with the Court's orders, and the few schools that exceeded the Court's standards did so by just one or two percent. (*Id.*)

CMS remained in substantial compliance throughout the 1980s. (*Id.*) Although more schools fell out of balance during this period due to demographic changes, only a few schools were consistently out of balance. (*Id.;* PX 138 at 9–13 (Clark Rpt.).) By this time, the school board had "institutionalized" the Court's racial balance guidelines such that the board was constantly adjusting boundaries, adding satellite zones, and reassigning students to different schools. (Tr 4/22 at 5–10 (Test. of Sharon Bynum).) This was a difficult process not just for the board members and school staff but for the families who were required to send their children to different schools every couple of years. (*Id.*)

In the 1990s, CMS—faced with a growing number of imbalanced schools and parents' concerns about stability and proximity of school assignments—made a major change to its student assignment policies with its magnet school initiative. *See supra* part I.B. This change eliminated some of the longest mandatory bus rides and promoted a more voluntary system of desegregation. (Tr. 4/26 at 25–27 (Test. of John Murphy).) The implementation of magnet schools also helped to restore and maintain racial balance in schools that were rapidly becoming imbalanced. (PX 69 at CM098438 (Mem. of CMS Assistant Superintendent); Tr. 4/26 at 41–43 (Test. of John Murphy); Tr. 6/8 at 86–87 (Test. of Eric Smith).) In particular, Ashley Park, J.T. Williams, Spaugh, Harding, and Northwest each had trends of about four to six years of black enrollment above the Court's standards in the late 1980s. (DX 3 (CMS Enrollment Rpts.).) After these schools implemented magnet programs, racial balance improved immediately by as much as 30%,[22] and each of these schools has remained racially balanced for the last six or seven years. (DX 3 (CMS Enrollment Rpts.).) At the same time, however, if enough students left their assignment zones for magnets, it would affect the balance of the schools to which they were otherwise assigned.[23] (Tr. 6/9 at 88–90

---

**21.** Wilmore was closed in 1977. (PX 158 at CM035831 (Schools Closings List).)

**22.** For example, Spaugh went from 72% black in 1991–92 to 42% black in 1992–93, (*id.*), which was the year it implemented a math, science, and technology magnet pro-

gram. (DX 5 Attach. B, Table 5 at 4 (Foster Rpt.).)

**23.** In contrast to Judge McMillan's warning about potential re. segregation from "optional schools" that did not have adequate safe-

(Test. of Dr. Gordon Foster).) In addition, the large influx of new students in the system, the changing demographics of the county, and the expanding geographic distribution of school-age children continued to affect the racial balance of assignment zones. (See PX 137 at 5–6 (Armor Rpt.); PX 138 at 2–13, Figs. 1–8 (Clark Rpt.).)

CMS and the Swann Plaintiffs assert that because there is more residential integration in the county than there was thirty years ago, see *supra* part I.B, it should be easier to racially balance more schools. This is an overly simplistic assumption. The beginning stages of desegregation involved a very high level of artificial school integration. Not surprisingly, this is difficult to maintain over time. Furthermore, the gradual increase in residential integration did not occur in a finite setting. The population in Mecklenburg county nearly doubled in the last three decades. *See supra* part I.B. At the same time, the population has expanded geographically into areas that were completely undeveloped at the time of the dual system. *See supra* part I.B. The fact that there are more pockets of integration has made it easier to have more stand alone schools in naturally integrated areas, but, looking at the system as a whole, there are still stark demographic contrasts between the inner city and the southernmost and northernmost areas of the county.

This argument is also premised on an erroneous legal assumption: that racial balance is to be pursued wherever and whenever it is possible.

Racial balance is not to be achieved for its own sake. It is to be pursued when racial imbalance has been caused by a

constitutional violation. Once the racial imbalance due to the *de jure* violation has been remedied, the school district is under no duty to remedy imbalance that is caused by demographic factors. *Freeman,* 503 U.S. at 494, 112 S. Ct. at 1447; *see Swann,* 402 U.S. at 24, 91 S. Ct. at 1280 ("The constitutional command to desegregate schools does not mean that every school in every community must always reflect the racial composition of the school system as a whole."). There can be no doubt that demography and geography have played the largest role in causing imbalance. There has been no showing that CMS has deliberately attempted to fix or alter demographic patterns to affect the racial composition of the schools. In fact, the opposite is true; CMS has openly encouraged and endorsed policy initiatives that promote integrated communities. *See infra* part II.B.8.

### d. The Concerns of *Martin:* School Siting and Transportation Burdens

CMS and the Swann Plaintiffs also argue that the system cannot be declared unitary because there has been more imbalance in recent years than at any time since the desegregation orders have been in place. They point to the fact that, in the 1979 *Martin* decision, Judge McMillan observed that " '[r]acially neutral attendance patterns' ha[d] never been achieved," even though, at that time, there were only a few schools with majority black populations. 475 F.Supp. at 1340. It is important to look at the *Martin* case in context. *Martin* was not a unitary status hearing; it was an action by parents to prevent CMS's reassignment of students three

---

guards, such as transportation and notification, the effects seen here have not wreaked "havoc" on or resulted in "significant jeopardy" to the underlying desegregation plan. *Swann,* 379 F.Supp. at 1103–04. To the contrary, magnet schools have had an overall effect of countering resegregntive trends, and a higher percentage of black students would have attended predominately black schools had the magnet schools not existed. (PX 1 at

10 (CMS Staff Discussion Paper); PX 6 at 9, 22 Fig. 1 (Tidwell Rpt.).) Furthermore, Dr. Foster testified that CMS "kept an eye on [magnet transfers] so that there wouldn't be a run on the bank so to speak from any one school." (Tr. % at 88–89 (Test. of Dr. Gordon Foster).) The problem, in his view, is that CMS did not have rigid controls in place. (*Id.,* at 89.)

years after *Swann* was closed. Given that the desegregation plan was still in its fledgling stages, the Court was inclined to keep the pressure on CMS. *Id.* Thus, the Court stated that continued supervision of student assignment was needed due to ongoing concerns related to the siting of schools and the disproportionate transportation burdens on black children.[24] *Id.* at 1341. Twenty years after *Martin*, the Court must look at those student assignment concerns in a new light. "[W]ith the passage of time, the degree to which racial imbalances continue to represent vestiges of a constitutional violation may diminish, and the practicability and efficacy of various remedies can be evaluated with more precision." *Freeman*, 503 U.S. at 491–92, 112 S.Ct. at 1446.

With regard to school siting concerns, the Supreme Court stated that "it is the responsibility of local authorities and district courts to see to it that future school construction and abandonment are not used and do not serve to perpetuate or reestablish the dual system." *Swann*, 402 U.S. at 21, 91 S.Ct. at 1279. The Supreme Court recognized that, after *Brown*, school authorities opposed to integration had closed schools in racially mixed areas and simultaneously built new schools in the outer suburban areas, far away from black populations. *Id.* at 21, 91 S.Ct. at 1278. Such policies, "when combined with 'neighborhood zoning,' further lock the school system into the mold of separation of the races." *Id.* District courts, therefore, must ascertain whether there is a discriminatory pattern in school siting practices. *Id.* at 21, 91 S.Ct. at 1278–79. In accordance with this admonition, the 1974 CAG Plan, approved by Judge McMillan, contained the following provision: "School planning is not to be predicated on population growth trends alone; consideration is to be given to the influence new building can be toward simplification of an integrated pupil assignment plan. Buildings are to be built where they can readily serve both races." *Swann*, 379 F.Supp. at 1107.

The evidence shows that the school siting decisions of CMS have not constituted an intentional or neglectful pattern of discrimination. Even though CMS has been forced to deal with an extraordinary amount of growth in the system, it has not based its school planning on growth trends alone. The school board and its staff routinely consider racial diversity in school siting decisions. (Tr. 4/27 at 9–11, 15–16, 152–53 (Test. of Jonathan Wells); Tr. 4/21 at 13 (Test. of Lindalyn Kakadelis).) They also consider a host of other important criteria, such as the system's finances, land values, site availability, zoning laws, topography, site size, building capacity, adequacy of public utilities, utilization of adjacent or feeder schools, traffic patterns, and the time and distance to transport students. (See Tr. 4/27 at 9 (Test. of Jonathan Wells); Tr. 5/25 at 5–7 (Test. of William Booker); Tr. 4/22 at 33–36, 72–73 (Test. of Sharon Bynum); Tr. 4/21 at 12 (Test. of Lindalyn Kakadelis).)

In 1992, CMS voluntarily resolved to build schools only in areas where blacks constituted at least 10% of the population. (PX 23 (CMS Resolution adopted 2/11/92).) Given that, in 1990, almost half of the county was comprised of census tracts that were less than 10% black, (DX 12 Fig. 17 (Lord Rpt.)), sustained adherence to this goal was improbable. In 1994, Assistant Superintendent Jeffrey Schiller found that, under the so-called "10% rule," it would be impossible for CMS to populate all schools with a 60% non–black–40% black ratio and still meet a 60–minute bus ride limit. (SX 122 at 5 (CMS Board Minutes of 4/26/94).) Despite these obstacles, the board still was mindful of its racial balancing goals and, at one point, even debated whether to accept a donation of free land for school use because it was located in the predominate-

---

**24.** These concerns did not modify any of the outstanding *Swann* orders. In fact, *Swann* remained inactive during the *Martin* case. Also, the Court did not impose any new injunctive orders against CMS.

ly white, southern area of the county.[25] (SX 119 at 4–5 (CMS Board Minutes of 5/28/96); Tr. 4/22 at 15–16 (Test. of Lindalyn Kakadelis).)

Since 1980, CMS has built twenty-seven new schools, completely renovated and "reopened" several old schools, and transformed some administration buildings into schools. (DX 266 (CMS School Construction 1980 to Present); PX 186 (CMS Physical Facilities Buildings and Additions); PX 187 (CMS Mem. re: Schools Opened and Renovated/Reopened); Tr. 4/26 at 61–63 (Test. of John Murphy).) With the exception of some of the newest schools in the southernmost and northernmost areas of the county, these schools have been able to accommodate racially balanced student populations. (*Compare* DX 266 (CMS School Construction 1980 to Present) *with* DX 3 (CMS Enrollment Rpts.).)[26]

If CMS was engaged in a pattern of closing its racially mixed suburban schools and simultaneously building schools in the county's outer areas, it could be seen as an attempt to "lock the school system into the mold of separation of the races."*Swann* 402 U.S. at 21, 91 S.Ct. at 1278. That has not been the case here. CMS has not closed its racially balanced schools in the middle suburban area. Quite the contrary,

schools in the middle suburban areas have maintained a high degree of racial balance, and the number of stand alone schools in naturally integrated areas continues to increase. (Tr. 6/22 at 27 (Test. of Arthur Griffin).) As of the 1998–99 school year, twenty-two stand alone schools have been created. (*Id.*) Meanwhile, the siting of schools in high-growth outer areas has been a pressing necessity in recent years. (See PX 3 at CM073068–69 (CMS Board Minutes of 1/12/88).) The schools currently operating there are overcrowded and in short supply. (Tr. 4/21 at 11–12 (Test. of Lindalyn Kakadelis).) This is a problem that CMS, not the Court, needs to solve. *See Swann*, 334 F.Supp. at 631 (App., Mem. of Oct. 5, 1970) ("Overcrowding, . . . though undesirable, is not a constitutional problem; its solution is unrelated to desegregation; it is a matter for the School Board, not the court, to deal with.").

CMS self-critically points out that, since 1980, almost all newly constructed schools have been built in predominately white areas, while the newly constructed and renovated schools that have opened in predominately black areas have been limited to magnet schools. (DX 266 (CMS School Construction 1980 to Present).) If anything, this trend is a consequence of racial

25. The board ultimately accepted the gift by a vote of five to four. (SX 119 at 5 (CMS Board Minutes of 5/28/96).) The donated land is located in the Ballentine development in the southernmost part of the county, which is the region experiencing some of the most intense growth. (PX 138 at 6, Fig. 4 (Clark Rpt.).) Thousands of residential building permits had been issued in this area years before this land was donated. (PX 3 at CM073068 (CMS Board Minutes of 1/12/88).) The nearest schools are already seriously overcrowded; McKee Elementary, for example, had to use twenty-four mobile classrooms last year. (DX 4 (CMS Capacity and Utilization Rpts. 1990–91 to 1998–99); Tr. 4/21 at 11–12 (Test. of Lindalyn Kakadelis).)

26. The majority of new schools built since 1980–fiften out of twenty-seven-have had racially balanced student bodies every year since they have been open. (DX 3 (CMS Enrollment Rpts.).) Only two schools built

since 1980—Morehead Elementary (one year old) and Winding Springs Elementary (four years old)—have even' had black student bodies above + 15% from the district-wide average, though only by one to three percentage points. (*Id.*) Six new schools—Crown Point Elementary (six years old), Lebanon Road Elementary (nine years old), Mallard Creek Elementary (twelve years old), McAlpine Elementary (thirteen years old), McKee Elementary (ten years old), and Providence High (ten years old)—have gone in and out of balance since opening. (*Id.*) Only four new schools—Elizabeth Lane Elementary (three years old), Crestdale Middle (one year old), Davidson IB Middle (five years old), and South Charlotte Middle (seven years old)—have never had black populations above − 15% from the district-wide average. (*Id.*) Of these four schools, the black population was 16% during Crestdale's first year and has ranged from 2–4% at Elizabeth Lane, 24–26% at Davidson IB, and 12–19% at South Charlotte. (*Id.*)

balancing requirements. Given the high concentration of blacks in the inner city, it is impracticable, if not impossible, to draw contiguous assignment zones in the inner city and racially balance them. (*See* PX 138 Fig. 9 (Clark Rpt.).) The only way to meet the racial balancing requirements in such a situation would be to transport white students in from satellite zones, which is difficult given the rush hour traffic patterns. (Tr. 4/22 at 12–14 (Test. of Sharon Bynum).) Also, experience has shown that it is more difficult to populate inner city black schools with suburban white students than vice versa. (PX 138 at 5 (Clark Rpt.); DX 108 at 6 (Stolee Plan).) While "white flight" cannot be used as an excuse for failing to desegregate a school system, a school board may consider this phenomenon in trying to improve racial balance under a desegregation order. *Riddick*, 784 F.2d at 528–29. As a result of these realities and the racial balance requirements, CMS has had to create dozens of tiny satellite zones in the inner city to disperse blacks away, while simultaneously drawing white students inward with magnet schools. (DX 262–64 (CMS Satellite Zones).) Building more schools in the inner city would have exacerbated this racial balancing dilemma.

Finally, the Court notes that neither the Swann Plaintiffs nor anyone else ever called on the Court to intervene in these school siting decisions. These decisions were the subject of public hearings, televised meetings, and ballot referenda. (*See* Tr. 4/27 at 109 (Test. of Jonathan Wells).) Moreover, the board members who were the most aggressive advocates of desegregation policies, including CMS Chairman Arthur Griffin, supported and voted for many of these initiatives. (*See, e.g.,* Tr. 6/21 at 101–03, 116, 138 (Test. of Arthur Griffin); Tr. 5/17 at 37 (Test. of Pamela Mange); SX 119 at 4–5 (CMS Board Minutes of 5/28/96).) Thus, the Court does not find any continuing constitutional violations in the area of school siting.

As to the transportation burdens on black children, Judge McMillan addressed this problem in an Order dated June 29, 1971, stating: "The court is not prepared, however, on the present record at least, to find that [the disproportionate burden of busing on black children] is unconstitutional; it may be the only practicable present way to deal with the problem." *Swann,* 328 F.Supp. at 1349. The Court then predicted: "It is more likely to be a practical problem which the school board will eventually solve under the political realities of school administration." *Id.* The Court reaffirmed this view in its Order dated October 21, 1971, stating: "Absolute equality in apportioning the burdens of attaining desegregation in compliance with the Constitution is impossible to achieve." *Swann,* 334 F.Supp. at 626. CMS represents that, during the most recent school year, 11,184 non-black students (42%) and 15,533 black students (58%) were transported for desegregation purposes. (CMS's Post–Trial Br. at 16.) Of course, a greater proportion of white students are bused voluntarily because they attend magnet programs, whereas more black students are bused due to mandatory assignments to certain schools. (Tr. 6/21 at 224–25 (Test. of Dr. David Armor).) On the other hand, students in magnet programs generally face much longer bus rides. (PX 43 (CMS Magnet Options 1998–99).) Given the realities of the situation, as noted above, the current situation may be about the best CMS can do while still adhering to racial balance guidelines.

#### e. The Historical Status of Imbalanced Schools

A look at the historical status of imbalanced schools, in light of demographic trends, further confirms that current imbalances are not traceable in a proximate way to the dual system. All of the former- *de jure* black schools still in operation have maintained consistent levels of racial balance for at least twenty-two years since 1970 despite the fact that they are located in neighborhoods that remain predomi-

nately black. (PX 137 at 11, Table 2 (Armor Rpt.); PX 138 Fig. 9 (Clark Rpt.).) Only four of these schools—Druid Hills, First Ward, Oaklawn, and West Charlotte—were imbalanced during the most recent school year. (DX 3 (CMS Enrollment Rpts.).) First Ward became imbalanced last year for the first time since court supervision began and was still only imbalanced by two percentage points. (*Id.*) West Charlotte, which has had a long-standing open enrollment program, did not become imbalanced until 1996. (*Id.*; PX 137 at 10 (Armor Rpt.).) Druid Hills and Oaklawn are currently imbalanced by five percentage points. (DX 3 (CMS Enrollment Rpts.).) These two schools were originally desegregated through pairing, but, in the early 1990s, as their pairing areas grew substantially blacker, they were depaired and magnetized. (DX 5 at 11 (Foster Rpt.).) The magnet program at Oaklawn restored balance for about four years before going out of balance. (PX 137 at 9 (Armor Rpt.).) The magnet program at Druid Hills has not drawn enough white students to be within the $\pm 15\%$ variance; though, without the magnet program, it would be nearly all black. (*Id.*)

The overwhelming majority of former-*dejure* white schools have remained racially balanced since 1970. (*Id.* at 10–11, Table 2.) Ironically, of the schools that have been racially imbalanced and predominately black for more than three years, *see supra* note 17, most were historically white schools. They include: Briarwood, Derita, Devonshire, Highland, Sedgefield, Shamrock Gardens, Thomasboro, Westerly Hills, Cochrane, Eastway, Wilson, and Garinger. Since court-ordered desegregation began, CMS has made periodic adjustments to the assignment zones of these schools to counteract demographic trends. (DX 5 at 13–23 (Foster Rpt.); PX 137 at 8–10 (Armor Rpt.).) All of these schools, with the exception of Briarwood, Devonshire, and Cochrane, were racially balanced for twenty years or more, and almost none of the imbalance in these

schools occurred until the 1990s. (PX 137 at 11, Table 2 (Armor Rpt.).)

Briarwood, Devonshire, and Cochrane are all located in the same proximity in Eastern Charlotte, just outside the inner city. (DX 5 Attach. E (Foster Rpt.).) This area has experienced a dramatic decrease in the white school-age population and a simultaneous increase in the black school-age population. (PX 137 at 9 (Armor Rpt.); PX 138 Table 6, Figs. 2–9 (Clark Rpt.).) Briarwood, which has had sixteen years of racial balance, fell in and out of balance a couple times in the 1980s and has been imbalanced since 1990. (PX 137 at 11 (Armor Rpt.).) It is currently 84% black, the highest black student population the district has seen in thirty years, aside from Hidden Valley. (DX 3 (CMS Enrollment Rpts.).) Devonshire experienced the same trend as Briarwood, but it has reduced its previously high black population of 82% to 66% by recently adding a magnet program. (DX 5 at 16–17 (Foster Rpt.).) Cochrane, which is currently 75% black, is surrounded by other majority black middle schools, making it impracticable to change its boundaries. (PX 137 at 9 (Armor Rpt.).) In 1997, Cochrane adopted a communication arts magnet to help correct its growing imbalance. (*Id.*; DX 5 Attach. B, Table 5 at 5 (Foster Rpt.).) So far, the reduction in the black population at Cochrane has been slight. (PX 137 at 9 (Armor Rpt.).) Part of the racial balancing difficulties appear to stem from the high number of whites in this area who attend private schools. (PX 138 at 11–12 (Clark Rpt.).)

Of the schools that have been racially imbalanced and predominately white for more than three years, *see supra* note 18, most are located in the northernmost and southernmost regions of the county where the census tracts are virtually all-white. (PX 137 at 5 (Armor Rpt.); PX 138 Figs. 8–9 (Clark Rpt.).) Of these outer area schools, Bain, Matthews, McAlpine, McKee, South Charlotte, and Providence are located in census tracts that, in the

most recent census of 1990, were 95% or more white. (PX 138 Figs. 8–9 (Clark Rpt.).) Clear Creek, Cornelius, Davidson Road, Huntersville, Lebanon Road, Mallard Creek, Alexander, and Davidson IB are located in outer area census tracts that, in 1990, were 75% to 95% white, and almost all of these schools closely bordered census tracts that were 95% or more white.[27] (Id.) Only two of the schools in the imbalanced-white category—Randolph and East Mecklenburg—are located in the middle suburban ring around the inner city, an area that is closer to more racially mixed neighborhoods but which remains predominately white for these two schools. (Id.; DX 5 Attach. E (Foster Rpt.).) Randolph had a long history of racial balance until the 1992–93 school year. (DX 7 Ex. A–115 (Peterkin Rebuttal Rpt.).) It fell out of balance for·six years but never had a black student body lower than 19%. (Id.) In the most recent school year, it had a 46% black student population. (Id.) East Mecklenburg fell out of balance for five non-consecutive years during the 1980s but never by more than two percentage points. (Id. at Ex. A–125.) It has remained racially balanced since the 1988–89 school year and, most recently, was 32% black. (Id.)

Given that the Court's earliest plans allowed some schools with black populations as low as 3%—coupled with the fact that the Court never explicitly established a minimum percent black enrollment—the Court is hesitant to find that the small black populations at schools in the outermost regions are vestiges of the dual system. Cf. Jacksonville NAACP, supra slip op. at 11 n. 10. Such racially identifiable schools are inevitable due to "the practicalities of the situation." Davis v. Board of Sch. Comm'rs, 402 U.S. 33,37,91 S.Ct. 1289,1292,28 L.Ed.2d 577 (1971); Swann, 402 U.S. at 25–26, 91 S.Ct. at 1280–81. While many of these outer area schools

maintained black enrollments at or near 20% in prior years, (DX 3 (CMS Enrollment Rpts.)), the white population in these areas has continued to grow. (PX 138 Fig. 8 (Clark Rpt.).) Consequently, it has become impracticable to achieve higher racial balance in the absence of large-scale mandatory busing efforts, which would only impose additional burdens on black students. (PX 137 at 5, 8 (Armor Rpt.); PX 138 at 12–13 (Clark Rpt.).)

### f. Possibilities of Further Racial Balance

CMS and the Swann Plaintiffs assert that the system can improve its racial balance by making further adjustments in assignment zones, creating new satellite zones, and so on. Such measures are not required. Swann, 402 U.S. at 31–32, 91 S.Ct. at 1283–84 ("Neither school authorities nor district courts are constitutionally required to make year-by-year adjustments of the racial composition of student bodies once the affirmative duty to desegregate has been accomplished and racial discrimination through official action is eliminated from the system."); see also Freeman, 503 U.S. at 493, 112 S.Ct. at 1447 ("[The Constitution does not] require[ ] 'awkward,' 'inconvenient,' and 'even bizarre' measures to achieve racial balance in student assignments in the late phases of carrying out a decree."); Morgan v. Nucci 831 F.2d 313, 325 (1st Cir.1987) ("[E]ven if some upgrading of attendance patterns were reasonably possible, such fine tuning would not warrant the court's continued indefinite involvement.").

Despite having no obligation to do so, CMS, for years, has attempted to fix growing imbalances that were attributable not to the prior de jure system but to independent demographic forces and private choice. While the Court's original plan created nine noncontiguous satellite zones,

---

**27.** Long Creek is the only outer area school in the imbalanced-white category that is located in a census tract that was 50% to 75% white in 1990; however, the school closely borders a large census tract that was 75% to 95% white. Long Creek did not fall out of balance until the 1991–92 school year and was back in balance with a 38% black population in the most recent school year. (Id.)

*Swann,* 402 U.S. at 9, 91 S.Ct. at 1273, today, there are sixty-nine satellite zones. (DX 262–64 (CMS Satellite Zones).) During the last decade, the continued expansion of desegregation strategies has had diminishing returns in achieving racial balance, causing CMS and the Swann Plaintiffs to assert that the system needs to remedy these mixed results. Yet, the Court's authority is limited to remedying vestiges of segregation; it has no authority to order remedial action for the shortcomings of nonmandatory desegregation practices. *Cf. United States v. City of Yonkers,* 181 F.3d 301, 325 (2d Cir.1999) (Sack, J., concurring in part and dissenting in part) ("Integration is not necessarily a vestige of segregation.").

A complete overhaul of the student assignment plan, as alternatively suggested by CMS, is likewise unnecessary. As an eleventh hour strategy, CMS presented a proposed student assignment plan just one week before trial. (*See* DX I (CMS's Proposed Remedial Plan) (proffered).)[28] This plan, which uses the technique known as "controlled choice,"[29] was developed only in response to the *Capacchione* litigation. CMS and the Swann Plaintiffs insist that the Court must entertain the proposed plan before deciding unitary status. They argue that a unitary status determination may not focus solely on the existing court-ordered desegregation plan but also must inquire into whether there are other practicable means available to achieve further racial balance. The Court disagrees.

■ "A court should not remain involved in the assignment process indefi-

nitely merely because some further degree of compliance with assignment standards is conceivable." *Morgan,* 831 F.2d at 324; *see Calhoun v. Cook,* 525 F.2d 1203, 1203 (5th Cir.1975) ("It would blink reality and authority, however, to hold the Atlanta School System to be nonunitary because further racial integration is theoretically possible and we expressly decline to do so." (citation omitted)); *cf. James B. Beam Distilling Co. v. Georgia,* 501 U.S. 529, 542, 111 S.Ct. 2439, 2447, 115 L.Ed.2d 481 (1991) ("Public policy dictates that there be an end to litigation." (citations omitted)). It would greatly confound discovery and trial proceedings in a unitary status case if, at the last minute, the party seeking to prolong court supervision simply could offer up the latest 'soup du jour' in desegregation policy as an untried method. Here, CMS already has implemented numerous techniques under the guidelines of *Swann* including a feeder plan, pairing and grouping, satellite zones, M–to–M transfers, stand alone schools, mid-point schools, and magnet schools. There always will be new, unused, and hypothetical education techniques and policies, just as there always will be new criticisms of the old policies. After all, the history of public education in America is a history of continual reform.

The Court declined to consider CMS's "litigation strategy" plan and therefore makes no finding as to whether it would achieve its stated goal of further racial balance. Rather, the Court observes that controlled choice is a technique that was

---

28. Court excluded the plan on the grounds that the initial phase of the trial involved whether CMS had complied with the *Swann* orders up to the time of the present lawsuit. (Order of 4/14/99.) The Court said it would consider the plan only if it found additional remedial action was needed. (*Id.*) The Court was especially concerned that the plan—which is purely speculative and based on numerous contingencies—was introduced after the deadlines for fact discovery and expert witness discovery had expired, a violation of the pretrial order. (*Id.*)

29. Under such a plan, the school system would be divided up into large racially diverse geographic zones, and students could apply to any school in their designated zone, (Tr. 6/9 at 171 (Test. of Dr. Gordon Foster) (proffered).) CMS would give preferences to those applicants who live in walking distance of the school and those with siblings in the school. (*Id.*) The remaining seats would be filled based on racial preferences with the goal of achieving a certain racial mix at each school. (*Id.* at 174.)

never mandated by this Court, was not contemplated under the guidelines enunciated in *Swann*, 402 U.S. at 22–32,91 S.Ct. at 1279–84, and was not even presented to the Court until the eve of the most recent trial. *Cf, Jacksonville NAACP, supra,* slip op. at 118–19 (rejecting the argument that the board must "adopt measures [namely, controlled choice] in addition to, or substantially different from, those the parties agreed to, and which the Court ratified").

As such, consideration of the plan, at this late date, would not serve the broader objective of ensuring that court supervision not extend any longer than is strictly necessary. *Jenkins III,* 515 U.S. at 99, 115 S.Ct. at 2054; *Freeman,* 503 U.S. at 489–90, 112 S.Ct. at 1445. Furthermore, on its face, the plan's cardinal fixation on racial preferences raises significant equal protection implications. As discussed above, there are limitations on using race, even in the desegregation context. *See supra* part II.A. A court would be remiss if–thirty years down the road, when any causal connection to the dual system necessarily has dissipated—it mandated compliance with a plan that was even more race conscious than the original plan. As stated in *Freeman,* "[a] remedy is justifiable only insofar as it advances the ultimate objective of alleviating the initial constitutional violation." 503 U.S. at 489, 112 S.Ct. at 1445; *see Swann,* 402 U.S. at 16, 91 S.Ct. at 1276 ("[T]he nature of the violation determines the scope of the remedy."). Here, the complete overhaul of the system would exceed the proper remedial scope.

The Court finds that CMS has complied fully and satisfactorily with the student assignment aspects of the court-ordered desegregation plan. The plan has achieved its objective of creating a unitary school system by eliminating the past vestiges of discrimination to the extent practicable.

## 2. Faculty Assignment

In the *Swann* Order of April 23, 1969, the Court examined the *post-Brown* faculty desegregation efforts of CMS, finding: "The Board makes no sustained effort to desegregate faculties." 300 F.Supp. at 1370. CMS's "passive selection policy," whereby the principal of each school selected the teachers for that school, had produced the following results:

> Of the thirteen all black schools in the system serving 8,840 students, only four have any white teachers. Those four have ten white teachers and 161 black teachers for 3,662 students. Few predominantly black schools have any substantial number of white teachers, except a few schools which serve areas rapidly turning from white to black. Eight other schools 99% or more black had only six white teachers among them for 5,246 black and 24 white pupils. Second Ward and West Charlotte High Schools, with 2,700 black students and three white students, have 131 black teachers and only nine white teachers.

> All of the white elementary schools have at least one and in a few cases as many as three or four black teachers. The proportions of black teachers in the junior and senior high schools run slightly higher. The system has not operated, however, to produce any substantial teaching of black students by white teachers.

*Id.* At the time, the faculty of CMS was about 26% black—roughly 900 out of 3,500 teachers. *Id.* Having found that the faculties remained virtually all-white or all-black, the Court directed the school board to submit a plan for the active and complete desegregation of teachers. *Id.* at 1373.

By August 15, 1969, the Court observed: "In the formerly all-black faculties the Board has dramatically exceeded its goal. It is assumed by the court that this process of faculty desegregation will continue and that the goal for 1970–71 will be that faculties in all schools will approach a ratio under which all schools in the system will have approximately the same proportion of black and white teachers." *Swann,* 306

F.Supp. at 1295. On November 7, 1969, the Court again commented that "[f]aculty desegregation ha[d] significantly and commendably improved" but noted that "only six 'black' schools and one 'black' kindergarten ha[d] predominantly white faculties; and 98 out of the 106 schools and kindergartens in the system [were] readily and obviously identifiable by the race of the heavy majority of their faculties." *Swann*, 306 F.Supp. at 1302. In a Supplementary Opinion dated December 1, 1969, the Court stated that "[t]he defendants have admitted their duty to desegregate the schools; considerable progress has been made toward desegregation of faculties." *Id.* at 1306. Still, "[n]ine-tenths of the faculties [we]re still obviously 'black' or 'white.' " *Id.* at 1308. The Court directed CMS to fully desegregate faculties by the beginning of the upcoming 1970–71 school year. *Id.* at 1313.

When the Court mandated a desegregation plan on February 5, 1970, it left the board-proposed faculty plan essentially intact, ordering: "That desegregation of faculty be accomplished, as previously ordered, by assigning faculty (specialized faculty positions excepted) so that the ratio of black and white faculty members of each school shall be approximately the same as the ratio of black and white faculty members throughout the system." *Swann*, 311 F.Supp. at 268 [30] The Court also directed CMS to implement a continuing program to assign teachers "in a condition of desegregation." *Id.* at 269. By August 3, 1970, the Court acknowledged that [f]aculties have been assigned for all schools according to the February 5, 1970 order, so that when schools open in September all faculties will have about 75% White teachers and about 25% Black teachers. *Swann*, 318 F.Supp. at 790. During the remainder of *Swann*, the Court entered no further directives or findings regarding faculty assignment other than to

restate the provisions of the Order of February 5, 1970. *See Swann*, 362 F.Supp. at 1225; *Swann*, 334 F.Supp. at 631.

CMS maintained a centrally-controlled faculty assignment process until 1992, when it adopted a more site-based management system in which principals actively recruited teachers and were then held accountable for the results they achieved. (Tr. 5/28 at 25–26 (Test. of Gwendolyn Bradford); Tr. 4/26 at 118–19 (Test. of John Murphy); Tr. 4/28 at 124–28 (Test. of Dan Saltrick).) Then–Superintendent John Murphy instituted this change as a way to improve the quality and competence of faculty and to achieve his goal of higher test scores for students. (Tr. 4/26 at 118–19 (Test. of John Murphy).) Current–Superintendent Eric Smith stated that this policy basically has continued, with CMS assisting in the recruitment of teachers to the district. (Tr. 6/8 at 172–73 (Test. of Eric Smith).)

In addition, CMS recently implemented regulations that restrict the freedom of teachers to transfer schools if the transfer would affect the racial balance of the school. (Tr. 5/28 at 34, 47 (Test. of Gwendolyn Bradford).) Of course, CMS runs the risk of losing significant numbers of teachers if its faculty assignment policies become too restrictive. (*Id.* at 47–49.) Attracting good teachers often means giving them preferences in where they work, and teachers usually want to work near their homes. (Tr. 5/19 at 116–18, 121–22 (Test. of Calvin Wallace); Tr. 4/28 at 124 (Test. of Dan Saltrick).) In this way, residential demographics pose a practical obstacle to achieving and maintaining an ideal amount of racial balance because CMS cannot control where teachers live. (Tr. 5/19 at 116–18, 121–22 (Test. of Calvin Wal-

---

30. The Court also ordered: "That teachers be assigned so that the competence and experience of teachers in formerly or recently black schools will not be inferior to those in the

formerly or recently white schools in the system." *Id.* Compliance with this provision is analyzed below as an ancillary quality of education issue. *See supra* part II.B.7.a.

lace); Tr. 5/28 at 59–62 (Test. of Gwendolyn Bradford).)

Another practical problem faced by the district is the fact that it must constantly hire thousands of new teachers in the midst of a national teacher shortage and a high turnover rate for teachers in economically-impoverished areas. (Tr. 5/27 at 45–47 (Test. of Dr. William Trent).) Gwendolyn Bradford, Executive Director of Human Resources for CMS, testified that the shortage of teachers is especially pronounced with regard to black teachers, particularly in this region of the country. (Tr. 5/28 at 45 (Test. of Gwendolyn Bradford).) *See also Coalition to Save Our Children v. State Bd. of Educ.* 90 F.3d 752, 767 (3d Cir.1996) (observing that the "critical shortage of black teachers in public schools" is "a manifestation of an unfortunate contemporary national trend"). The proportion of black faculty in CMS rose to about 30% in 1980 but has fallen to about 20% in the most recent year. (SX 3 at 6 (Smith Rpt.).) In response, CMS has instituted hiring policies aimed at drawing black teachers to the district. (Tr. 5/28 at 33–34, 79–80 (Test. of Gwendolyn Bradford).) Apparently, this has had some success because Bradford testified that CMS currently exceeds the state and national average for the number of minority teachers employed. (*Id.* at at 46.)

In assessing CMS's compliance with the faculty assignment order, the Court must be sensitive to these practical problems but also must scrutinize the level of racial balance in light of CMS's departure from the central monitoring of faculty assignment. The Court first notes that the faculty assignment order was never made any more numerically specific than requiring the racial composition of faculty at each school to reflect the district-wide average. The Court will examine CMS's racial bal-

ance in faculty using a ±15% variance, which is a commonly accepted standard. *See Coalition to Save Our Children,* 90 F.3d at 766 n. 21 ("Courts addressing unitary status motions typically have considered faculties within ± 15 percentage point of the district-wide minority composition to be racially balanced). Indeed, recognizing the difficulty of achieving perfect balance, particularly with small elementary school faculties, some courts have applied a standard of ± 20 percentage points." (citing *Flax v. Potts,* 725 F.Supp. 322, 326–29 (N.D.Tex.1989), aff'd, 915 F.2d 155 (5th Cir.199)); *Pitts v. Freeman,* 887 F.2d 1438, 1447 (11th Cir.1989) affirming a ± variance for faculty as within the district court's discretion).

During the trial, the bulk of the evidence focused on the most recent school years given that CMS and the Swann Plaintiffs asserted that the worst imbalances in faculties occurred in the 1990s when the system instituted site-based management. The calculations made by the parties' experts varied due to the use of differing standards for compliance, the rounding off to different decimals, and the counting of "special school" faculties, which are inapplicable to the analysis.[31] The Court relies on the school-by-school faculty composition data presented in the report of Dr. William Trent, a CMS expert witness. (DX 10 App. C, Ex. 5, Tables 24–26 (Trent Rpt.).) Dr. Trent's report provided the racial percentages for faculty for school years 1995–96, 1996–97, and 1997–98. (*Id.*)

The evidence from these recent years reveals a stark contrast to the Court's findings in 1969. No school has had an all-black faculty. (*Id.*) Only one school, Amay James Elementary, ever had an all-white

---

**31.** The Court does not include "special schools" in calculating faculty imbalance for the same reason that those schools are excluded from the student assignment analysis. *See supra* part I.B.1.b. Plus, "specialized faculty" are exempt from racial balancing requirements. *Swann,* 311 F.Supp. at 268. A certain background would be needed for faculty that deal with students who are mentally or physically disabled or who have severe disciplinary problems, It would be unfair to enforce a prescribed racial balance in such schools. Also, it is somewhat misleading to count them as imbalanced schools because the faculties for these programs tend to be small, sometimes as few as four teachers. (*See* Tr. 5/19 at 55 (Test. of Calvin Wallace).)

faculty. (*Id.*) During the 1995–96 school year, Amay James—interestingly, a former-*de jure* black school, located in the inner city-had no blacks among its fifteen teachers. (*Id.*) This may have been due to the fact that the school had recently started a Montessori magnet program, which uses certified Montessori teachers. (DX 5 Attach. B, Table 5 at 3 (Foster Rpt.); PX 212 (CMS Facts & Faces).) Notably, the Court's order on faculty assignment excludes "specialized faculty positions," *Swann*, 311 F.Supp. at 268, and certified Montessori teachers are presumably included in this exemption.

Similarly, there have been no conspicuous cases of predominately black faculties. None of the 122 schools that CMS operated during the 1997–98 school year had majority black faculties. (*Id.* Ex. 5, Table 26.) As for the previous years, only two schools had black faculties exceeding 50%: Lincoln Heights Elementary was 59% black in 1995–96 and Cochrane Middle was 54% black in 1996–97. (*Id.* Ex. 5, Tables 24–26.)

Applying the ± 15% standard, well over 90% of the system's schools were within this variance even during the school years with the "worst" racial imbalance. During the 1997–98 school year, only ten schools exceeded the ± 15% variance: Briarwood Elementary (5.5% above), Druid Hills Elementary (7.4% above), First Ward Elementary (9.8% above), Oakdale Elementary (0.7% above), Westerly Hills Elementary (2.9% above), Albemarle Road Middle (2.5% above), Cochrane (8.3% above), Northeast Middle (2.1% above), Wilson Middle (3.2% above), and Garinger High (1.1% above). (PX 137 (Armor Rebuttal Rpt.); *cf.* DX 10 App. C, Ex. 5, Table 26 (Trent Rpt.).) The previous school year saw only nine schools exceeding the ± 15% variance: Briarwood (12.5% above), Lincoln Heights (6.1% above), Tryon Hills Elementary (6.1% above), Westerly Hills (0.4% above), Cochrane (12.5% above), Ranson Middle (1.2% above), South Charlotte Middle (4.8% below), Wilson (4.2% above), and Garinger (3.3% above). (PX 137 (Armor Rebuttal Rpt.); *cf.* DX 10 App. C, Ex. 5, Table 25 (Trent Rpt.).)

CMS and the Swann Plaintiffs claim that site-based management led to a total disregard of the faculty assignment order, and they point to a 1992 memorandum written by Dr. Stolce to then-superintendent Murphy, cautioning that the faculties of fifteen schools were racially identifiable using a ± 10% variance from the district-wide ratio. (SX 56 (Mem. from Stolee to Murphy of 6/11/92); *see also* DX 71 (Mem. from Stolee to Murphy of 4/13/92).) It is unclear whether Superintendent Murphy ignored this warning. (Tr. ⁴/₂₆ at 164–68 (Test. of John Murphy).) During the 1997–98 school year, only three of these fifteen schools remained outside a ± 10% variance: Eastover Elementary (1.9% below), Huntersville Elementary (1.7% above), and Albemarle Road Middle (7.5% above). (*See* DX 10 App. C, Ex. 5, Table 26 (Trent Rpt.); PX 137 (Armor Rebuttal Rpt.).) Of these, only Albemarle Road was outside the ± 15% variance. Thus, either something was done about the imbalances in the fifteen schools or the problem corrected itself.

CMS undoubtedly has achieved the type of balance one would find in a desegregated system. For example, the Third Circuit affirmed a unitary status finding where a school district had satisfied a ± 10 standard in 80% of its schools for fifteen years. *Coalition to Save Our Children*, 90 F.3d at 766–67 n. 21. CMS has matched this mark even according to the analysis of the district's own expert. Dr. Peterkin found that, from 1977 to 1997, 75% to 95% of the district's schools had racially balanced faculties in any given year based on a restrictive ± 10% variance; moreover, this analysis inflated the level of racial imbalance by including the faculties of special schools. (DX 6 Ex. 13d (Peterkin Rpt.).) *See also Flax*, 915 F.2d at 163 (upholding a unitary status declaration as to faculty even though six schools lay more

than twenty percentage points outside the system-wide ratio).

In sum, CMS complied with the Court's faculty assignment provisions by reassigning faculty in large numbers early on and by maintaining a high degree of racial balance for many years thereafter. The Court has not had to revisit the issue of faculty assignment since 1970. Given CMS's trend of compliance, the Court likely would have granted unitary status as to faculty when site-based management was instituted in 1992. The remaining imbalance is too small to be considered indicative of a school system that is segregating its faculty. Plus, the deficiencies are generally attributable to factors outside CMS's control, such as the shortage of teachers and the impact of residential demographics on schools' faculty compositions. The Court therefore concludes that CMS has fulfilled the Court's mandate by desegregating its faculty to the extent practicable.

### 3. Facilities and Resources [32]

In contrast to student assignment and, to some extent, faculty assignment, where often a longer remedial period is expected, the remaining *Green* factors are amenable to more immediate compliance. As stated by the Supreme Court in *Swann:*

> When a system has been dual ..., the first remedial responsibility of school authorities is to eliminate invidious racial distinctions. With respect to such matters as transportation, supporting personnel, and extracurricular activities, no more than this may be necessary. Similar corrective action must be taken with regard to the maintenance of buildings and the distribution of equipment.

402 U.S. at 18, 91 S.Ct. at 1277. Thus, disparities in these areas are not likely to be grounds for prolonged judicial supervision. *See, e.g., Henry v. Clarksdale Mu-*

*nicipal Separate School Dist.,* 433 F.2d 387, 388 n. 3 (5th Cir.1970) (finding immediate compliance with a desegregation order as to transportation, faculty, staff, extra-curricular activities, and facilities).

In the initial stage of the *Swann* case, the Court examined the various aspects of school operations to determine whether vestiges of the dual system remained. In its Order of April 23, 1969, the Court concluded the following:

> No racial discrimination or inequality is found in the following disputed matters:
>
> . . . .
>
> The quality of the school buildings and equipment. The evidence showed the per pupil value of the land and buildings and equipment of the various schools. Average value of these items per pupil for elementary schools was $861; for high schools $1,229; and for senior high schools $1,567. Schools described by witnesses as 'white' ranged well up and down on both sides of that average figure and schools described by witnesses as 'black' showed a similar variation. Several of the oldest and most respected 'white' elementary schools in the county (Sharon Road and Steele Creek, for example) have very low per pupil facilities values. One of the newest but still all black high schools (West Charlotte) has one of the highest per pupil facilities values. The highest priced school (Olympic High) is totally desegregated (522 white and 259 black students). No racial discrimination in spending money or providing facilities appears.

*Swann,* 300 F.Supp. at 1366.

The Court reiterated this finding in its Order dated August 15, 1969: "The defendants contended and the court found in its April 23, 1969 order that facilities and teachers in the various black schools were

---

**32.** The Court's analysis of the facilities Green factor does not encompass the issue of school siting, which is more appropriately addressed as an aspect of student assignment. *See supra* part II.B.1; *see also Martin,* 475 F.Supp. at 1328 (treating school siting as an aspect of pupil assignment).

not measurably inferior to those in the various white schools. It is too late now to expect the court to proceed upon an opposite assumption." *Swann*, 306 F.Supp. at 1298. In its Order dated October 21, 1971, the Court again stated: "[T]he formerly black schools are not shown nor suggested to be inferior in faculty, plant, equipment or program." *Swann*, 334 F.Supp. at 625. In 1975, just prior to the final "Swann Song" order, the Court awarded attorneys' fees to the Swann Plaintiffs, observing that they were the prevailing party "[e]xcept for the refusal of the court to find in the plaintiffs' favor ... regarding adequacy of physical plants and equipment and teacher quality." *Swann v. Charlotte–Mecklenburg Bd. of Educ.*, 66 F.R.D. 483, 484 (W.D.N.C.1975).

These findings establish that there were no vestiges of discrimination in facilities and resources at the initial stages of the *Swann* case and at the close of the case in 1975. Moreover, at no time since the Swann case was filed has the Court ever imposed any remedial measures addressing discrimination in the quality of facilities. Despite these findings, CMS and the Swann Plaintiffs assert that there are current disparities in facilities that require remedial action. They ask the Court to presume that such disparities are vestiges of segregation that are causally linked to the dual system. The Plaintiff–Intervenors counter that Judge McMillan's findings on facilities constitute collateral estoppel and law of the case as to that *Green* factor, thereby shifting the burden to CMS and the Swann Plaintiffs to show discriminatory intent.

■■ "The principles of collateral estoppel or issue preclusion are applicable to school desegregation cases." *Riddick*, 784 F.2d at 531 (citations omitted). Thus, where a court previously granted unitary status, there can be no automatic presumption that racial disparities are causally linked to the dual system, and the burden of proof shifts back to the plaintiffs alleging discrimination. *Id.* at 534. Here,

the Court has never granted unitary status to CMS, nor has it partially withdrawn supervision as to facilities or any other *Green* factor. Then again, it was not clear that a court could incrementally withdraw its supervision in a desegregation case until the *Freeman* decision in 1992. 503 U.S. at 490, 112 S.Ct. at 1445.

Justice Souter's concurrence in *Freeman* suggests that, prior to the total dissolution of a desegregation order, a court may reassert control over a relinquished area without a new showing of discriminatory intent. *Id.* at 509, 112 S.Ct. at 1455 (Souter, J., concurring). Of course, the possible reassertion of control addressed by Justice Souter involved an aspect of school operations where discrimination was once found and subsequently remedied. *Id.* In the present case, the Court cannot "reassert" control over facilities because it never assumed control. Indeed, the Court refused to remedy any disparities in facilities because, after the issue was thoroughly litigated, it found no discrimination. Certainly, there was a reason for the Court to make such findings.

■ Because desegregation remedies must be premised upon constitutional violations, *Swann*, 402 U.S. at 22–23, 91 S.Ct. at 1279, "plaintiffs ... must prove intent and causation and not merely the existence of racial disparity." *Freeman*, 503 U.S. at 506, 112 S.Ct. at 1454 (Scalia, J., concurring) (citing *Bazemore v. Friday*, 478 U.S. 385, 407–09, 106 S.Ct. 3000, 3012–13, 92 L.Ed.2d 315 (1986) (White, J., concurring); *Washington v. Davis*, 426 U.S. 229, 245, 96 S.Ct. 2040, 2050, 48 L.Ed.2d 597 (1976)). Of course, at the outset of a desegregation case, a finding of intentional discrimination in one area of school operations warrants an inference that segregation in other parts of the system was also purposeful absent sufficient evidence to the contrary. *Dayton Bd. of Educ. v. Brinkman*, 443 U.S. 526, 537, 99 S.Ct. 2971, 2978–79, 61 L.Ed.2d 720 (1979); *Keyes v. School Dist. No. 1*, 413 U.S. 189, 206–14, 93 S.Ct. 2686, 2696–700, 37 L.Ed.2d 548 (1973). The ex-

press findings of the Court in *Swann* show that CMS overcame this inference as to certain areas of school operations, including the quality of facilities. 300 F.Supp. at 1366–67. Thus, it would defy logic to place now the burden of proof on the Plaintiff–Intervenors, requiring them to prove that vestiges of discrimination in facilities have been remedied, when the Court originally found no vestiges to exist. See *City of Yonkers*, 181 F.3d 301, 305 n. *I ("[I]n the absence of findings that there are vestiges .... the burden is properly placed on the parties that desire to prolong judicial oversight.").

In any event, the Court heard a great deal of testimony on the alleged racial disparities in facilities. Many witnesses, including school board members, testified that there are disparities in the quality of facilities throughout the system. (*See, e.g.,* Tr. 4/20 at 189) (Test. of John Lassiter) ("[A]ll schools are not equal."); Tr. 4/21 at 126 (Test. of Lindalyn Kakadelis) ("[F]acilities need to be upgraded."); (Tr. 4/22 at 108 (Test. of Velma Leake) ("[F]acilities were not adequate across the district.").) This is not surprising in a system with 135 schools. Witnesses debated whether such disparities appear along racial lines, however. For the most part, witnesses only offered anecdotal evidence, which rarely, if ever, suffices to show a systematic pattern of discrimination justifying remedial action. *Wessmann v. Gittens*, 160 F.3d 790, 805–06 (1st Cir.1998) (*citing Coral Const. Co. v. King County*, 941 F.2d 910, 919 (9th Cir.1991)). Leaving aside the reliability problems of anecdotal evidence, the Court could not draw any consistent conclusions from such testimony.

For example, Jane McIntyre, a school board member from 1987 to 1995, complained of disparities in facilities she observed in the mid–1970s when her daughters were bused to First Ward Elementary, which was located in the middle of an inner city public housing area. (Tr. 5/13 at 126–32 (Test. of Jane McIntyre).) First Ward, as she described it, had "trash everywhere" and was surrounded by a chain-link fence with "barbed wire." (*Id.* at 128–30.) Compared to the "very well maintained" Landsdowne Elementary, the predominately white school where her daughters started their education, the conditions at First Ward were "unnerving." (*Id.* at 126–27, 129.) Since that time, though, CMS has spent a great deal of money improving First Ward—$2,910,308 in 1987 and a proposed $1,848,000 from 1997 bond money—to the point where, today, it is arguably a more attractive school than Landsdowne. (*Id.* at 176–82, 184–85.)

The problem of comparing just a handful of schools was similarly illustrated with Susan Purser, Associate Superintendent of Educational Services for CMS. Purser testified that she visited a variety of schools when she first came to CMS in the 1996–97 school year, and, right away, she noticed the difference between Elizabeth Lane Elementary, a predominately white school that was "very adequately equipped," and Shamrock Gardens Elementary, a predominately black school with "dingy" classrooms. (Tr. 6/14 at 81–82 (Test. of Susan Purser).) On cross-examination, counsel presented Purser with a recent inventory survey conducted by CMS to determine schools' baseline needs. *Id.* at 112–31. In comparing Hidden Valley Elementary (95% black) with McAlpine Elementary (4% black), McAlpine appeared to have much greater needs than Hidden Valley. *Id.* Thus, different generalizations can be made depending on which two schools one picks to compare.

Likewise, Annelle Houk, former chair of the League of Women Voters education committee, recited a number of problems she observed in predominately black schools, recounting that, in one school, the PTA had to raise money just to buy toilet paper. (Tr. 5/14 at 11–12 (Test. of Annelle Houk).) On cross-examination, counsel questioned Houk about a 1992 survey conducted by the League of Women Voters

that compiled the "urgent basic needs" of various schools in the district. (*Id.* at 64.) Most of the schools listed in the survey with urgent needs were racially balanced, while others were identifiably white or black. (*Id.* at 64–85.) In fact, the survey revealed that the school she said was in need of toilet paper was Marie G. Davis Middle School, a racially balanced, majority white school. (*Id.* at 78–80.)

Expert witnesses also offered testimony on the quality of facilities. Dr. Armor testified for the Plaintiff–Intervenors that there were no racial disparities in facilities. (Tr. 4/29 at 113 (Test. of Dr. David Armor).) While the Court ultimately concludes the same, it does not rely on Dr. Armor's testimony for two reasons. First, his testimony on facilities was of limited usefulness due to his lack of experience in facilities planning. (*Id.* at 7–10.) Second, having no full database on the quality of CMS's facilities, he attempted to evaluate the system's facilities by reviewing CMS's parental satisfaction surveys [33] and by visiting selected schools.[34] (*Id.* at 108–09.) Such non-random methodologies provide an inadequate basis to form a reliable expert opinion under Rules 702 and 703 of the Federal Rules of Evidence. *See Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 589–90, 113 S.Ct. 2786, 2795, 125 L.Ed.2d 469 (1993). To his credit, Dr. Armor admitted that his samples were not random, (Tr. 4/29 at 113 (Test. of Dr. David Armor)), and he offered no conclusion as to the unitariness of facilities, stating that he did not have adequate information. (*Id.* at 243–44.)

CMS called Dr. Dwayne Gardner as a facilities expert to testify that schools in predominately black areas are in greater need of improvement than those in predominately white areas. (Tr. 5/24 at 121 (Test. of Dr. Dwayne Gardner).) Dr. Gardner conducted physical inspections of 73 schools—slightly more than half of the system's 135 schools. (DX 13 at 5 (Gardner Rpt.).) Each inspection lasted approximately two to three hours. (*Id.* at 2.) He visited all schools that CMS deemed either (1) identifiably black or (2) racially balanced but located in a predominately black area. (*Id.* at 5–6.) The remaining schools—a sampling of those that did not fall into the first two categories—were likewise selected by CMS, which raises obvious concerns about the independence and reliability of the sample. (Tr. 5/24 at 186–87 (Test. of Dr. Dwayne Gardner).) Based on these inspections and other CMS documents, Dr. Gardner assessed the quality of each school by assigning it a rating from 1–100 in the following areas: adequacy, safety, healthfulness, accessibility, flexibility, efficiency, expansibility, and appearance. (*Id.* at 2.) He then made a composite score for each school and grouped the schools into the following categories: 0–44 (suggests replacement), 45–59 (needs major improvement), 60–74 (needs minor improvement), 75–89 (serves program needs), and 90–100 (exceptional quality). (*Id.* at 4–5.)

Aside from the lack of a truly random sample and the inherent subjectivity in rating schools based on criteria not rigidly quantifiable, the results of Dr. Gardner's analysis do not show disparities along racial lines. For example, of all the schools he assessed, a total of four schools fell into the lowest category, which suggests that the facility is so inadequate it needs replacement. Druid Hills Elementary and Highland Elementary—both imbalanced-black schools based on the ± 15% standard—had respective scores of 44 and 43. (*Id.*, Att. C, Ex. I at 1.) Elizabeth Traditional Elementary and Myers Park Ele-

---

**33.** The surveys showed that parents overall, black and white, were satisfied with the facilities where they sent their children and that, in some categories, black parents were more satisfied than white parents. (*Id.* at 11–12.)

**34.** Armor visited thirteen schools, spending roughly an hour at each one, and also drove by various others to get a "representative sample." (*Id.* at 112–14.) He concluded that he was "impressed with the overall operations of these facilities." (*Id.* at 113.)

mentary—both majority white schools in predominately white neighborhoods—had respective scores of 38 and 41, the two lowest scores in the district. (*Id.*, Att. C, Ex. I at 4; Tr. 5/24 at 175–78 (Test. of Dr. Dwayne Gardner.)) The two highest scores for CMS elementary schools were 82 for Davidson Elementary, a predominately white school in a predominately white neighborhood, and 79 for Morehead Elementary, a school with a 60% black student population. (DX 13, Att. C, Ex. I (Gardner Rpt.).)

While none of the schools scored in the 90–100 category, a majority of the schools scored in the 45–59 category, indicating a need for major improvements. (Id.) Sixteen identifiably black schools fell into the "needs major improvement" category, while eighteen identifiably white and eight racially balanced schools fell into that category. (*Id.*) It must be remembered that Dr. Gardner analyzed *every* identifiably black school in the system, while he analyzed only a *sampling* of schools deemed racially balanced or identifiably white, so the latter two categories are likely to have even more schools needing major improvements. (*Id.* at 5–6.)

In sum, Dr. Gardner's report demonstrates that CMS's facilities needs are spread across the system without regard to the racial composition of its schools. Dr. Gardner was unable to trace any current disparities to the dual system. (Tr. 5/24 at 152–58 (Test. of Dr. Dwayne Gardner).) The only cause of disparities that Dr. Gardner identified was related to the age of respective facilities. He stated that different building standards [35] apply when a new facility is constructed as compared to when an older facility is renovated or upgraded. (*Id.* at 125.) In other words, the renovation of an older facility usually complies with the code under which the

facility was built. Because most facilities in the predominately black inner city are older while facilities in the predominately white suburbs are newer, the inference is that differences in building standards tend to affect black students disproportionately. This does not amount to racial discrimination. Indeed, this practice applies regardless of the racial composition of the school. (*Id.* at 142–143.) Thus, older schools that are predominately white—several of which were built in the 1920s, (DX 13, Att. C, Ex. 1 at 4 (Gardner Rpt.))—are likewise affected by this practice.

The testimony of the CMS employee ultimately responsible for the maintenance of facilities echoed the findings of Dr. Gardner. William Booker, Assistant Superintendent for Building Services, was similarly unaware of any evidence that would link present inequities with the *de jure* discriminatory system. (Tr. 4/30 at 154–56 (Test. of William Booker).) Instead, he acknowledged that building codes and educational specifications change year-to-year and that the older a school gets, the more difficult it becomes to perform basic upgrades. (Tr. 5/25 at 19 (Test. of William Booker).) He testified that a large majority of schools–108 out of 135 or roughly 80% of them—are in need of renovations, and most of these needy schools–80 out of 108 or roughly 75% of them—have racially balanced student populations. (Tr. 4/30 at 142–45 (Test. of William Booker).) The primary reason for these inequities has been a shortage of funds and the need to focus scarce resources on critical areas first. (*Id.* at 151–54.) [36]

A particularly pressing need has been to build schools in areas with "significant growth and significant overcrowding." (Tr. 4/20 at 191 (Test. of John Lassiter).) Sharon Bynum, a former school board

---

**35.** Curiously, Dr. Gardner was at a complete loss to explain what these standards were. (*Id.* at 147–50.)

**36.** Booker insisted that the Board's failure to direct employees to upgrade older schools

also contributed to inequities. (*Id.*) Of course, this still goes back to funding. Had there been sufficient funds, CMS would have been able to adequately address the inequities.

member who served from 1986 to 1996, stated that the "extreme influx" of people into the outer regions of the county made it difficult to keep up with the maintenance of older facilities. (Tr. 4/22 at 26 (Test. of Sharon Bynum).) Plus, in the 1980s, the maintenance department was not managed well. (*Id.* at 25.) Once that department was reorganized, the problem of funding remained. (Id. at 25–26.)

In the early 1990s, CMS commissioned a report, known as the Heery Report, to determine the cost necessary to update and rehabilitate all physical facilities in the system. (Tr. 5/19 at 28–30 (Test. of Calvin Wallace).) The estimated cost was roughly $750,000,000, an amount that CMS has never had available for such purposes. (Tr. at 29, 34.) To paraphrase a statement by one attorney, the problem is not black or white; it's green. (Tr. 6/22 at 141 (Closing Argument of Lee Parks).)

Nevertheless, CMS continues to use its best efforts to renovate old facilities. (Tr. 4/30 at 156 (Test. of William Booker).) Perhaps the most crucial "equity safeguard" in place is CMS's practice of allocating funds on a per-pupil basis.[37] (Tr. 6/14 at 102 (Test. of Susan Purser); Tr. 5/19 at 35–36 (Test. of Calvin Wallace).) Most recently, CMS implemented baseline standards to assure that all facilities in the system are upgraded to comply with the most state-of-the-art standards. (DX 133 at 29–30 (Future School Planning Task Force Rpt.); Tr. 4/22 at 116 (Test. of Velma Leake); Tr. 5/24 at 26 (Test. of John Kramer); Tr. 6/14 at 58 (Test. of Susan Purser); Tr. 6/18 at 177–78 (Test. of Arthur Griffin).) These were actions that CMS took on its own initiative; the Court did not order it to do so.

Moreover, CMS has spent a large portion of bond money on improving schools in predominately black areas. (DX 63

(compilation of bond expenditures for 1985, 1987, 1991, 1993, and 1995).) One board member stated that "since 1993, we have spent somewhere in the neighborhood of $500,000,000 trying to renovate older facilities that had gone untouched in prior Board activity." (Tr. 4/20 at 196 (Test. of John Lassiter).) As discussed above, several old facilities have been overhauled completely. CMS also has received an infusion of federal funds to improve inner city schools by magnetizing them. (Tr. 4/22 at 27–28 (Test. of Sharon Bynum).) While some magnet schools still need renovations, they have not failed to draw students. (Tr. 4/20 at 213–14 (Test. of John Lassiter).) Also, some predominately black schools have won awards for their educational programs despite perceived deficiencies. (Tr. 5/18 at 24–25 (Test. of William McMillan).)

Just as Judge McMillan found thirty years ago, the Court finds today that inequities in facilities exist throughout the system regardless of the racial makeup of the school. These disparities are generally the result of the relative ages of the facilities, combined with an ongoing lack of funding and the need to accommodate unprecedented growth. As one former board member remarked:

> [N]obody intentionally ever focused on particular schools and said, forget them, let's spend the money over here. We did what we had to do. When the growth got so out of control in this county and we had to build new schools, we weren't going to put old resources in that school, you can't even buy those. You are going to put new resources in them. So, of course, the new schools had better walls and better cabling and software and so forth than some of the other schools did. It was a game of

---

37. Of course, PTA funding and other outside contributions, such as corporate donations, may cause disparities, but CMS has no control over this. *See Swann,* 300 F.Supp. at 1366–67 ("Parents contribute to school projects through voluntary Parent–Teacher Associations. This voluntary parental action is not racial discrimination against children whose parents are less able to make such contributions, and it does not come about through state action.").

catch up constantly without enough money for it.

(Tr. 4/22 at 51 (Test. of Sharon Bynum).)

Most notably, the Swann Plaintiffs have failed to overcome the Court's previous findings on facilities by establishing the requisite discriminatory intent and causation.[38] Despite thorough questioning throughout the two-month trial, none of CMS's current and former board members or employees could testify about intentionally discriminatory policies in the area of facilities. (*See, e.g.,* Tr. 4/20 at 196–98 (Test. of John Lassiter); Tr. 4/21 at 15,-218–19 (Test. of Lindalyn Kakadelis); Tr. 4/22 at 48–50 (Test. of Sharon Bynum).) Likewise, no witness was able to provide any evidence to show a causal link between current disparities in facilities and the dual system. (*See* Tr. 5/24 at 152–58 (Test. of Dr. Dwayne Gardner); Tr. 4/30 at 154–56 (Test. of William Booker).) As such, there is no need for the Court to assume supervision over CMS's facilities. CMS is capable of addressing the inequities in its facilities without a court order and has shown that it is committed to doing so. Therefore, the Court belatedly grants unitary status to CMS as to the *Green* factor of facilities.

### 4. Transportation

█ With regard to the factor of transportation, a court may grant unitary status when transportation is provided on a nondiscriminatory basis. *Coalition to Save Our Children,* 90 F.3d at 768; *Jacksonville NAACP, supra,* slip op. at 136–37; *United States v. Unified School Dist.,* 974 F.Supp. 1367, 1380–81 (D.Kan.1997). Here, the Court ordered "[t]hat transportation be offered on a uniform non-racial basis to all children whose reassignment to any school is necessary to bring about the reduction of segregation, and who live farther from the school to which they are assigned than the Board determines to be walking distance." *Swann,* 311 F.Supp. at

268. CMS has complied fully and satisfactorily with this requirement.

Indeed, CMS provides free bus transportation to all students who do not live within a mile and a half of their schools, regardless of whether they attend their assigned schools or magnet schools. (PX 19 at 3 (CMS Facts); Tr. 5/21 at 16 (Test. of Eric Becoates).) According to a 1994 report, this cost CMS roughly $75,000 per day. (DX 52 at 8 (Committee of 25 Rpt.).) Last year, 81,967 students—roughly 83% of CMS's current enrollment—were assigned to buses. (DX 215 (1998–99 CMS Facts).) Thus, rather than being a vestige of past discrimination, CMS's transportation practices have been designed to effectively remedy the remnants of segregation in student assignments. *Accord Dowell v. Board of Educ.,* 778 F.Supp. 1144, 1177 (W.D.Okla.1991) ("[F]ar from being a vestige of prior segregation, transportation was actually the principal tool utilized to eliminate prior segregation.").

The Swann Plaintiffs concede that "[t]he district does not discriminate in providing transportation to students." (Swann Pl.'s Proposed Findings of Fact and Conclusions of Law at 114.) Nevertheless, CMS and the Swann Plaintiffs argue that prolonged supervision of transportation is needed because a disproportionate burden of busing falls on black children. This issue was addressed above, *see supra* part II.B.1.d, and the Court need not address it again here as it is most appropriately treated as an aspect of student assignment. *See Martin,* 475 F.Supp. at 1328–29 (treating transportation burdens as an aspect of pupil assignment).

The Court finds that CMS has complied with the order to provide bus transportation in a nondiscriminatory manner. As such, there is no need to extend supervision over this *Green* factor.

---

**38.** On the other hand, the Court finds that the Plaintiff–Intervenors have proven, to the extent possible, the absence of intent and causation.

### 5. Staff Assignment

During the early active phases of *Swann*, the Court never made findings of discrimination in staff assignment. Perhaps as a precautionary measure, the Court simply ordered "[t]hat the internal operation of each school, and the assignment and management of school employees, of course be conducted on a non-racial, non-discriminatory basis." *Swann*, 311 F.Supp. at 269. Since then, and during the recent trial in this case, CMS and the Swann Plaintiffs have presented no evidence of racial discrimination or disparities in the hiring or assignment of staff.[39] Indeed, the parties' post-trial briefs do not even address the issue of staff assignment. While the parties addressed the issue of faculty assignment, which is a separate *Green* factor from staff assignment, they always focused solely on teachers and not on administrative staff or personnel. The Court finds that CMS has complied with the order on staff assignment; therefore, there is no basis for prolonged supervision over this *Green* factor.

### 6. Extracurricular Activities

At the initial stages of *Swann*, the Court made no comprehensive findings in the area of extracurricular activities. In its Order of April 23, 1969, the Court found that there was "no racial discrimination or inequality" in the "coaching of athletics." 300 F.Supp. at 1366. Stated the Court: "Several black coaches have been employed at 'white' schools. No black coach was shown to have applied and been refused a job. No pattern of discrimination appears in the coaching ranks." *Id.* On June 20, 1969, the Court struck a proposed provision in CMS's pupil assignment plan

that had a racially discriminatory effect on black student athletes[40] *Swann*, 300 F.Supp. at 1384. Other than these narrow findings, the Court did not address whether vestiges of past discrimination existed in extracurricular activities.

In the current stage of the case, CMS and the Swann Plaintiffs assert that prolonged supervision is needed. Yet, the evidence persuasively shows otherwise. Dr. Peterkin, who testified for CMS about the system's educational opportunities, tabulated the racial breakdown in extracurricular involvement for the three most recent school years. (DX 6, Ex. 5a (Peterkin Rpt.).) The results show that participation in athletics occurs proportionately to the district-wide racial average. (*Id.*) As for student government, participation is equal at a roughly 50-50 ratio, and in two of the three years examined, blacks outnumbered whites as far as holding office. (*Id.*) Blacks also generally participated at a higher rate in a category labeled "school activity." (*Id.*) On the other hand, black student participation in honors societies and other clubs was lower, representing approximately 20% of those students involved. (*Id.*)

The Swann Plaintiffs concede that "the evidence in the case shows generally favorable statistics on extracurricular involvement." (Swann Pl.'s Proposed Findings of Fact and Conclusions of Law at 114.) Still, CMS and the Swann Plaintiffs assert that lower black student participation in honors societies and other academically-related clubs is grounds for continued court supervision. While black student participation in certain clubs may be lower than white student participation, the Court can make no finding that this is discrimi-

---

**39.** Based on the racial identities of the CMS staff members who testified at trial, it is apparent that blacks hold many important positions of authority in the various areas of school operations. While this is obviously too small a sample size from which to base any conclusions, it simply shows that blacks occupy positions of influence in CMS's administrative hierarchy. *See Morgan*, 831 F.2d at 321 ("Minority presence in the power structure is

a factor that might be expected to help prevent regression to a dual system once the court's presence is withdrawn." (citing *Riddick*, 784 F.2d at 528)).

**40.** The provision made students who transfer from one high school to another ineligible for high school athletics for one year.

natory, especially when participation in extracurricular activities is voluntary or, in the case of honors societies, requires a certain level of academic achievement for membership. As stated by the Third Circuit: "We cannot, however, expect a school district to compel or deny student participation in non-compulsory extracurricular activities merely to effect a racial balance." *Coalition To Save Our Children,* 90 F.3d at 768. Furthermore, it would be beyond a court's power to require that student participation in extracurricular activities reach a prescribed racial percentage or ratio. *See Coalition to Save Our Children v. State Bd. of Educ.,* 901 F.Supp. 784, 806 (D.Del.1995) (finding no precedent for imposing a measure of compliance to determine whether unitary status has been achieved in the area of extracurricular involvement), *aff'd,* 90 F.3d 752 (3d Cir. 1996).

■ "[A] school district's extracurricular activities are unitary if they 'are available to all students within the School District regardless of race.'" *Coalition to Save Our Children,* 90 F.3d at 768 (quoting *Singleton v. Jackson Mun. Separate School Dist.,* 541 F.Supp. 904, 908 (S.D.Miss.1981)); *Jacksonville NAACP, supra,* slip op. at 138. Here, there is no evidence that CMS prevents any student from participating in any extracurricular activities. A wide variety of extracurricular activities are available in all schools. Some witnesses have suggested that the absence of a chess club at certain predominately black schools is discriminatory. (Tr. 6/14 at 74–75 (Test. of Susan Purser).) To suggest that Article III powers must be invoked to start chess clubs is a stretch. CMS is the party that raised this as a reason for continued supervision, and CMS could have started several chess clubs in the time that it took to put on such evidence. Even so, without student interest and initiative, a chess club will never last. Furthermore, there is no evidence that students, parents, faculty, or others are clamoring for such clubs in the schools where they do not exist.

CMS's anecdotal evidence regarding discrimination in extracurricular activities was unconvincing. School Board Chairman Griffin testified about a high school principal who was going to hold an unprecedented runoff election in the Miss South Mecklenburg competition after a black female received the most votes. (Tr. 6/18 at 172 (Test. of Arthur Griffin).) Superintendent Smith quickly intervened and prevented the runoff from happening. *(Id.)* Here again, if CMS is asserting that the extraordinary remedy of court supervision is needed to referee a beauty pageant, this is clearly overkill.

Griffin also asserted that the long distances students are bused to school inhibits after-school involvement in extracurricular activities. (Tr. 6/18 at 125 (Test. of Arthur Griffin).) If anything, this is a strong argument for neighborhood schools. Griffin testified that special bus transportation is provided for students involved in athletics but not for non-athletic activities. (Id.) The Court heard no evidence as to the extent that this is a problem, but the fact that CMS raised the issue and stands ready to address it obviates the need for further court supervision.

Finally, CMS argues that it must monitor student participation in extracurricular activities by race in order to achieve unitary status. (DX 6 at 7 (Peterkin Rpt,); Tr. 6/17 at 186 (Test. of Dr. Robert Peterkin).) Whatever good monitoring would do, this was never a requirement imposed by the Court, and the Court will not impose such a requirement at this late date. In sum, there was no credible evidence produced at trial regarding alleged discrimination in extracurricular activities. Therefore, the Court finds no basis for prolonged supervision over this Green factor.

### 7. Ancillary Considerations

CMS and the Swann Plaintiffs raised a laundry list of quality of education con-

cerns for the Court to consider in determining unitary status. Such factors, which a court may consider in its discretion, *Freeman*, 503 U.S. at 492, 112 S.Ct. at 1446, are addressed below.

### a. Teacher Quality

During *Swann*, the Court never found that there was discrimination in the quality of teaching. In fact, the Court observed in 1969 that "teachers in the various black schools are not inferior to those in the various white schools." *Swann*, 306 F.Supp. at 1298. Nevertheless, as part of the desegregation plan mandated in 1970, the Court ordered: "That teachers be assigned so that the competence and experience of teachers in formerly or recently black schools will not be inferior to those in the formerly or recently white schools in the system." *Swann*, 311 F.Supp. at 268. This was likely a "safeguard" provision in light of the massive reassignment of faculty under the 1970 plan. *See Swann*, 300 F.Supp. at 1373. By 1971, the Court stated that "the formerly black schools are not shown nor suggested to be inferior in faculty." *Swann*, 334 F.Supp. at 625. Also, right before closing *Swann* in 1975, the Court reiterated that it did not find in the Swann Plaintiffs' favor on the issue of discrimination in teacher quality. *Swann*, 66 F.R.D. at 484.

In the present case, CMS and the Swann Plaintiffs assert that the district has been operating identifiably black schools with inferior faculties in violation of the Court's order. Determining whether CMS has violated the safeguard provision is a formidable task, however, because teacher competence is not easily measurable. Also, given that the provision was not remedial—in the sense that it was not aimed at eliminating a past condition in the schools—it is difficult to assess compliance by comparing past and present circumstances. *Cf. Keyes v. Congress of Hispanic Educators*, 902 F.Supp. 1274, 1281 (D.Colo.1995) ("The constitutional authority of the federal courts is limited to compelling the elimination of negative effects of *de jure* discrimination; it does not include the power to posit any particular affirmative achievements.").

CMS and the Swann Plaintiffs base their argument of noncompliance on a comparison of the district's schools during recent years, looking specifically at the years of teachers' experience and the percentage of teachers with advanced degrees. (DX 6 at 4–5 (Peterkin Rpt.); DX 10 at 2 (Trent Rpt.); SX 3 at 9–12, Tables III–V (Smith Rpt.).) It is unclear whether the inferiority or superiority of a given faculty in the district can be determined by these characteristics. In fact, there is a debate in the research literature regarding the effect of teacher experience and education on student achievement. (Tr. 5/27 at 44–45 (Test. of Dr. William Trent).) Trial witnesses also debated the issue. Some CMS employees testified that veteran teachers generally provide better educational experiences for students. (Tr. 5/14 at 153–54 (Test. of Richard McElrath); Tr. 5/25 at 182–83 (Test. of Teresa Cockerham); Tr. 6/14 at 25–26 (Test. of Susan Purser). On the other hand, Dan Saltrick, former-CMS Assistant Superintendent for Instructional Services, testified that he did not equate teachers who had less experience with those who were less qualified. (Tr. 4/28 at 125–26, 128–29) (Test. of Dan Saltrick).) "It was just the opposite in many cases," stated Saltrick, who observed that many of the newest teachers were better prepared in their use of technology in the classroom, in their knowledge of various teaching strategies, and in their ability to deal with diversity. (*Id.*)

Also, CMS's Director of Human Resources testified that there is no correlation between the race of a teacher and a teacher's competence. (Tr. 5/28 at 45 (Test. of Gwendolyn Bradford).) Apparently, this is so despite the fact that black teachers in the district, when compared to their white counterparts, have, on average, more years of teaching experience and also have a higher proportion of advanced de-

grees. (DX 10 App. C, Ex. 2, Tables 2–3 (Trent Rpt.).)

In any event, the differences in teachers' experience is relatively small among the district's schools. (PX 137 (Armor Rebuttal Rpt.); Tr. 6/21 at 190–92 (Test. of Dr. David Armor).) During the 1998–99 school year, the average number of years of teaching experience in the district was 10.9 for elementary school teachers, 9.0 for middle school teachers, and 12.5 for high school teachers. (DX 6 Ex. 2a (Peterkin Rpt.).) In imbalanced-black schools, i.e., schools with black student bodies above +15% from the district-wide average, the average experience was 9.6 years for elementary school teachers, 8.2 years for middle school teachers, and 11.8 years for high school teachers. (Id.) In imbalanced-white schools, i.e., schools with black student bodies below −15% from the district-wide average, the average experience was 12.5 years for elementary school teachers, 9.8 years for middle school teachers, and 14.2 years for high school teachers. (Id.) Thus, on average, teachers in imbalanced-black schools had 0.7 to 1.3 fewer years experience than the district averages and had 1.6 to 2.9 fewer years experience than teachers in imbalanced-white schools. (Id.)

During the same year, the average percentage of teachers with advanced degrees in the district was 31% for elementary schools, 27% for middle schools, and 37% for high schools. (DX 6 Ex. 2a (Peterkin Rpt.).) In imbalanced-black schools, the average percentage was 26% for elementary schools, 24% for middle schools, and 31% for high schools. (Id.) In imbalanced-white schools, the average percentage was 36% for elementary schools, 33% for middle schools, and 46% for high schools. (Id.) While the difference with this teacher characteristic is more noticeable, it must be remembered that the large presence of teachers with master's degrees may be a relatively new phenomenon, which would mean that this disparity is not a vestige that is traceable to the dual era.

A more meaningful way to examine CMS's distribution of teacher experience and advanced degrees is to examine the impact of these characteristics on students' test scores. Dr. Trent suggested that differences in teachers' experience and education influence student performance in CMS, (DX 10 at 2 (Trent Rpt.)), but the results of his regression analyses show that there is no statistically significant effect of these teacher characteristics on academic achievement. (PX 137 (Armor Rebuttal Rpt.); Tr. 6/21 at 148–51 (Test. of Dr. David Armor).) Thus, it would appear that the competence and experience of faculty is not unevenly distributed.

Moreover, whatever small disparities exist are likely mitigated by the more favorable pupil-teacher ratios in predominately black schools. (PX 137 (Armor Rebuttal Rpt.); Tr. 4/28 at 123–24 (Test. of Dan Saltrick).) Classrooms in majority black elementary schools have, on average, a little over fifteen students, which is, on average, about five or six students less than in elementary schools that are more than 80% white. (PX 137 (Armor Rebuttal Rpt.).) Smaller class sizes mean that students receive more teacher attention and more instructional time. (Tr. 4/28 at 123–24 (Test. of Dan Saltrick).) Thus, in terms of allocating teacher competence as an educational resource, students in schools with higher black ratios may receive fuller benefits from a teacher's experience and education. (Tr. 6/21 at 152–53 (Test. of Dr. David Armor); Tr. 4/28 at 123–24 (Test. of Dan Saltrick).)

Finally, CMS, like many school districts in metropolitan areas, faces the practical problem of a high turnover rate for teachers in economically-impoverished areas. See supra part II.B.2. CMS is trying to combat this trend by offering incentive pay to highly qualified teachers who agree to work in these areas. (Tr. 5/28 at 79 (Test. of Gwendolyn Bradford).)

The Court finds that prolonged supervision over teacher quality is unnecessary given that no such discrimination was

found in *Swann*, the Court's order in *Swann* was precautionary and not remedial, the disparities in teacher competence are hard to define and difficult to measure, there are mitigating factors with the alleged disparities, there are practical problems in achieving and maintaining better results, and CMS appears committed to doing its best to improve teacher quality throughout the district.

### b. Student Achievement

Because numerous external factors beyond the control of a school district affect educational outcomes, racial disparities in student test scores are generally not a bar to unitary status, and the authority of courts to require improvements in student achievement is very limited. *Jenkins III*, 515 U.S. at 101–02, 115 S.Ct. at 2055–56. As stated by the Supreme Court: "Insistence upon academic goals unrelated to the effects of legal segregation unwarrantably postpones the day when the [school district] will be able to operate on its own." *Id.; see City of Yonkers*, 181 F.3d 301, 316 ("As other courts have recognized, using achievement test scores as a measure, either direct or indirect, of a school system's movement away from segregation is deeply problematic." (citing *Jenkins*, 515 U.S. at 101, 115 S.Ct. at 2055; *People Who Care v. Rockford Bd. of Educ.*, 111 F.3d 528, 537 (7th Cir.1997); *Coalition to Save Our Children*, 90 F.3d at 776–78)); *Keyes*, 902 F.Supp. at 1282 (" '[T]here is nothing in the law which does or could require equality in the results of educational services.... No school policy and no court order can assure any particular level of success in public schools any more than in any other aspect of life.' " (quoting *Keyes v. School Dist. No. 1*, 609 F.Supp. 1491, 1515, 1498 (D.Colo.1985))); *Flax*, 725 F.Supp. at 330 ("Poor achievement scores are often an incidence of poverty and fami-

ly environment, matters not remediable by a school desegregation plan."), *aff'd*, 915 F.2d 155 (5th Cir.1990); *but see Jenkins v. Missouri*, 122 F.3d 588, 597–99 (8th Cir. 1997) (affirming an order to partially remedy an achievement gap because the district court found that a portion of the gap was attributable to segregation).[41]

### i. The Requirements of *Swann*

The issue of student achievement disparities was addressed during the early stages of *Swann*, when Judge McMillan observed a racial disparity in test scores and surmised that "segregation in Mecklenburg County has produced its inevitable results in the retarded educational achievement and capacity of segregated school children." 306 F.Supp. at 1296–97; *see Swann*, 300 F.Supp. at 1368–69; *Swann*, 318 F.Supp. at 791. While experts in *Swann* agreed that poverty and culture played a role in the underachievement of blacks, 300 F.Supp. at 1368–69, the Court did not conclusively identify the cause of the disparity. Stated the Court: "Until unlawful segregation is eliminated, it is idle to speculate whether some of this gap can be charged to racial differences or to 'socio-economic-cultural' lag." *Swann*, 306 F.Supp. at 1309.

The Court never ordered CMS to adopt specific academic programs to remedy the achievement gap but, rather, assumed that racial balance in schools would provide "hopeful relief." *Swann*, 306 F.Supp. at 1297. In fact, the Court found that CMS's academic programs and educational opportunities related to achievement were not discriminatory. *Swann*, 300 F.Supp. at 1367. With regard to the "individual evaluation of students," the Court stated:

> Individual students are evaluated annually in terms of achievement in particular subjects, and divided into groups for

---

**41.** In arguing that prolonged supervision is needed due to the achievement gap, the Swann Plaintiffs rely heavily on the Eighth Circuit's opinion in *Jenkins*, 122 F.3d 588. That opinion is puzzling considering that the Supreme Court had just reversed the Eighth Circuit on the issue of student achievement disparities, stating that, on remand, "the District Court should sharply limit, if not dispense with, its reliance on this factor." *Jenkins*, 515 U.S. at 101, 115 S.Ct. at 2055.

the study of particular subjects in accordance with their achievement.... Few black students are in the advanced sections and most are in regular or slow sections. Assignments to sections are made by the various schools based not on race but on the achievement of the individual students in a particular subject. There is no legal reason why fast learners in a particular subject should not be allowed to move ahead and avoid boredom while slow learners are brought along at their own pace to avoid frustration. It is an educational rather than a legal matter to say whether this is done with the students all in one classroom or separated into groups.

*Id.* The Court similarly found that there was no discrimination in "elective courses." *Id.*

Some elective courses such as German are offered at some but not all of the high schools. They are offered at a school only if enough students express a desire for the course. Not all schools therefore have all elective courses every year. This situation is not the result of discrimination on account of race.

*Id.* Thus, in terms of complying with the Court's orders, CMS's sole obligation with regard to the achievement gap was to eliminate segregated schools.

As set forth above, CMS has eliminated segregation in schools by achieving and maintaining a high level of racial balance in student assignment for many years. *see supra* part II.B.1. Nevertheless, an achievement gap remains. While test scores for black students have made significant improvements over time, and blacks in CMS have outperformed blacks statewide and nationwide,[42] the black-white achievement gap has remained relatively constant regardless of the year or type of test because white students have made

progress as well. (PX 137 at 12 (Armor Rpt.); DX 7 Exs. D1–D3 (Peterkin Rebuttal Rpt.); PX 74 at CM098914, CM098916 (Student Assessment Measures); PX 171 (CMS College Entrance Examination Board Results).) What is more, the black-white achievement gap in CMS is comparable to the gap found in North Carolina and throughout the nation. (PX 137 at 12 (Armor Rpt.); PX 171 (CMS College Entrance Examination Board Results).)

Thus, contrary to the Court's prediction in 1969, the dramatic increase in racial balance throughout CMS did not result in a closure of the achievement gap. In fact, the maintenance of racially balanced schools appears to have no effect on test score disparities and seems to make little difference in the level of black achievement. (PX 137 at 1, 12, Charts 8–10 (Armor Rpt.); Tr. 4/28 at 131 (Test. of Dan Saltrick).) A comparison of End–of–Grade (EOG) test scores shows that blacks generally achieved the same results regardless of the racial composition of the school. (PX 137 at 12, Charts 9, 10 (Armor Rpt.); DX 10 at 7, App. C, Ex. 3, Tables 5b, 7b (Trent Rpt.).)

### ii. CMS's Efforts to Close the Gap

The Court might end its inquiry there. Still, it is worth recapping some of CMS's efforts to address the gap. These efforts are best "characterized as general educational enrichments rather than remedies for prior segregation." *City of Yonkers,* 181 F.3d 301, 318 (citing *Swann,* 402 U.S. at 16, 91 S.Ct. at 1276).

In 1983, CMS began a minority achievement program to provide additional academic support for black children and to increase black participation in the district's various academic programs. (Tr. 5/14 at 96–97 (Test. of may Howell).) At the time,

---

**42.** As regards SAT scores, from 1987, "the first year that ethnic comparisons were available from the College Board," to 1997, blacks in CMS scored at or above the statewide average for blacks every year and scored above the national average for blacks every

year from 1992 to 1996. PX 171 (CMS College Entrance Examination Board Results.) Meanwhile, whites in CMS scored above the statewide average for whites every year but only scored above the national average for whites in 1994. (*Id.*)

there was no similar program to this in North Carolina. (*Id.*, at 96.) During the 1980s, however, the state-of-the-art practices for achieving maximum academic performance were not well-developed, so progress was limited. (Tr. 5/3 at 59–60, 151–57 (Test. of Jeffrey Schiller).) By the early 1990s, such strategies were more sophisticated. (*Id.* at 151–57.) It was at that time that Dr. Murphy was hired as Superintendent of CMS with a primary goal of improving student test scores, particularly among black students. (Tr. 4/26 at 8–10 (Test. of John Murphy); Tr. 4/28 at 97–98 (Test. of Dan Saltrick).)

During Superintendent Murphy's tenure, CMS instituted numerous programs to enhance the academic achievement of students. He immediately eliminated "fluff courses" and implemented a more demanding uniform curriculum. (Tr. 4/26 at 23–24 (Test. of John Murphy).) CMS offered incentives to teachers and principals to improve test scores and tied bonuses specifically to increasing black participation in more challenging courses. (*Id.* at 83–84, 118; Tr. 4/28 at 126–27, 166–68 (Test. of Dan Saltrick).) CMS "aggressively" recruited black students to enroll in Advanced Placement (AP) courses and in the rigorous International Baccalaureate (IB) program. (Tr. 4/26 at 80, 116 (Test. of John Murphy); *see* Tr. 4/28 at 197 (Test. of Dan Saltrick) ("[W]e almost killed ourselves trying to get students into those courses.").) CMS set up Learning Immersion programs and instituted Project Start, a grant-funded program, to train teachers to use new methods to identify a broader range of students as academically gifted. (PX 83 at 11 (State of the System Address, 1993).) In order to accelerate the preparedness of students to take these more challenging courses, CMS provided tutors and support staff, extended school days, and instituted summer programs. (Tr. 4/26 at 88, 96 (Test. of John Murphy); Tr. 4/28 at 141–42 (Test. of Dan Saltrick).)

As a result of these efforts, CMS experienced a seven-fold increase in black enrollment in AP courses from 1991–92 to 1995–96. (PX 74 at CM098914 (Student Assessment Measures).) From 1992 to 1995, the percentage of blacks enrolled in higher level courses rose from 9.3% to 25.9%. (*Id.*) The number of AP course offerings also increased in schools with large black populations. For example, West Charlotte, one of only two imbalanced-black high schools operating last year, offered the second highest number of AP courses in the system. DX 36 (CMS Students in AP Courses); Tr. 6/14 at 158–62 (Test. of Susan Purser).

Meanwhile, CMS also did what it could to provide remedial education to those lagging the furthest behind. As stated above, CMS reduced the number of students in classrooms in predominately black schools so as to increase student-teacher interaction. *See supra* part II.B.7.a. Teachers also received special training to assist the most needy students. (Tr. 4/26 at 18–19 (Test. of John Murphy); (PX 83 at 18) (State of the System Address, 1993).) Having identified the connection of language skills with the black-white achievement gap, CMS created K–1–2 Literacy sites in elementary schools. (PX 83 at 18 (State of the System Address, 1993).)

CMS continues to implement more programs aimed at improving black achievement. Recently, CMS revised the process of identifying students as academically gifted and, as a result, has seen further increases in black enrollment in gifted programs. (Tr. 6/14 at 49–50 (Test. of Susan Purser).) CMS started a large-scale pre-kindergarten program, Bright Beginnings, which was designed to enhance the academic achievement of educationally disadvantaged students at the earliest stages. (Tr. 4/20 at 46–47 (Test. of James Puckett).) Children in this program are screened for participation based upon educational needs, and, notably, 70% of the students participating are black. (*Id.* at 47, 49.) To increase the amount of educational resources in schools with large black populations, CMS started an Equity

Plus program. (Tr. 5/25 at 153–54 (Test. of Ron Dixon).) CMS also sought to increase parental involvement in these schools through its Comer Schools program. (*Id.* at 150–51.) Moreover, CMS continues to receive assistance from the State's ABC's program, which sends in remedial teams to overhaul low-performing schools. (*Id.* at 150.)

These enhanced educational opportunities aimed at black students have coincided with some notable improvements. From 1992 to 1994, CMS began to see a significantly greater percentage of blacks prepared for the next grade level than was seen in previous years. (PX 72 at CM084532 (Performance of Black Students).) During the 1994–95 school year, the gap between black and white students decreased in twenty-nine out of thirty-nine test subject categories. (PX 74 at CM098913 (Student Assessment Measures).) In eight of the ten remaining categories, blacks still showed progress, but the increase was offset by a greater increase for whites. (*Id.*) With focused efforts, these gap-narrowing trends continue today. (*See, e.g.,* Tr. 6/8 at 21, 31 (Test. of Eric Smith).)

### iii. Experts' Explanations of the Gap

Expert witnesses attempted to explain the causes of the gap using regression analyses. Dr. Armor concluded that the gap "is not causally related to past or present student assignment and is mostly explained by socioeconomic factors over which CMS has no control." (PX 137 at 1 (Armor Rpt.).) He identified the racial

differences in the four socioeconomic status (SES) measures that were available for elementary students in 1998: poverty, as measured by students receiving free lunch; parental education; family income; and family size. (*Id.* at 13, Chart 8.) Each of these SES factors were shown to have a statistically significant effect on student achievement. (*Id.* at 13, Appendix.)

The differences are revealing. The average black family income is $31,000, as compared to $59,000 for white families. (*Id.*) Only 15% of black parents have college degrees, whereas 58% of white parents do. (*Id.*) A large poverty gap is revealed, with 63% of black students receiving free lunch, as compared to 9% of white students. (*Id.*) Finally, 83% of white students have both parents at home, as compared to only 42% for black students, (*Id.*) These four SES factors alone, which do not represent the universe of known SES factors that impact achievement,[43] explain nearly 50% of the reading gap and over 40% of the math gap. (*Id.* at 14, Table 3.) When early test scores—the second grade is the earliest grade for which CMS has any test data—are added to the analysis to control for the skills children have close to the time they begin formal school training, nearly 80% of the reading gap and over 70% of the math gap are explained. (*Id.*) Dr. Armor testified that he likely could explain all of the existing gap if enough measures of SES and family background were available. (Tr. 4/29 at 129–31,229 (Test. of Dr. David Armor).)

---

**43.** Other important SES factors include the age of mother at birth, birth weight, child-rearing practices, parents' cognitive abilities, parents' occupational backgrounds, parental interest and involvement, and so on. (PX 137 at 13 (Armor Rpt.).) See City of Yonkers, 181 F.3d 301, 316–17. The evidence suggests that these other factors would be significant. A parental survey conducted by CMS at the start of the Murphy administration showed that black children, as compared to white children, generally were read to less, watched more television, and spent less time on home-

work. (Tr. 4/28 at 139–40 (Test. of Dan Saltrick).) Low parental expectations for black students also appeared to be a pervasive problem. (Tr. at 17–18 (Test. of John Murphy).) Additionally, in the most recent school year, roughly 40% of black children in kindergarten were previously identified in the Bright Beginnings program as educationally disadvantaged. (Tr. 4/20 at 45–50 (Test. of James Puckett).) Consequently, a large percentage of black children may lack the type of support system they need prior to entering the school system, and this can continue as those children go through the system.

Dr. Trent, testifying for CMS, agreed that the largest reduction in the "race effect" occurs when one controls for SES factors. (Tr. 5/27 at 32–39 (Test. of Dr. William Trent).) Nevertheless, he attempted to downplay the contribution of these factors by limiting the variables in his analysis. Dr. Trent only controlled for sex, free-or-reduced lunch status, and early test scores. (DX 10 App. C, Ex. 5, Tables 9–23 (Trent Rpt.).) While the free lunch variable is a useful standard-and an important one to use if available-it is a relatively crude proxy for SES that does not provide the whole story. (Tr. 6/21 at 153 (Test. of Dr. David Armor).) Free lunch status is nothing more than a single gross measure that distinguishes the poor from the non-poor according to a federal definition of poverty. (*Id.*) It does not account for the severity of a family's poverty, and it does not differentiate between children of highly affluent parents and children of middle or working class parents. (*Id.*) Dr. Trent further restricted the SES effect when he controlled for early test scores. Rather than using second grade scores, which are the earliest available scores, Dr. Trent used data from either the third, fourth, fifth, or sixth grades. (DX 10 App. C, Ex. 5, Tables 9–23 (Trent Rpt.).) The use of these later test scores attenuates the ability to control for skills that children have before they enter the school system. (Tr. 6/21 at 154–55 (Test. of Dr. David Armor).) Also, he only controlled for the percentage of students who were at low mastery levels, as opposed to the full range of the variables. (*Id.* at 154.)

Despite the availability of data, Dr. Trent did not attempt to control for parental education, parental income, and other important SES variables that social scientists agree have a direct, cumulative impact on academic achievement. (*Id.,* at 153–54.) As stated in *Wessmann:* "[T]he requirement of considering various salient causal factors is part and parcel of a party's duty to limn a plausible causal relationship between particular independent and dependent variables." 160 F.3d at 805

n. 8 (citation omitted); *see also City of Yonkers,* 181 F.3d 301, 316 (rejecting a regression analysis that omitted several SES factors known to describe profound childhood influences). Because Dr. Trent restricted his consideration of crucial SES factors, the Court accords little or no weight to his regression analyses. *See Bazemore,* 478 U.S. at 400 & n. 10, 106 S.Ct. at 3009 & n. 10 ("Normally, failure to include variables will affect the analysis' probativeness, not its admissibility.... There may, of course, be some regressions so incomplete as to be inadmissible as irrelevant."); *Koger v. Reno,* 98 F.3d 631, 637 (D.C.Cir.1996) ("Courts have not ... understood *Bazemore* to require acceptance of regressions from which clearly major variables have been omitted.").

Dr. Trent also argued that the achievement gap, or at least a portion thereof, is explained by "school climate," that is, the extent to which teachers in a given school have high expectations of and favorable attitudes toward their students. (DX 10 at 2, 7 (Trent Rpt.); Tr. 5/26 at 90 (Test. of Dr. William Trent).) Dr. Trent's methodologies and conclusions concerning school climate were sharply criticized and ultimately invalidated in *Wessmann,* 160 F.3d at 804–06. In *Wessmann,* the First Circuit stated:

> Dr. Trent's charge was to trace the causal relationship, if any, between teacher attitudes and poor student performance. His failure to obtain reliable data disabled him from taking even the first step, for he could not validly establish whether Boston teachers' attitudes in fact were discriminatory, let alone show that they caused (or even significantly contributed to) the achievement gap. This first step is a cornerstone of the entire research project; in its absence, Dr. Trent could not legitimately eliminate other variables (including societal discrimination) that might explain the achievement gap in the Boston public schools.... It follows inexorably that, with no methodological support, he

could not produce a meaningful analysis of causation and, accordingly, his conclusions cannot bear the weight of the School Committee's thesis.

*Id.* at 805 (citations omitted). The Court finds that Dr. Trent's climate study in the case at bar suffers from many of the same defects.

Dr. Trent's analysis involved self-selected visits to twenty-five schools, interviews with various unnamed CMS employees, and reliance upon third-party survey data. (Tr. 5/26 at 22–23, 197–98 (Test. of Dr. William Trent).) The self-selection of visits to less than one-fifth of the district's schools suggests that his study may have been result-driven. These visits "lasted on average between 45 minutes to an hour," (DX 10 at 3 (Trent Rpt.)), and were conducted over the course of about six days. (Tr. 5/26 at 22 (Test. of Dr. William Trent).) The Court finds it incredible that a school can be labeled as having lower student expectations based upon such brief visits. This limited amount of time fails to grasp the multitude of factors that impact upon a daily interaction between teachers and students and fails to do so in a way that permits system-wide inferences.

In addition, the survey information relied on by Dr. Trent is suspect. These data consisted of voluntary responses to a question from a CMS teacher survey conducted in three separate school years. Notably, the question was not worded the same every year. In the 1995–96 and 1996–97 school years, the question asked whether students of all races and backgrounds got along well at that school. (DX 10 App. C, Ex. 4, Table 8 (Trent Rpt.).) This question cannot be a reliable measure of teacher attitudes because the responses said nothing about how the faculty or administration was treating students; it only asked how students treated each other. (Tr. 5/27 at 41–42 (Test. of Dr. William Trent); Tr. 6/21 at 157 (Test. of Dr. David Armor).) The survey question from the 1997–98 school year ambiguously asked whether students were treated fairly regardless of "cultural" background. (DX 10 App. C, Ex. 4, Table 8 (Trent Rpt.).) This question is problematic because "culture" is a much broader concept than "race" and can be interpreted differently. (*Id.;* Tr. 5/26 at I 85–86 (Test. of Dr. William Trent); Tr. 6/21 at 157 (Test. of Dr. David Armor).) Also, the question does not distinguish between the treatment of blacks, whites, Hispanics, Asians, or others, so it is an unreliable indicator for racial discrimination against blacks. (Tr. 6/21 at 157–58 (Test. of Dr. David Armor).)

The survey questions relied upon by Dr. Trent do not provide—and, apparently, were not designed to provide-an accurate measure of teacher attitudes and expectations. (*Id.* at 156.) Furthermore, Dr. Trent conceded that he made no effort to validate the survey data. (Tr. 5/26 at 203 (Test. of Dr. William Trent).) Assuming *arguendo* that the survey responses are an accurate measure of student treatment, a school-by-school comparison of these data indicates a high level of fair treatment regardless of the racial composition of the school. (PX 137 (Armor Rebuttal Rpt.); Tr. 6/21 at 158–59 (Test. of Dr. David Armor).) In fact, the percentage of teachers who agree that students are treated fairly is as great or greater in schools with the highest percentage of black students than in schools that are racially balanced or imbalanced-white. (PX 137 (Armor Rebuttal Rpt.); Tr. 6/21 at 158–59 (Test. of Dr. David Armor).) Thus, the evidence would show, once again, that racial balance in student assignment is a factor not directly related to academic achievement.

Perhaps the most serious deficiency in Dr. Trent's analysis is that he did not attempt to show that the alleged differences in teacher expectations were attitudinal remnants of the segregation era. (Tr. 5/26 at 179 (Test. of Dr. William Trent).) Given that the vast majority of teachers in CMS came to the system in the post-segregation era, it would appear unlikely that any such differences could be traced to the dual system. In the end,

even if it could be demonstrated scientifically that teachers in CMS have lower expectations for black students, the Court would be hard-pressed to fashion and enforce a remedy. Requiring that teachers raise their expectations or that students get along is not the type of "real and tangible relief" that courts can provide. *Freeman*, 503 U.S. at 493, 112 S.Ct. at 1447.

Dr. Rosalyn Mickelson, another CMS expert, similarly testified that the system deprives blacks of educational opportunities. The Plaintiff–Intervenors raised several credibility concerns with her testimony.[44] Even leaving these concerns aside, much of Dr. Mickelson's report was rendered useless because she relied on a seriously flawed data matrix. (Tr. 6/17 at 3–12 (Stipulation by counsel and Test. of Dr. Rosalyn Mickelson).) In identifying schools that were racially imbalanced, she counted *minority* student enrollment rather than *black* student enrollment. (Id. at 6.) The effect of using minority enrollment almost invariably misstated the alleged black enrollment and caused many racially balanced schools to be incorrectly labeled as racially identifiable (*Id.* at 3–12.) After considerable debate over the discrepancies, the Court directed Dr. Mickelson to double-check her numbers overnight. (Tr. 6/16 at 121–74 (Test. of Dr. Rosalyn Mickelson).) The next day, she admitted that her data were wrong, and she withdrew her regression analysis to the extent that it attempted to link lower achievement with attending an imbalanced-black school.

(Tr. 6/17 at 10 (Test. of Dr. Rosalyn Mickelson).)

Most troubling was the great length Dr. Mickelson went to deny an obvious error. She repeatedly sought to explain, under oath, that any discrepancies between her data and CMS's official enrollment figures were due to head counts being taken at different stages of the school year. (*Id.* at 127, 136–37, 161–62.) She stuck by this explanation even though, in some schools, it meant that the racial balance would have fluctuated by as much as 20% within a period of a few days, weeks, or months. (*Id.* at 128, 162.) The Court finds that her willingness to prop up baseless excuses in an effort to cover up her errors raises serious doubts about her scientific objectivity and creates suspicions as to the rest of her report. *See Holm v, United States*, 325 F.2d 44, 46–47 (9th Cir.1963) (holding that the fact-finder may disregard all of an expert's testimony or consider it weakened if the expert contradicts himself or is impeached).

In any event, the remainder of her report was irrelevant. She blamed the achievement gap on CMS's "hierarchically differentiated system of instructional delivery, commonly known as 'tracking.'" (DX 8 at 7 (Mickelson Rpt.).) She overlooked that, in *Swann* the Court explicitly approved of the ability grouping of students. 300 F.Supp. at 1367. Furthermore, even though 'in-school segregation' may result from this practice, as a matter of law, it is regarded as a legitimate means of educat-

---

**44.** Dr. Mickelson failed to candidly disclose the terms of compensation for her services. (Tr. 6/15 at 106–12, 120–22 (Test. of Dr. Rosalyn Mickelson.) Fed. R. Civ. P. 26(a)(2)(B). In addition, she has had a long-standing relationship with CMS in "a number of capacities," including co-authoring the "Pupil Assignment Subcommittee Report" for the Committee of 25, a group assembled by CMS to examine school policies. (Tr. 6/15 at 122 (Test of Dr. Rosalyn Mickelson)); DX 128 (Committee of 25 Pupil Assignment Rpt.) The reforms advocated in that report are similar to the reforms she advocates in this case. Finally, the language and format of Dr. Mickelson's report suggested that her work was

not wholly independent and original. She insisted that, prior to filing her report, she never had any contact with Dr. Trent, who offered conclusions that were overlapping in subject matter. (Tr. 6/15 at 97–106 (Test. of Dr. Rosalyn Mickelson).) Yet, the introduction and point headings in her report showed a strikingly verbatim similarity with Dr. Trent's report. (*Compare* DX 8 (Mickelson Rpt,) *with* DX 10 (Trent Rpt.).) Dr. Mickelson emphatically stated that all of the language in her report was her own and could offer no simple explanation for the resemblance. (Tr. 6/15 at 113–17 (Test of Dr. Rosalyn Mickelson).)

ing children. As Chief Judge Posner recently wrote in a Seventh Circuit opinion:

> Tracking is a controversial educational policy, although just grouping students by age, something no one questions, is a form of 'tracking.' Lawyers and judges are not competent to resolve the controversy. The conceit that they are belongs to a myth of the legal profession's omnicompetence that was exploded long ago. To abolish tracking is to say to bright kids, whether white or black, that they have to go at a slower pace than they're capable of; it is to say to the parents of the brighter kids that their children don't really belong in the public school system; and it is to say to the slower kids, of whatever race, that they may have difficulty keeping up, because the brighter kids may force the pace of the class.... [A]s the consensus of the nation's educational authorities, [tracking] deserves some consideration by a federal court.

*People Who Care,* 111 F.3d at 536. Moreover, Dr. Mickelson conceded that CMS has flexibility in its 'tracking' practices. (Tr. 6/16 at 84–85 (Test. of Dr. Rosalyn Mickelson).) Placement in courses is due in part to choice, with choices structured and channeled based on prerequisites and prior achievement. (*Id.*) Additionally, CMS allows parents to challenge their child's designation. (*Id.*)

Dr. Mickelson's assumption that CMS was discriminating against blacks in the assignment of students to academically gifted programs and special education programs also was flawed because she was not aware of the assignment criteria used by CMS. (*Id.* at 11–12.) In fact, assignments to these programs involve the use of government standards. (*Id.* at 16.) Furthermore, the assignment processes are inherently fair because parents may have their children tested independently of the school system to determine whether they are academically gifted, (*id.* at 14), and CMS provides meaningful appellate procedures when students are assigned to spe-

cial education programs. (*Id.* at 17; Tr. 5/19 at 132–35 (Test. of Calvin Wallace).)

As to Dr. Mickelson's conclusion that the Court should order CMS to undertake further reforms, the Court notes that her prior research tends to undermine her recommendation. In an article published in 1990, she claimed that black students' attitudes and beliefs regarding the value of long-term educational benefits were significantly different than for whites. (PX 219) (R.A. Mickelson, *The Attitude–Achievement Paradox Among Black Adolescents,* 63 Soc. Educ. 44 (1990).) This difference, she wrote, manifested itself in lower black achievement. (*Id.* at 45.) Her article concluded: "Without fundamental change in the larger opportunity structure, the underachievement of minority and working-class students is likely to persist even in the face of the best-designed and most lavishly funded educational reforms." (*Id.* at 60.) As stated throughout equal protection case law, it is beyond the proper purpose of a desegregation decree to remedy societal discrimination. *Swann,* 402 U.S. at 22–23, 91 S.Ct. at 1279. Thus, her article indicates that the type of court-ordered remedy she envisions would be either improper or futile.

Like Drs. Trent and Mickelson, CMS expert Dr. Peterkin asserted that low teacher expectations and inadequate educational opportunities were the cause of underachievement for blacks. (DX 6 at 3 (Peterkin Rpt.).) He conducted no regression analysis to substantiate this. (Tr. 9/17 at 216, 223 (Test. of Dr. Robert Peterkin).) His report on student achievement was largely a compilation of statistics without any analysis demonstrating a causal relationship between current racial disparities and any past or present discrimination. (*Id.* at 216–27.) Similarly, Dr. Stevens, the Swann Plaintiffs' expert, did nothing more than compile raw statistics to show that blacks were underrepresented in gifted programs and overrepresented in learning disability programs. (SX 2 at 23–27 (Stevens Rpt.).) As recognized in *Wess-*

*mann,* "it is fallacious to maintain that an endless gaze at any set of raw numbers permits a court to arrive at a valid etiology of complex social phenomena." 160 F.3d at 804. "[I]f such statistics axe to be at all probative of discrimination, they must link cause and effect variables in a manner which would permit such an inference." *Id.*

In asserting that black students were denied access to advanced classes, Dr. Peterkin completely ignored the great efforts of CMS to recruit black students to take AP courses, *see supra,* and he overlooked the fact that AP courses are open to any students who have taken the prerequisite classes. (Tr. 6/18 at 36 (Test. of Dr. Robert Peterkin).) He conceded that he had conducted no study to determine the rate of black students' interest in taking these courses. (*Id.* at 38–39.) Without some empirical basis for finding similar rates of interest among black and white students in classes that are equally open to students, there is no rational way to infer lack of access from disparities in enrollment.

Though he opined extensively on teacher expectations, Dr. Peterkin conducted no interviews with teachers and conducted no teacher surveys. (*Id.* at 72–73.) He based his conclusions on interviews he conducted with CMS central and building administrators and on a series often-minute visits to various classrooms in self-selected schools. (*Id.* at 80–81; DX 6 at 3 (Peterkin Rpt.).) These *subjective impressions are entitled to little or no weight. Wessmann.* 160 F.3d at 806–07.

Finally, the Court notes that Dr. Peterkin was a school board witness in the *Jacksonville NAACP* case, *supra.* where he testified that, based on a comparison to the national achievement gap, the achievement gap in Duval County, Florida, was not a vestige of past discrimination. "I find these conditions in school systems throughout the nation," he stated, adding that " [i]t's one of those vexing problems in public education that we have struggled with," and "I wish I had the answers to why it persists in so many districts across this nation." (Tr. 6/18 at 70–71 (Test. of Dr. Robert Peterkin) (reading transcript from *Jacksonville NAACP).*) Based on the similarity of facts recited in *Jacksonville NAACP, supra* slip op. at 96–109, 139, the Court finds it disconcerting that Dr. Peterkin could reach the exact opposite conclusion about the achievement gap in Charlotte.

When Judge McMillan observed the test score disparities in 1969, he acknowledged that the measure of a school system moving away from segregation is not dependent upon student achievement, stating: "Segregation would not become lawful, however, if all children scored equally on the tests." *Swann,* 318 F.Supp. at 794 (emphasis deleted). Thirty years later, the Court finds no credible evidence that the "longstanding and seemingly intractable disparities" in student achievement are caused by discriminatory practices of CMS, past or present. *Keyes,* 902 F.Supp. at 1300. Instead, the evidence has shown that CMS is an innovative school system. It has implemented a number of programs to enhance the academic success of all students, black and white.

There always will be something more that CMS can do to improve the academic performance of black students, and it is encouraging that CMS believes that it can close the achievement gap, regardless of whether the system is under supervision. (Tr. 6/14 at 90–91 (Test. of Susan Purser).) Of course, the school system, not the Court, is best-equipped to take on this challenge. *See Keyes,* 902 F.Supp. at 1307 ("[C]ourts using the adversary system were not designed to accomplish institutional reform."); *id.* at 1281–82 ("[E]ducational policy is to be determined through the democratic process.").

In sum, most of the existing achievement gap is explained by available socioeconomic measures. As to the portion of the gap that may or may not be explained by socioeconomics, the Court cannot find

that this is related to any discriminatory practice by CMS and cannot identify a cause for which the Court can order a realistic and practical injunction. Therefore, the Court will not delay the finding of unitary status due to racial disparities in student achievement.

### c. Student Discipline

In *Swann*, the Court never made findings and never entered any remedial orders regarding student discipline. The Swann Plaintiffs raise the issue now, however, asserting that black students are overerrepresented in disciplinary matters. Their expert, Dr. Stevens, who has no expertise in the area of student disciplinary procedure, (Tr. 5/12 at 49 (Test. of Dr. Leonard Stevens)), pointed out that "Black pupils in the District are disciplined at rates disproportionate to their presence in the schools." (SX 2 at 27–30 (Stevens Rpt.).) Likewise, CMS accused itself of discrimination. Dr. Peterkin pointed out that, of the 13,206 students disciplined during school years 1995–96 through 1997–98, 66.3% were black and 33.7% were white. (DX 6 Ex. 6a (Peterkin Rpt.).)

Of course, this disparity does not, by itself, constitute discrimination; rather, it is probably due to a disproportionate incidence of infractions committed by black students. This is the most likely explanation given that CMS has a uniform, race-neutral policy of discipline, which, CMS officials say, is applied to all students fairly. (Tr. 5/19 at 137–41 (Test. of Calvin Wallace); Tr. 5/28 at 133–34 (Test. of Ron Thompson).) Notably, any student who is charged with a violation has the right to an appeal and may assert that the charge was due to racial bias. (Tr. 5/19 at 138–41 (Test. of Calvin Wallace).) Regional Assistant Superintendent Calvin Wallace, a long-standing employee of CMS who has been responsible for developing disciplinary guidelines, testified that he was unaware of any students alleging that race played a role in their being punished for a violation. (*Id.* at 141.)

Despite CMS's uniform guidelines, Dr. Peterkin argued that blacks are more likely to face severer penalties than whites who commit the same offense. (DX 6 at 8, Ex. 6c (Peterkin Rpt.); DX 7 7–8, Exs. H 1–1423 (Peterkin Rebuttal Rpt.).) The evidence did not necessarily show this, however. From 1995–96 to 1997–98, blacks accounted for 62% of in-school suspensions and 66% of out-of-school suspensions. These ratios almost exactly mirror the overall suspension rate for blacks, which, as stated above, was 66.3%. (*Compare id.*, Ex. 6a *with id.* Ex. 6c.) The only apparent disproportionality is with the assignment of blacks to management schools. Of the eighty-four students assigned to these schools from 1995–96 to 1997–98, sixty-eight (81%) were black, whereas sixteen (19%) were white. (*Id.* Ex. 6c.) Given that a total of 13,206 students were disciplined during these three years, (*id.* Ex. 6a), it is difficult to conclude that a disparity among eighty-four students constitutes discrimination. Furthermore, the discipline imposed in each case will differ based upon the individual facts and circumstances. A student might be subject to severer penalties, even when the same offense is at issue, due to the egregiousness of the student's conduct or because of a history of repeated offenses. Dr. Peterkin's analysis did not account for these factors. (Tr. 6/18 at 55–67 (Test. of Dr. Robert Peterkin).)

There is little that the Court could do or should do to change the racial disparity in student discipline. As Chief Judge Posner stated: "Racial disciplinary quotas violate equity in its root sense. They entail either systematically overpunishing the innocent or systematically underpunishing the guilty. They place race at war with justice. They teach school children an unedifying lesson of racial entitlements." *People Who Care*, 111 F.3d at 538.

The Court finds that any disparities that exist in the area of discipline are not causally related to the dual system. Given that CMS accuses itself for the disparity, it is

clear that the district is sensitive to the issue. Most importantly, CMS has even-handed disciplinary procedures, and it is expected that students will be disciplined regardless of the effect on racial statistics. The Court therefore will not prolong supervision over CMS due to racial disparities in disciplinary matters.

### 8. Good Faith

■ In determining whether a school board has shown a good faith commitment to a desegregation plan, a district court must consider whether the school board's policies "form a consistent pattern of lawful conduct directed to eliminating earlier violations." *Freeman*, 503 U.S. at 491, 112 S.Ct. at 1446; *see Lockett v. Board of Educ.*, 111 F.3d 839, 843–44 (11th Cir.), *reh'g denied*, 121 F.3d 724 (11th Cir.1997). Without reservation, the Court finds that CMS has demonstrated a good faith commitment to complying with the *Swann* desegregation orders and that there is no concern that CMS will return to an unlawfully segregated school system. The Court bases this conclusion on several findings.

First, since the final order was entered in *Swann* in 1975, the Swann Plaintiffs have never filed a motion for further relief, *see Jenkins v. Missouri*, 967 F.2d 1248, 1251 (8th Cir.1992) ("Monitoring implementation of the remedy is a crucial part of the plaintiffs' function in these cases."), and the Court has never had to enjoin or sanction CMS for noncompliance. In fact, the only sanctions imposed on CMS have been in the current *Capacchione* litigation, where CMS, in its overzealous attempt to keep the desegregation order in place, refused to produce relevant documents in an appropriate manner and improperly concealed the identity of its trial witnesses. (*See* Order of 4123/99 (sanctioning CMS for non-disclosure of trial witnesses); *see also* Order of 9/16/98 (ordering CMS to produce documents and warning that sanc-

tions may be imposed); Order of 10/7/98 (observing CMS's lack of cooperation in releasing information); Order of 11/23/98 (noting that CMS's pretrial tactics were causing "unnecessary obstruction and delay").)

Second, CMS has taken actions that have gone above and beyond what the Court's orders required. To cite just a few examples, CMS has continued to adjust student attendance zones when schools fell out of racial balance, even though imbalances were due to private choices and countervailing demographic forces. *See supra* part II.B.1. CMS also implemented and expanded a magnet school program, which has helped to achieve racial balance in schools where such balance otherwise had been difficult to attain.[45] *See supra* parts I.B and II. B.1. In addition, CMS instituted a minority achievement program, a pre-kindergarten program, and other measures to address concerns over the achievement gap. *See supra* part II.B.7.b.ii. In a similar vein, the school board has attempted to recruit more black teachers so as to provide more minority role models. *See supra* part I1.B.2. While no remedial actions were required in facilities, CMS nevertheless adopted baseline standards to improve the quality of all its facilities. *See supra* part II.B.3. Many other examples undoubtedly exist, but the Court was unlikely to hear any of them from CMS, whose stance in the case was such that it offered no self-congratulatory evidence and strongly objected to anything that shed favorable light on the school system. (*See, e.g.* Tr. 5/27 at 116 (objection by CMS to document references indicating that black students in CMS had outperformed blacks nationally on the SAT).)

Third, CMS regularly sought input from the community on its desegregation efforts. In addition to regular school board meetings held in a public forum, CMS established various citizen advisory com-

---

**45.** In fact, CMS went too far in trying to achieve racial balance in its magnet schools by imposing a prescribed admissions quota that was too inflexible. *See infra* part 11.C.

mittees—such as the Citizens Advisory Group, the Committee of 16, the Committee of 25, the Committee of 33, and the Future School Planning Task Force—to provide suggestions and feedback on school policy. Regardless of whether CMS ultimately adopted specific committee proposals, the board demonstrated its accessibility and openness to criticism and its desire to build community support for integration.

Fourth, CMS routinely reaffirmed its commitment to integration. On September 10, 1991, CMS declared its ambition to be "the premier urban, integrated system in the nation" and incorporated this proclamation into its mission statement. (*See* PX 44 at CM035773 ("Student Assignment Plan: A New Generation of Excellence").) This mission statement has become CMS's mantra. (*See id.;* PX 104 at CM047928 (CMS Facilities Master Plan); PX 30 at CM207953 (CMS Resolution adopted 2/11/92); PX 2 at CM100533 (CMS Resolution adopted 4/12/94).) CMS even passed resolutions supporting integration policies that went beyond the school board's authority. For example, on February 11, 1992, the board unanimously adopted a resolution that advocated the building of "low-moderate income housing" throughout the county. (DX 89 at 6 & attach. (CMS Board Minutes of 2/11/92); Tr. 2/21 at 95–96 (Test. of Arthur Griffin).) On April 12, 1994, the board further resolved to "convene an affordable housing policy task force" to evaluate and recommend housing policy initiatives that promote integrated communities. (PX 2 (CMS Resolution adopted 4/12/94).)

Fifth, blacks have maintained a significant presence on the school board. Currently, four of the nine school board members are black, including the board chairman, Arthur Griffin. (Tr. 6/18 at 72 (Test. of Arthur Griffin).) *Accord Morgan v. Nucci,* 831 F.2d 313, 321 (1st Cir. 1987) ("Minority presence in the power structure is a factor that might be expected to help prevent regression to a dual

system once the court's presence is withdrawn."); *Riddick,* 784 F.2d at 528 (noting that the racial integration of Norfolk's school board made discrimination unlikely). Moreover, white members of the board have consistently voted with black members on policy issues pertaining to integration. (Tr. 4/22 at 19 (Test. of Sharon Bynum).)

Sixth, there has been no evidence of racial animus or discriminatory intent in any school board actions during the thirty years that CMS has been under court order. Even when the Court scolded the board for dragging its feet at the early stages of *Swann,* the Court never questioned "the motives or the judgment of the School Board members." *See Swann,* 300 F.Supp. at 1372. Eventually, the board began to actively support the Court's desegregation plan, and the Court closed the *Swann,* case in 1975, expressing its confidence that the board would remain committed to the plan. *Swann,* 67 F.R.D. at 649–50. One former school board member, who served with some fifteen to twenty board members from 1986 to 1996, stated that every board member she ever worked with was committed to complying with the desegregation order. (Tr. 4/22 at 19 (Test. of Sharon Bynum).) Despite its self-accusatory position in this case, CMS stipulated that, while under court order, it never "acted with 'a racially segregative purpose.'" (Pl.'s Mem. Supp. Mot. Compel filed 8/17/98, Ex. B (CMS's Resp. Interrogs. at 11, no. 11).)

Seventh, while the goal of perfect compliance with court orders has remained elusive, no evidence has been presented that school authorities were guilty of easily correctable errors. Rather, school board members generally testified about the difficulties of reassigning students and building new facilities. (*See, e.g.,* Tr. 4/22 at 51 (Test. of Sharon Bynum).)

These findings are consistent with observations made by Dr. Stolee, the education consultant hired in 1991 to evaluate

and revise CMS's student assignment plan. Stated Dr. Stolee:

> For the last twenty years, the Charlotte–Mecklenberg Board of Education and the Charlotte–Mecklenburg community have, in good faith, complied with the orders of the court.... [A]ll desegregated. Each year adjustments have been made to the pupil assignment plan in order to keep schools "in balance." This task has been complicated by the population growth in the Charlotte–Mecklenburg area, with the concomitant need to build new schools.

> It must be said that the Charlotte–Mecklenburg Board and community have a great deal of pride in the fact that they successfully met a challenge and made the solution work. Schools in other parts of the nation have looked to Charlotte–Mecklenburg as an exemplar. The pride felt and the national respect are well deserved.

(DX 108 at 1–2 (Stolee Plan).)

There can be no serious contention that CMS has been uncommitted to the *Swann* desegregation orders. Arguments to the contrary are wholly unconvincing. One CMS official's unsubstantiated fear that discrimination might reappear in the absence of a court order[46] is no grounds for prolonging court supervision. *Singleton v. Jackson Mun. Separate School Dist.*, 541

F. Supp. 904, 914 (S.D.Miss.1981). Similarly, isolated incidents of racial insensitivity that never were condoned by CMS cannot be a basis for denying unitary status.[47] In fact, the evidence consistently showed that persons involved in such incidents were investigated, reprimanded, suspended, or even fired. (*See, e.g.*, Tr. 5/25 at 192–93, 217–19 (Test. of Teresa Cockerham); Tr. 5/28 at 94–96, 109–10 (Test. of Ron Thompson); Tr. 6/8 at 41–43 (Test. of Eric Smith); Tr. 6/18 at 169–70 (Test. of Arthur Griffin).)

The Court finds that CMS has eliminated the vestiges of past discrimination to the extent practicable and has complied with the Court's orders in good faith for almost thirty years. It is totally unforeseeable that CMS would return to an intentionally-segregative system. Accordingly, the Court declares that CMS has achieved unitary status in all respects and thereby vacates and dissolves all prior injunctive orders from *Swann.*

## H. Constitutional Injuries

It is important to remember that the current litigation started not as a petition for unitary status but as a discrimination suit arising out of Cristina Capacchione's denial of admission to a magnet school based on her race. CMS responded that it was required to use racial criteria in the

---

**46.** Associate Superintendent Purser expressed such fear in her cross-examination:
> Q. But you think that if suddenly the Court declares the school system unitary, that all of those things that you have done are going to drop off, is that what you are telling this Judge?
> A. Yes, I think there would be a difference....

> · · · · ·

> Q. So, ma'am, this school system's commitment to enhancing the educational opportunities of black students and increasing their academic achievement is something that this administration and this School Board is going to make sure happens regardless of what happens in this case, isn't it?
> A. Yes, this School Board will in fact be focused. But again, the School Board will

change, superintendents will change, the people involved in this organization will change.
> Q. But you don't know what any future School Board or administration will do either way, do you?
> A. That's exactly my point.
> (Tr. 6/14 at 98–101 (Test. of Susan Purser).)

**47.** While the law of employment discrimination under Title VII is inapplicable to this case, an instructive principle from that context is that no racially discriminatory intent can be established by "stray remarks and isolated statements by those unconnected to the final decision-making process." *See Bodoy v. North Arundel Hosp.*, 945 F.Supp. 890, 895 (D.Md.1996), *aff'd*, 112 F.3d 508 (4th Cir.1997).

school's admissions program based on the *Swann* desegregation orders. As such, CMS argues that it cannot be held liable for actions taken pursuant to a court order. CMS further argues that its race-based policies are constitutionally permissible under the theory that achieving diversity is a compelling state interest. The Plaintiff–Intervenors counter that CMS cannot use the *Swann* orders as a defense because the system has been *de facto* unitary for years. Additionally, the Plaintiff–Intervenors argue that various race-based policies instituted by CMS are unconstitutional because they are not narrowly tailored.

### 1. Immunity under the *Swann* Orders

██ ██ Public officials acting pursuant to court directives are immune from liability for damages in a suit challenging the prescribed conduct. *Wolfe v. City of Pittsburgh,* 140 F.3d 236, 240 (3d Cir.1998). Up until this ruling, CMS was still under court order. The Court finds no legal basis for a finding of *de facto* unitary status that would abrogate CMS's immunity retroactively. In other words, the termination of court supervision today cannot "relate back" to an earlier time. The relinquishment of court supervision in a desegregation case must be clear and unambiguous. *Dowell,* 498 U.S. at 246, 111 S.Ct. at 636. As stated in *Dowell:* "[A] school board is entitled to a rather precise statement of its obligations under a desegregation decree. If such a decree is to be terminated or dissolved, . . . the school board [is] entitled to a like statement from the court." *Id.* (citing *Spangler,* 427 U.S. 424, 96 S.Ct. 2697). Here even though the *Swann* case was closed in 1975 and remained inactive for over twenty years, jurisdiction was expressly retained, *Swann,* 67 *F.R.D.* at 649; *Martin,* 475 F.Supp. at 1341, and CMS continued to act as if it were under court order. Consequently, CMS enjoys immunity from liability for any actions it took consistent with the Court's injunction.

This immunity has limits, however. CMS cannot enjoy immunity for *ultra vires* acts—that is, acts that are beyond the scope of the Court's mandate and that are not otherwise constitutionally authorized. As discussed above, the Supreme Court's decision in *Swann* recognized the limits of how race could be considered in crafting a desegregation order. *See supra* part II.A. In addition, the development of equal protection jurisprudence since *Swann* has further crystallized the limitations to which state actors must adhere when enacting race-based remedial policies. *See supra* part II.A. Thus, contrary to CMS's position in this case, the *Swann* desegregation order was not a license to pervade every aspect of school operations with an ever-expansive array of race-based policies. *See People Who Care,* 111 F.3d at 534 ("[A desegregation] remedy must be tailored to the violation, rather than the violation being a pretext for the remedy. Violations of law must be dealt with firmly, but not used to launch . . . ambitious schemes of social engineering.").

Given the potential misuse of race-conscious remedies and the plausible inadequacies of injunctive relief, it is conceivable that certain school board actions could open the door to liability for legal damages. For instance, involuntary busing that is so unreasonably long that it jeopardizes the health, safety, or educational experience of schoolchildren (of any race), coupled with a school system's refusal to make reasonable accommodations or provide reasonable alternatives, is the sort of unauthorized act that, in the most extreme cases, could give rise to liability. *See Swann,* 402 U.S. at 30–31, 91 S.Ct. at 1283 ("An objection to transportation of students may have validity when the time or distance of travel is so great as to either risk the health of the children or significantly impinge on the educational process."); *see also Washington v. Seattle School Dist. No. 1,* 458 U.S. 457, 492 n. 6, 102 S.Ct. 3187, 3206 n. 6, 73 L.Ed.2d 896

(1982) (Powell, J., dissenting) ("Extensive pupil transportation may threaten liberty or privacy interests." (citations omitted)); cf. 20 U.S.C. § 1714 (1999) (prohibiting busing when it adversely affects students' health and educational experience). The evidence did not present such a situation here.

An area of liability that is, however, at issue in this case is the use of rigid racial quotas. One of the most basic tenets underlying *Swann* was that the use of mathematical ratios in desegregation plans could be used as a "starting point" but could not be used as an "inflexible requirement." *Swann*, 402 U.S. at 25, 91 S.Ct. at 1280. Of course, if Judge McMillan had mandated the use of inflexible quotas, CMS could not be held liable, even though the Court's order would have been unconstitutional. *See Turney v. O'Toole*, 898 F.2d 1470, 1472–73 (10th Cir.1990) ("[O]fficials charged with the duty of executing a facially valid court order enjoy absolute immunity from liability for damages in a suit challenging conduct prescribed in that order. .... 'Facially valid' does not mean 'lawful.' An erroneous order can be valid." (citations and brackets omitted)). Judge McMillan, however, firmly rejected the use of rigid racial quotas, *see Swann*, 306 F.Supp. at 1312 ("Fixed ratios of pupils in particular schools will not be set."), and always allowed for flexibility in the use of racial balancing goals. *See, e.g., Swann*, 311 F.Supp. at 268 (stating that "variations from [the] norm may be unavoidable" and crafting guidelines with elastic terms, such as "approximately" and "about the same proportion"). CMS ran the risk of exposure to liability when, in instituting its magnet program without seeking judicial approval, it implemented a new regime of rigid race-based assignment procedures.

 A school board that is under a desegregation order is not barred from ever modifying a desegregation plan, but, prior to making substantial changes, the board is expected to seek approval from the supervising court. *Riddick*, 784 F.2d at 535. Thus, in *Swann* the Court left "maximum discretion in the Board to choose methods that will accomplish the required results"[48] but the Court also "directed that leave of court be obtained before making any material departure from any specific requirement." 311 F.Supp. at 270. Dr. Stolee recognized this obligation when he drafted the proposed magnet plan in 1992. (DX 108 at 9 (Stolee Plan).) Of the forty-four recommendations he made to CMS in that plan, "RECOMMENDATION #1" read: "THE SCHOOL BOARD, THROUGH LEGAL COUNSEL, SHOULD APPROACH THE FEDERAL COURT TO SECURE APPROVAL TO CHANGE THE COURT-ORDERED DESEGREGATION PLAN." (*Id.* at 9,606–8 (caps in original).) The board ignored this advice.

CMS now maintains that magnets schools are permissible under the existing *Swann* orders and, particularly, under the provision for "optional schools" in the 1974 CAG Plan. 379 F.Supp. at 1104. The Court acknowledges that a magnet school can be an acceptable desegregation tool. *See, e.g., Milliken*, 433 U.S. at 272, 97 S.Ct. at 2753. The Court also acknowledges that the optional schools of the 1970s, similar to today's magnet schools, involved countywide open enrollment and a racial balancing target. *Id.* Nonetheless, the way that CMS's magnet program uses race in its admissions process is significantly different from any assignment policy ordered or approved of in *Swann*.[49]

---

48. Just because the Court gave CMS "maximum discretion" does not mean that the Court should allow an abuse of discretion. "[T]he *Brown* Court made it abundantly clear that constitutional principles cannot take a back seat to the discretion of local school officials in respect to matters such as the racial composition of student bodies." *Wessmann*, 160 F.3d at 797 n. 3.

49. Furthermore, magnets differ from optional schools in that magnets offer specialized curricula and thereby convey to a subset of students a benefit above and beyond the regular academic program. (*See* PX 43 (CMS Magnet

This change in the student assignment process was a material departure from the *Swann* orders. Ultimately, however, what is important is not whether CMS departed from the desegregation order, but whether CMS departed from the order in a way that harmed someone's rights. *Cf. Dowell,* 498 U.S. at 249–50 n. 1, 111 S.Ct. at 638 n.1.

## 2. The Magnet School Admissions Policy

 CMS's magnet school admissions policy has never been subject to judicial review or approval. The use of racial criteria in this process is constitutionally suspect, so the Court reviews the admissions policy under a strict scrutiny analysis. *See Adarand,* 515 U.S. at 215–16, 115 S.Ct. at 2107 (holding that strict scrutiny applies to all racial classifications). This analysis provides that racial classifications are constitutional only if they further compelling governmental interests and are narrowly tailored measures. *Id.* at 227, 115 S.Ct. at 2113.

That the magnet admissions process uses racial classifications is clear. At the start of the process, CMS first fills seats with preferences based on whether the applicant lives in close proximity to the school and whether the applicant has any siblings in the school. (PX 53 (1997–98 Magnet Application Process); PX 44 at CM035759 (1992 Student Assignment Plan).) CMS then fills the remaining seats by selecting students from a black lottery and a non-black lottery until the precise racial balance is achieved. (PX 53 (1997–98 Magnet Application Process); Tr. 4/27 at 164–65 (Test. of David Wells).)

As stated in the 1992 student assignment plan: "Spaces in magnet schools will be allocated to a percentage of black students that equals the system-wide percentage of black students. Grade levels will maintain racial balance." (PX 44 at CM035757 (1992 Student Assignment Plan).) The policy further states:

Racial balance will be maintained and applicants on a waiting list will only be admitted if the 40%/60% racial balance can be maintained. If there are insufficient applications to fill the program and create the appropriate racial balance, racial balance will be allowed to fluctuate, but *slots reserved for one race will not be filled by students of another race.*

(*Id.* at CM035760 (emphasis added); PX 8 at CM007233 (Mem. from Schiller to the Board of 11/4/99).) As likewise explained in a memorandum by Dr. Stolee to then-Superintendent Murphy: "Each magnet school should enroll a student body of 60% white and 40% black. If one race were to be underenrolled, *the other race should not be permitted to fill the vacant slots.*" (SX 56 at CMI01611 (Mem. from Dr. Stolee to Dr. Murphy of 6/11/92) (emphasis added).)

CMS has argued that because the admissions process involves other criteria besides race, namely, proximity and sibling preferences, it cannot be deemed a racial quota. Similar semantics regarding the race-based admissions policy of the Boston Latin School were rejected by the First Circuit:

At a certain point in its application process ... the Policy relies on race and ethnicity, and nothing else, to select a subset of entrants. Thus, whether the Policy is truly a quota or whether it is best described otherwise is entirely irrelevant for the purpose of equal protection analysis. Attractive labeling cannot alter the fact that any program which

Options 1998–99).) in this way, the case at bar is distinguishable from the 1979 *Martin* case. *See supra* part I.B. In *Martin,* the Court rejected a challenge based on *Bakke* to CMS's race-conscious reassignment of students because, under that reassignment, all students were guaranteed admission into schools of equal quality; the question was simply where.

*Martin,* 475 F.Supp. at 1321. Here, the magnet school program, as advertised by CMS, provides special benefits. (PX 43 (CMS Magnet Options 1998–99).) Thus, contrary to the situation in *Martin* students are being denied "opportunities or benefits enjoyed by others solely because of [ ] race." *Bakke,* 438 U.S. at 305, 98 S.Ct. at 2756.

induces schools to grant preferences based on race and ethnicity is constitutionally suspect.

*Wessmann,* 160 F.3d at 794; *see also Bakke,* 438 U.S. at 289, 98 S. Ct. at 2747 (observing that regardless of whether the limitation at issue was "described as a quota or a goal," it was "a line drawn on the basis of race and ethnic status.").

In policy and in practice, the 60–40 racial requirement is an inflexible quota. In the case of Olde Providence School, where Cristina Capacchione applied to kindergarten for the 1996–97 school year, 104 seats were available for the incoming class; 42 of those seats were reserved for blacks, and 62 seats were reserved for non-blacks. (DX 273 (1996–97 Magnet Seats for Olde Providence); Tr. 6/14 at 67 (Test. of Susan Purser).) CMS received magnet applications for the 1996–97 school year in the early months of 1996. (Tr. 6/14 at 67 (Test. of Susan Purser); *see* PX 53 (Magnet Application Process.) After granting proximity and sibling preferences, 47 seats remained available: 26 black seats and 21 non-black seats. (DX 273 (1996–97 Magnet Seats for Olde Providence); Tr. 6/14 at 67, 173 (Test. of Susan Purser).) Then, in April 1996, CMS selected students from the black and non-black lotteries. (Tr. 6/14 at 67 (Test. of Susan Purser). The dual lottery managed to fill every non-black seat at Olde Providence and all but two black seats. (Id.)

While all blacks who applied to Olde Providence were admitted, more than a hundred non-blacks were placed on a waiting list.[50] (*Id.* at 178; PX 61 (1996–97 Magnet Waiting Lists).) Rather than fill the two black vacancies with wait-listed applicants—which would have resulted in a student body well within the court-ordered racial balancing guidelines—CMS continued to actively recruit black applicants and even sought late applications on into and through the summer. (Tr. 6/14 at 174 (Test. of Susan Purser).) As the school year began in the fall, Olde Providence finally filled the last two vacancies, and the kindergarten class consisted of 41 blacks (39.4%) and 63 non-blacks (60.6%). (*Id.* at 77; Tr. 4/27 at 164–66 (Test. of Jonathan Wells); PX 64 (1996–97 Magnet Enrollment).) In this instance, Olde Providence deviated from official CMS policy; a non-black applicant received a black seat. In other magnet programs, however, where the admissions policy was strictly enforced, it was not uncommon for the school year to begin with seats remaining vacant because to admit students of one race would disrupt the desired racial balance. (Tr. at 4/27 at 164–66 (Test. of Jonathan Wells); Tr. 6/14 at 174–77, 195 (Test. of Susan Purser); PX 43 (CMS Magnet Options 1998–99); PX 56 (Mem. from Henry to Smith of 10/I/96); PX 61 (1996–97 Magnet Waiting Lists); PX 63 (Magnet School Vacancies).)

Because CMS was still under court order when it implemented this procedure,

**50.** CMS argues that Cristina's lottery number was high enough that she would not have obtained admission to Olde Providence even if race were not considered. (Tr. 6/14 at 68–69 (Test. of Susan Purser).) Likewise, Benjamin Gavreau, a child of one of the Plaintiff-Intervenors, had a lottery number that was too high to obtain admission at his magnet school of choice, Davidson IB, even if race were not considered. (Id. at 72.) This is not the proper standard for analyzing an equal protection violation. As stated by the Supreme Court in *Northeastern Fla. Chapter of the Associated Gen. Contractors of Am. v. City of Jacksonville,* 508 U.S. 656, 666, 113 S.Ct. 2297, 2303, 124 L.Ed.2d 586 (1993):

When the government erects a barrier that makes it more difficult for members of one group to obtain a benefit than it is for members of another group, a member of the former group seeking to challenge the barrier need not allege that he would have obtained the benefit but for the barrier in order to establish standing. The 'injury in fact' in an equal protection case of this variety is the denial of equal treatment resulting from the imposition of the barrier, not the ultimate inability to obtain the benefit.

*See also Bakke,* 438 U.S. at 280–81 n. 14, 98 S.Ct. at 2743 n. 14 ("[E]ven if Bakke had been unable to prove that he would have been admitted in the absence of the special program, it would not follow that he lacked standing.").

the Court accepts that the school system was acting to further a compelling governmental interest, i.e., remedying the effects of past racial discrimination. CMS's alternative theory, that it has a compelling governmental interest in pursuing racial diversity, is therefore irrelevant. The Court notes, however, that a growing number of circuit courts have held, based on recent Supreme Court precedent, that diversity is never a compelling governmental interest, *Lutheran Church–Mo. Synod v. FCC*, 141 F.3d 344, 354 (D.C.Cir.1998); *Hopwood*, 78 F.3d at 948, and other courts have soundly rejected the diversity rationale based on the facts before them. *Wessmann*, 160 F.3d at 795–800, *Hayes*, 10 F.3d at 213.

In reviewing whether the magnet admissions procedure is narrowly tailored, the Court considers factors such as: (1) the necessity of the policy; (2) the flexibility of the policy, including the availability of waiver provisions; (3) the relationship of the numerical goal to the relevant population; (4) the burden of the policy on innocent third parties; and (5) the duration of the policy. *United States v. Paradise*, 480 U.S. 149, 171, 107 S.Ct. 1053, 1066, 94 L.Ed.2d 203 (1987) (plurality opinion); *Middleton v. City of Flint*, 92 F.3d 396, 409 (6th Cir.1996), *cert. denied*, 520 U.S. 1196, 117 S.Ct. 1552, 137 L.Ed.2d 700 (1997); *Hayes*, 10 F.3d at 216.

As to the necessity of the magnet admissions policy, the Court observes that CMS never was required to implement the procedure in question, and, in fact, the procedure goes far afield from the guidelines set forth in *Swann*. 402 U.S. at 22–25, 91 S.Ct. at 1279–81. Contrary to the Supreme Court's admonition in *Swann*, CMS is using mathematical ratios not as a "starting point" but as an "ending point." *Id*. at 25, 91 S.Ct. at 1280. CMS unreasonably prohibits any variance from the 60–40 reservation of magnet seats by race. The result is that children are being denied the special benefits offered by magnet programs based solely on their race. This denial of equal footing occurs even where seats are available and where racial balancing goals under the desegregation order would not be affected.

It was especially unnecessary for CMS, after twenty years of operating under a desegregation order, to institute racial policies that were even more race conscious than what were originally ordered. *See Detroit Police Officers Ass'n v. Young*, 989 F.2d 225, 228 (6th Cir.1993) (holding that the same affirmative action program that had been upheld in the 1970s was no longer narrowly tailored or required to serve a compelling state interest because circumstances had changed over two decades). The Court originally sought to desegregate schools by assigning students based on the racial compositions of geographic zones. By comparison, the magnet admissions process focuses primarily on individual students' racial identities.

The inflexibility of the magnet admissions policy is particularly troubling. The Court is hard-pressed to find a more restrictive means of using race than a process that results in holding seats vacant while long waiting lists full of eager applicants are virtually ignored. At the very least, the admissions policy should have contained a waiver provision to overcome this inflexibility. *Paradise*, 480 U.S. at 177–78, 107 S.Ct. at 1070. The Court also notes that flexibility is not demonstrated by the fact that some of the magnet programs deviate from a precise 60–40 ratio. The issue is not whether the racial classification produces a consistent outcome; the issue is whether the set-aside unjustifiably curtails the rights of others. *Wessmann*, 160 F.3d at 794. Thus, the fact that the magnet admissions policy allows for racial balance to "fluctuate" does not cure the fact that "slots reserved for one race will not be filled by students of another race." (PX 44 at CM035757 (1992 Student Assignment Plan).)

While the 60–40 numerical goal is related to the relevant population, i.e., the racial composition of schoolchildren in CMS,

some consideration should have been given to the practicability of achieving this precise ratio in every magnet school. The Court notes that the system has one exception to the 60–40 target: Davidson IB, which has a 75% non–black—25% black enrollment requirement. (Tr. 5/19 at 86–88 (Test. of Calvin Wallace).) Davidson IB is excepted, presumably, because it is located in the northernmost area of the county, where achieving a 6040 ratio is impracticable. This 75–25 ratio is still well within the requirement of the 1974 CAG Plan that the black populations at optional schools be "at or above approximately 20%." *Swann*, 379 F.Supp. at 1108.

With regard to the burdens placed on third parties, the families with children placed on a waiting list must wait for months without knowing where their children eventually will be placed. Parents need to make accommodations regarding their child's education far in advance. It is unfair to allow this type of delay when, as discussed above, the strict adherence to a 60–40 ratio is wholly unnecessary. *See People Who Care*, 111 F.3d at 534 ("Children, the most innocent of the innocent persons brushed by draconian decrees, should not be made subjects of utopian projects.").

Finally, the 1992 magnet plan made no mention of the duration that CMS would use racially segregated lotteries, vacancies, and waiting lists. The temporal scope is important because preferences may remain in effect only so long as necessary to remedy the discrimination at which they are aimed; they may not take on a life of their own. *Paradise*, 480 U.S. at 178–79, 107 S.Ct. at 1070.

In sum, the Court finds that the magnet school admissions policy is not properly tailored. In fact, there is no reasonable basis for the rigid set-asides. Essentially, CMS is "standing in the schoolhouse door" and turning students away from its magnet programs based on race, which is inconsistent with the movement towards race neutrality envisioned in *Brown I*.

### 3. Nominal Damages

As the Court already ruled out an award of actual damages, (Order of 5/28/99 at 1), CMS shall be held nominally liable in the amount of one dollar. The rationale for awarding nominal damages is that federal courts should provide some marginal vindication when a constitutional violation occurs, even if the injury is not measurably compensable. *Price*, 93 F.3d at 1246. Here, the award of nominal damages serves to vindicate the constitutional rights of children denied an equal footing in applying to magnet schools.

### D. Injunctive Relief

Upon a declaration of ·unitary status, a district court must relinquish jurisdiction over a school system and restore control to state and local authorities. *Freeman*, 503 U.S. at 489, 112 S.Ct. at 1445. Notwithstanding the relinquishment of jurisdiction, courts that have dissolved desegregation orders simultaneously have entered "permanent injunctions" to the effect that the school system shall not intentionally segregate students and shall comply with the commands of the Fourteenth Amendment. *Wessmann*, 160 F.3d at 800–01; *cf. Dowell*, 498 U.S. at 250, 111 S.Ct. at 638 ("A school district which has been released from an injunction ... of course remains subject to the mandate of the Equal Protection Clause."). Such an injunction operates as a negative injunction rather than a requirement of affirmative action because a school system that has achieved unitary status has satisfied the mandate of *Green* and therefore has no more affirmative obligation to actively desegregate. *Wessmann*, 160 F.3d at 801; *Riddick*, 784 F.2d at 534–39. Indeed, once a school system is declared unitary, the remedial justification for using race-conscious policies is gone, and the district must reevaluate any continuing use of race in school policy. *See Keyes*, 902 F.Supp. at 1282–86 (declaring a school system unitary and cautioning that, "[i]n the future, the District's use of race

... will be subject to the constitutional limitations articulated by the Supreme Court in recent opinions, including *Adarand....*, and the requirements of applicable state and federal statutes").

In conjunction with their request for a unitary status declaration, the Plaintiff–Intervenors seek an injunction barring CMS from assigning students or otherwise allocating benefits to students based on race. In their post-trial briefing, the Plaintiff–Intervenors suggested that CMS should report to the Court to confirm that all race-based policies throughout the system have been terminated and to describe and provide justification for any such policy that CMS seeks to maintain. (Pl.-Intervenors' Proposed Findings of Fact and Conclusions of Law at 110.) The Court believes that such administrative entanglement would be inconsistent with the relinquishment of court supervision. For similar reasons, the Court will not demand clearance of any future student assignment plans prior to implementation. See *Dowell*, 498 U.S. at 250, 111 S.Ct. at 638 (stating that, when courts return control to local authorities, those school systems "no longer require[ ] court authorization for the promulgation of policies and rules regulating matters such as assignment of students and the like.").

On the other hand, the Court is not precluded from granting injunctive relief as to the underlying § 1983 action. *See Evans v. Harnett County Bd. of Educ.*, 684 F.2d 304, 306 (4th Cir.1982) (holding that the district court committed clear error in failing to grant the plaintiff's requested injunctive relief under § 1983 because the court found an underlying constitutional violation and there was a possibility of prospective harm to others). As set forth above, the Court found that CMS's magnet school admissions policy went beyond constitutionally permissible bounds because it was not narrowly tailored and was not within the guidelines of the desegregation plan. *See supra* part II.C.2. Given that CMS now has achieved unitary status, the magnet admissions process is a *fortiori* unconstitutional. The additional problem is that, in a non-remedial, unitary status setting, the use of race in the admissions process does not further a compelling governmental interest.

█ CMS offers its "diversity" rationale as a justification for using race, but, as stated above, the emerging consensus is that achieving diversity is not a proper grounds for race-conscious action. *See supra* part II.C.2. CMS offered the testimony of a few lay witnesses to state for the record that racial diversity in classrooms is needed because as society becomes more racially heterogeneous, students must learn to communicate and cooperate with people of different backgrounds. (Tr. 6/9 at 7–14 (Test. of Ed Crutchfield); Tr. 6/17 at 63–70 (Test. of Jackie Fishman); Tr. 6/16 at 185–94 (Test. of James Woodward).) While the bases offered for this testimony were vague and inconclusive,[51] the Court accepts that children may derive benefits from encounters with students of different races. Nevertheless, a major problem with the single-minded focus on racial diversity is that it produces diversity in nothing but race. Children are not viewed as individual students but as cogs in a social experimentation machine.

In *Wessmann*, the First Circuit addressed the diversity justification in the public school context. 160 F.3d at 796–800. There, the court held that a student assignment policy that reserved school

---

**51.** For example, CMS called Ed Crutchfield, CEO of First Union Bank, to testify that employees enter the workplace with a handicap if they attended schools that are all or virtually one race. (Tr. 6/9 at 12–14 (Test. of Ed Crutchfield).) Yet, Crutchfield also testified that employees who attended historically black colleges are not limited in their poten-

tial for success. (*Id.* at 19.) Similarly, Jackie Fishman, a CMS teacher, testified that racial diversity in essential to having meaningful discussions in the classroom, but her basis for making such a statement was limited because she had never taught a class that was racially homogeneous. (Tr. 6/17 at 71–73 (Test. of Jackie Fishman).)

seats based on race was not justified in the name of achieving diversity. *Id.* at 800. In so holding, the court rejected a similar litany of generalizations lauding the benefits of racial diversity. Stated the court: "[T]he potential for harmful consequences prevents us from succumbing to good intentions. The Policy is, at bottom, a mechanism for racial balancing—and placing our imprimatur on racial balancing risks setting a precedent that is both dangerous to our democratic ideals and almost always constitutionally forbidden." *Id.* at 799 (citing *Freeman,* 503 U.S. at 494, 112 S.Ct. at 1447; *Croson,* 488 U.S. at 507, 109 S.Ct. at 729); *see also Metro Broadcasting,* 497 U.S. at 602, 110 S.Ct. at 3029 (O'Connor, J., dissenting) ("Social scientists may debate how peoples' thoughts and behavior reflect their background, but the Constitution provides that the Government may not allocate benefits and burdens among individuals based on the assumption that race or ethnicity determines how they act or think.").

In the present case, the Court finds that CMS's pursuit of diversity is likewise nothing more than a means for racial balancing. In addition, the Court finds that CMS's desire to use racial student assignments for diversity purposes suffers from the same fatal defect recognized with regard to the "role model theory" in *Wygant v. Jackson Bd. of Educ.,* "no logical stopping point." 476 U.S. 267, 275, 106 S.Ct. 1842, 1847,90 L.Ed.2d 260 (1986) (plurality opinion); *see also* Douglas W. Kmiec & Stephen B. Presser, *The American Constitutional Order History Cases and Philosophy* 1270–73 (1998) (observing that diversity as a rationale for racial preferences in public education appears to have been ruled off-limits, in part because its rationale applies in perpetuity).

Because, in a unitary setting, the magnet school admissions process cannot clear the first hurdle of strict scrutiny by showing a compelling governmental interest, the Court enjoins CMS from any further use of race-based lotteries, preferences, and set-asides in student assignment.[52] Absent a constitutionally permissible remedial justification, CMS shall not foreclose students from consideration for admission into certain schools or educational programs simply because of their racial or ethnic category.

### E. Attorneys Fees

██ A prevailing party in a case brought under federal civil rights law is entitled to recover his or her reasonable attorneys' fees and expert witness fees. 42 U.S.C. § 1988(b)-(c) (1999); *Hensley v. Eckerhart,* 461 U.S. 424, 429, 103 S.Ct. 1933, 1937, 76 L.Ed.2d 40 (1983). The awarding of attorneys' fees to a prevailing party is particularly appropriate in a school desegregation case.[53] *Jenkins,* 967 F.2d at 1251; *Swann,* 66 F.R.D. at 484.

██ In the present case, the Plaintiff-Intervenors prevailed after taking on the extraordinary burden of proving that CMS had achieved unitary status. This task was particularly challenging given that CMS was the party with the most ready access to the voluminous information on the issues before the Court. Moreover, the Court had to intervene in several discovery matters due to CMS's refusal to produce documents and identify witnesses. (*See* Order of 9/16/98 (ordering CMS to produce documents with warning of sanctions); Order of 10/7/98 (observing CMS's lack of cooperation in releasing information); Order of 11/23/98 (noting that CMS's pretrial tactics were causing "unnecessary obstruction and delay"); Order

---

**52.** In the interest of stability, this injunction shall not affect assignments for the 1999–2000 school year that are already in place at the time of this order.

**53.** The Swann Plaintiffs have acknowledged this point repeatedly. (Swann Pl.'s Trial Brf. at 26; Swann Pl.'s Supplemental Br. on Damages at 2; Swann Pl.'s Mot. Directed Verdict at 20.)

of 4/23/99 (sanctioning CMS for improperly concealing trial witnesses).)

The Court also considers the public interest involved. Prevailing third-party intervenors, similar to prevailing desegregation plaintiffs, should be compensated for their monumental efforts in keeping a school system in compliance with the Constitution. As noted by the Second Circuit in a similar case: "An open-ended remedial regime, in combination with a potentially collusive alignment of parties, can create a troubling dynamic." *City of Yonkers,* 181 F.3d 301, 317. In such circumstances, there is a danger that a school system might overextend its use of race-based remedies in a constitutionally impermissible way unless a third party intervenes. Given the tremendous expense of mounting such a challenge, intervening parties would be at a considerable disadvantage if they were barred from collecting fees after successfully litigating the suit. Of course, if the intervenors' challenge to continued court supervision was "frivolous, unreasonable, or without foundation," they would end up paying the attorneys' fees of the plaintiffs responsible for monitoring a desegregation plan. *Jenkins,* 967 F.2d at 1250 (citing *Independent Fed'n of Flight Attendants v. Zipes,* 491 U.S. 754, 761, 109 S.Ct. 2732, 2736, 105 L.Ed.2d 639 (1989)).

The Court finds that the Plaintiff–Intervenors are the prevailing parties in this litigation and are therefore entitled to reasonable attorneys' fees, expert fees, and costs. *See Texas Teachers Ass'n v. Garland School Dist.,* 489 U.S. 782, 791, 109 S.Ct. 1486, 1493, 103 L.Ed.2d 866 (1989) ("A prevailing party must be one who has succeeded on any significant claim affording it some of the relief sought."). Plaintiff–Intervenors shall submit to the Court a list of their reasonable fees and costs within thirty days from entry of this Order. CMS will be given an opportunity to raise any objections before these fees and costs are taxed.

## CONCLUSION

Federal court supervision is invoked in desegregation cases to ensure "equal racial access to schools, not access to racially equal schools." *Freeman,* 503 U.S. at 503, 112 S.Ct. at 1452 (Scalia, J., concurring); *cf. Swann,* 402 U.S. at 24, 91 S.Ct. at 1280 (rejecting "as a matter of substantive constitutional right" any guarantee of racial balance in schools). Too often, as was illustrated here, this concept has gotten lost in a numbers game of non-remedial racial balancing goals. Ultimately, a unitary status determination hinges on whether a school system has remedied a past constitutional violation. *Freeman,* 503 U.S. at 489, 112 S.Ct. at 1445. The Court finds that CMS fulfilled this purpose quite some time ago.

It is likewise improper for a district court or a school board to prolong the life of a desegregation order by using it as a pretext for launching institutional reforms unrelated to dismantling a dual system. CMS faces a Sysiphean challenge in assigning and educating students. In the absence of any remedial necessity, the Court will not add to that conundrum by requiring additional affirmative obligations that address socioeconomic concerns or societal discrimination. It is telling that CMS's current superintendent was unable to articulate any benefit from continued active court supervision. (Tr. 6/8 at 89–92, 148–50 (Test. of Eric Smith).) In fact, he stated that CMS was aggressively attacking many problems and that it would be best for the Court to stay out of the way. (*Id.*) The Court will take the superintendent at his word.

To summarize, on the basis of the record in this consolidated action, the Court makes the following findings and conclusions:

1. CMS has eliminated, to the extent practicable, the vestiges of past discrimination in the traditional areas of school operations—student assignment, faculty assignment, facilities, transportation, staff, and extra-

curricular activities—and no vestiges are found in the ancillary areas of teacher quality, student achievement, and student discipline.

2. CMS has complied in good faith with the desegregation orders since the close of *Swann*, and there is no indication that CMS will return to a de jure segregated system in the future.

3. CMS has achieved unitary status in all respects; therefore, all prior injunctive orders from *Swann* are vacated and dissolved.

4. In pursuing racial balance, CMS's magnet school admissions process went beyond the scope of the *Swann* orders and included an inflexible racial assignment provision that was not narrowly tailored.

5. The Plaintiff–Intervenors are not entitled to an award of actual damages, but, given that the magnet school admissions policy was found to violate the Equal Protection Clause, CMS is nominally liable to the Plaintiff–Intervenors in the amount of one dollar ($1.00).

6. CMS is enjoined from assigning children to schools or allocating educational opportunities and benefits through race-based lotteries, preferences, set-asides, or other means that deny students an equal footing based on race.

7. The Court finds that the Plaintiff–Intervenors are the prevailing parties in this litigation and are therefore entitled to reasonable attorneys' fees, expert fees, and costs.

**IT IS SO ORDERED.**